MABGDEN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          20 Cr. 623 (JSR)

5   WILLIE DENNIS,

6                                          Trial

7              Defendant.

    ------------------------------x

8
                                           New York, N.Y.
9                                          October 11, 2022
                                           11:30 a.m.
10

11  Before:

12                      HON. JED S. RAKOFF,

13                                         District Judge
                                            and a Jury
14
                             APPEARANCES
15
    DAMIAN WILLIAMS
16       United States Attorney for the
         Southern District of New York
17  SARAH KUSHNER
    STEPHANIE SIMON
18  KIMBERLY RAVENER
         Assistant United States Attorney
19
    WILLIE DENNIS, Pro Se
20
    Also Present:
21
    Colleen Geier, Paralegal
22  Elisabeth Wheeler, FBI
    Elizabeth Caruso, Interpreter (Spanish)
23  Elizabeth Ilaakostos, Interpreter (Spanish)

24

25

MABGDEN1

```
 1              (In open court; jury not present)
 2              THE COURT:  This is United States v. Dennis.
 3              Counsel for the government please identify themselves.
 4              MS. KUSHNER:  Good morning, your Honor.  Sarah
 5    Kushner, Stephanie Simon and Kimberly Ravener on behalf of the
 6    government.  And also at counsel table is also FBI Special
 7    Agent Elisabeth Wheeler.
 8              THE COURT:  Good morning.  So it is now 11:25.
 9    Mr. Dennis was informed in our last conference on the record
10    that this matter would begin promptly at 11:15.  He is not yet
11    here.  We will wait a reasonable amount of time.  But if he
12    doesn't show, of course, we'll need to take appropriate action,
13    but let's see what happens.
14              What was the last contact that anyone at government
15    table had with Mr. Dennis?
16              MR. DENNIS:  He emailed the government this morning
17    asking for the courtroom address.
18              THE COURT:  When was that, approximately?
19              MR. DENNIS:  It was approximately an hour ago.  And we
20    responded right away.
21              THE COURT:  All right.
22              THE DEPUTY CLERK:  Does he have the courtroom number?
23              MR. DENNIS:  It was an hour and a half ago, closer to
24    two hours.  And we and your law clerk provided the address.
25              THE COURT:  I hope it won't be necessary, but has the
```

MABGDEN1

1    government now prepared a bench warrant?

2            MS. SIMON:  We're working on it, your Honor.

3            (Pause)

4            LAW CLERK:  We just got an email from Mr. Dennis.  It

5    says, I'm a little delayed.  I expect to be at the courthouse

6    in the next 15 minutes.

7            So that would be by 11:45 a.m.

8            (Pause)

9            THE COURT:  Where do we stand on that bench warrant?

10           MS. SIMON:  It's being prepared by our office now.

11   And with the Court's permission, we would submit it by email.

12   Would that be possible?

13           THE COURT:  Yes, that's possible.  But this normally

14   would take, on a slow day, about two minutes to prepare.

15           MS. SIMON:  We're having some connectivity issues here

16   in the courtroom, your Honor.  And that's why someone back in

17   our office is preparing it.

18           THE COURT:  Have you ever heard of the telephone?  Who

19   is it you want to reach?

20           MS. SIMON:  They are already preparing it.

21           THE COURT:  You just tell them that I want it here in

22   five minutes or less.

23           MS. SIMON:  Yes, your Honor.

24           Would your Honor like us to send it to the chambers

25   address or to Mr. Kern?

MABGDEN1

1            THE COURT:  Send it to Mr. Kern.

2            MS. SIMON:  We just sent it to you.

3            THE COURT:  So I will give the signed arrest warrant

4    to the government.  It is now 11:45, so it's a half hour since

5    Mr. Dennis was supposed to appear.  My law clerk said he sent

6    an email saying he would be here at approximately 11:45.  We

7    will wait no more than 15 additional minutes.

8            (Pause)

9            MS. SIMON:  Pretrial just provided an address to us.

10   It's the west side Y M C A at --

11           THE COURT:  Here is the defendant.

12           Take a seat at the second table, Mr. Dennis.

13           MR. DENNIS:  Apologies, your Honor.  I was delayed

14   downstairs, your Honor, because they took my cell phone and my

15   iPad.

16           THE COURT:  Yes, as they will with every single human

17   being who goes through this court, except upon order of the

18   court.  But we'll take that up later, because it is now almost

19   12:00 o'clock.  This matter was called for 11:15, and we're

20   going to bring up the jury panel right now.

21           MR. DENNIS:  My apologies, your Honor.  My parents had

22   an issue with their medication this morning.  As you know, I am

23   their primary caretaker.  So I had to get on the phone with

24   them.  The person who was stepping in for me did not come.  So

25   I had to make sure they got their medication.  This is their

MABGDEN1

1    first day without me helping them with that process, so it got

2    a little confused.  So I apologize.

3              Your Honor, during the jury portion, jury selection,

4    does the government have their devices?

5              THE COURT:  They have previously obtained permission.

6    If you would like permission, I will consider that.

7              MR. DENNIS:  I think I'm at a severe disadvantage,

8    your Honor.

9              THE COURT:  No, you're not at a severe disadvantage

10   because you have paid no attention to the rules of this court.

11   If you had done even the most basic research, you would have

12   known you needed the court's permission because it has been the

13   rule of this court for at least the last dozen years that, for

14   security reasons, no person entering this court can keep their

15   electronic equipment, except upon prior express order of the

16   court.  But I am happy, if you wish, to execute such an order

17   in your case.  But don't tell me about unfairness when you have

18   created the situation.

19             MR. DENNIS:  Your Honor, I object and disagree.

20   Because once again, as we have discussed before, I am

21   representing myself pro se.  So there are three government

22   attorneys sitting here, and I am -- the only reason why I raise

23   this issue is because you are saying if I do this and if I do

24   that.  I'm doing a lot.  They have three attorneys, they have

25   paralegals, they have secretaries.  And in my instance, it's

MABGDEN1

1    just me, my mother and father and my iPad.

2              THE COURT:  So the point is that, during this trial,

3    the rule of law, including the rules of this court, will be in

4    full stead.  Now, Mr. Dennis, to be frank, you have a long

5    history of violating my rules.  The most recent one being just

6    this past weekend.  I have told you at least a dozen times --

7    and of course, it's in my individual rules as well -- not to

8    send emails to the Court.  But rather, if you have an

9    application, to make it through a joint telephone call with the

10   government.  And that seems to have not made any difference to

11   you.

12             MR. DENNIS:  I object, your Honor, again.  As is in

13   the prior record, I was being -- I was -- Judge Schofield was

14   presiding over this.  I am a pro se representative --

15             THE COURT:  Mr. -- go ahead, finish.

16             MR. DENNIS:  Your Honor, 60 days before trial, I've

17   had a new judge come in, who is now insisting that any

18   violation of all of his rules -- that I have to learn all of

19   his new rules, and he knows that I'm representing myself pro

20   se.

21             THE COURT:  Now, there is one rule -- stop faking.

22             MR. DENNIS:  Excuse me, your Honor.  I object.

23             THE COURT:  Well, I'm going to tell you.

24             MR. DENNIS:  I object.

25             THE COURT:  There is only one rule that I've told you

MABGDEN1

1    to abide by.  And I told it to you the very first day we had

2    our first conference.  And I have told it to you again and

3    again and again, which is not to send emails, but to convene --

4    if you have an application -- convene a joint conference with

5    the government and the Court, which has been my universal rule

6    for 26 years.  And it makes a lot of sense, for reasons I'll

7    get to in a minute.  But that's one rule.  It's one very simple

8    rule.  So what is this stuff about, oh, the case was

9    transferred and I had to learn all sorts of new rules?  It was

10   one rule, and you seem incapable of abiding by it.

11            MR. DENNIS:  Your Honor, it's so that it's on the

12   record, when I emailed the Court was yesterday, Monday, as I

13   was traveling and could not get on a phone, was having problems

14   with my -- with my cell phone, as I informed pretrial

15   repeatedly, and the only request that I made was that my

16   parents be able to participate, who I have been -- I'm the

17   primary caretaker for, have been for the entire time.  And your

18   Honor has that in his record, that I take care of their

19   medicine.  Your Honor has it in the record that my mother

20   almost died twice during this period.  So the only thing

21   that -- going outside of your rules was yesterday asking if you

22   would give them permission to be able to participate via audio,

23   in the event of my conviction, being that they're 87 and 81

24   years of age, they may never see me again.  So I'm sorry that I

25   offended your Honor by making that request given the

MABGDEN1

circumstances I was under yesterday.

THE COURT:  So let's, again, get the record straight.

As you yourself pointed out in your email, this was something that you should have brought up at the conference we held on Friday where, to accommodate you and your parents and your care for your parents, I allowed you to appear telephonically over the government's objection.  And then you waited until late yesterday.  And out of respect for your parents and only out of respect for your parents, I once again, as I have so often, did not enforce my rule, but rather responded to your request saying that I was sympathetic to your request, but that I needed to hear from the government, which we will hear from in a minute.

So the rules are not to be made by you.  They are not to be made, oh, well, I'm traveling so I don't have to abide by your rules with respect to a request that I could have made the previous Friday, but Judge, now I'm traveling.  So I'm going to ignore your rule.  That will not do in my court.  So let me just make it clear and then we'll move on to the substance.

If I receive from any party in this case any email between now and the end of the case, I will consider holding that person in contempt of court, which could mean, among other things, revocation of bail.

Now --

MR. DENNIS:  Just so I'm clear, your Honor, so right

MABGDEN1

1    now, I'm on trial and basically facing five years in prison

2    because I sent emails that the government is claiming injured

3    and harassed them.  And now you are saying, basically, that if

4    I violate one of your rules, even if it's -- particularly, if

5    it's relating to my parents and their health, that you will

6    possibly revoke my bail and send me to jail for that?

7            THE COURT:  I'm telling you that because you are a

8    serial violator of the one and only rule that I have stressed,

9    that if you do it again, you may pay the consequences.

10           Now, why do I have that rule?

11           MR. DENNIS:  I object.  I'm not a serial violator.

12           THE COURT:  Your objection is duly noted, but you

13   better not send another email.

14           MR. DENNIS:  Understood, your Honor.

15           THE COURT:  So the reason I have this rule is really

16   for your benefit as much as anyone's.  Because had you convened

17   a telephone call at any time between Friday and yesterday, I

18   could have gotten the government's position, and then I could

19   have ruled.  And if I had ruled in your favor, we could have

20   set up the equipment.  But that's the reason I have the rule,

21   so I can deal expeditiously with any application made by any

22   party.  And every party, including pro se parties, have had no

23   difficulty abiding by that rule for the last 26 years until

24   you, Mr. Dennis.

25           Now, let's turn to the merits.

MABGDEN1

1              MR. DENNIS:  Your Honor, before -- I'm sitting back

2     here.  Is there a reason why I'm not sitting closer to --

3              THE COURT:  Yes.  Because defendants always sit at the

4     second table.

5              MR. DENNIS:  Okay.  Thank you.

6              THE COURT:  Now, what is the government's position

7     with respect to the request that Mr. Dennis' parents be plugged

8     in by video to these proceedings?

9              MR. DENNIS:  Your Honor, the government objects.  It's

10    a fairly extraordinary application to ask that a jury trial be

11    video streamed.  Of course, even when a witness, under extreme

12    circumstances, has to testify remotely, there are procedures

13    and standards in place.  And here, we do not think that this is

14    an extraordinary reason justifying the video broadcast of a

15    jury trial involving sensitive issues.

16             THE COURT:  Let me ask you this, Mr. Dennis, the one

17    concern I have about video -- in addition to that it's very

18    unusual in these circumstances -- but one concern I have about

19    video is it would be totally improper for the jury to be seeing

20    your parents 24/7 or whatever the time was of the trial,

21    because that would introduce an element to the case that was

22    not there.

23             So what about the telephone connection so they can

24    hear everything that's going on?

25             MR. DENNIS:  That would be fine, your Honor.

MABGDEN1

1          THE COURT:  That would be fine?

2          MR. DENNIS:  Yes.

3          THE COURT:  All right.  I will see -- because we're

4   running late, I had wanted to try to contact audiovisual people

5   earlier -- but I'll see what I can do to set up -- they

6   understand that they won't be able to talk, they'll just be

7   able to listen; you understand that?

8          MR. DENNIS:  Yes.

9          THE COURT:  I think my feeling on this is that -- as I

10  have tried to do throughout the case since it was assigned to

11  me -- we have to give accommodation to Mr. Dennis' parents and

12  the unhappy situation that they are in, both health-wise and

13  otherwise.  And so I think it would not be inappropriate to set

14  up a telephone link so they could listen to the trial.  So I

15  will do my best to arrange that during the lunch break today.

16         MR. DENNIS:  Your Honor, I was going to take notes on

17  my iPad, but I don't have it right now.

18         THE COURT:  I'm sorry, do you need a pen?

19         MR. DENNIS:  Yes.

20         THE COURT:  If someone would give him a pen, please.

21         MR. DENNIS:  Thank you.

22         THE COURT:  Now, in terms of your equipment, you have

23  a cell phone and an iPad; is that what was taken from you?

24         MR. DENNIS:  Yes, your Honor.

25         THE COURT:  Any objection from the government to the

MABGDEN1

1    Court issuing the order allowing him to keep those during the

2    course of this trial?

3           MR. DENNIS:  No, your Honor.

4           THE COURT:  So I'll ask my law clerk to prepare such

5    an order during the lunch break, and you'll be able during the

6    lunch break then to retrieve them, Mr. Dennis.

7           Now, I think the only other pending matter we have was

8    there was one outstanding issue regarding a subpoena.  Namely,

9    this was the subpoena that Mr. Dennis had propounded to

10   Bradford Smith, the chairman of Microsoft.  His process server

11   was unable to serve Mr. Smith, so he asked, Mr. Dennis asked if

12   he could serve him by mail.  This was an application made on

13   Friday when I didn't have a copy of the subpoena in front of

14   me.

15          I had previously approved, as I had approved every

16   last one of Mr. Dennis' subpoenas for service --

17          MR. DENNIS:  Sorry, your Honor, one issue.  What we

18   talked about at the last hearing was that I was going to be

19   able to respond as to why I needed Mr. Smith.

20          THE COURT:  Yes.  You told me that your process server

21   had tried to get in there and had not been successful.

22          MR. DENNIS:  Right.  So all my notes relating to that

23   manner and the conversation we're about to have is on my iPad.

24          THE COURT:  Well, do you want to hold off until we get

25   your iPad?

MABGDEN1

1            MR. DENNIS:  Yes, please.

2            THE COURT:  We'll do that.

3            Now, one of the most unfortunate things about the

4    defendant's delay was we were originally going to have the jury

5    panel at 11:30 and we had to excuse them because we didn't know

6    when you were going to appear, so my courtroom deputy is, I

7    think, checking on that.  But let me ask my law clerk to go

8    check with her and see what the story is.

9            There they are.

10           (Recess)

MabWden2

1          THE COURT:  All right.  Ladies and gentlemen, you are

2     our jury to try this case.  In a few minutes, we're going to

3     swear you in and then excuse you for lunch, and then when you

4     come back we'll start with the opening statements of counsel

5     and the first witness.  But let me give you a few sort of

6     housekeeping details.

7          First, you should not discuss this case with anyone

8     outside.  You may have to tell an employer or a spouse or

9     someone like that you're going to be on jury service for about

10    a week, but when they inevitably say, oh, tell us about the

11    case, you have to say no, I'm sorry; I can't discuss the case.

12    And the reason for that is we want you to decide this case

13    based solely and wholly on the evidence that you hear here in

14    the courtroom.  The evidence will consist of testimony.  It

15    will consist of exhibits.  Once in a while there's also

16    something called a stipulation, where the parties agree to a

17    fact.  Those are the only sources of evidence, and it will help

18    you to focus just on that, not to discuss with someone who

19    hasn't been here and doesn't know any of the evidence in the

20    case.

21          The second rule, which is a little less obvious, is

22    that you should not discuss the case even among yourselves

23    until it's given to you for your deliberations at the close of

24    all the evidence.  And the reason for that rule is that the

25    evidence will come in one witness at a time, one document at a

MabWden2

time, and it will a while until you have the whole picture, and

we don't want you to start making up your mind until you have

heard all of the evidence.  So don't even discuss the case

among yourselves until it's given to you for your

deliberations.

A third rule, which, again, is probably quite obvious,

don't try to do your own research.  Don't Google anything about

the case or cyberstalking or anything like that.  We'll give

you everything you need to know here in the courtroom, and

that's what you need to decide the case on.

And finally, really a rule for the parties and the

lawyers, but I want you to be aware of it, is they are under

very strict orders to have no contact with you.  So if you're

in the elevator and there's one of the lawyers or parties and

they don't even smile and say hello, it's not that they're

being rude.  It's because they're under very strict orders to

have no contact with you whatsoever.

Now, we're going to excuse you.  You'll initially go

into the jury room.  My courtroom deputy will take some contact

information, and then you'll be excused for lunch.  We'll give

you a full hour for lunch, and then we'll resume about 2:15 and

hear the opening statements of counsel.

MR. DENNIS:  Your Honor, because I have to retrieve my

iPad and --

THE COURT:  Yes, we'll take care of that.

MabWden2

1           MR. DENNIS:  -- can we have a little more time?

2           THE COURT:  OK.  We'll give you an hour and a quarter

3    for lunch.  I'm sure we can do that for you quite swiftly.

4           MR. DENNIS:  OK.

5           THE COURT:  So we'll start again at 2:30, in which

6    case we won't take a midafternoon break.  We'll just go from

7    2:30 to 4:30 this afternoon.  But now we need to swear you in.

8           (A jury of twelve and three alternates was impaneled

9    and sworn)

10          THE DEPUTY CLERK:  Please follow me into the jury

11   room.

12          (Jury not present)

13          THE COURT:  Mr. Dennis, if you want to wait here,

14   we'll get you that order right away and have someone escort you

15   down to security so you can get your electronic equipment right

16   away.

17          We will convene promptly at 2:30.

18          MS. KUSHNER:  Your Honor, can we raise four brief

19   issues?

20          THE COURT:  Yes.

21          MS. KUSHNER:  Just to be clear -- all the proposed

22   instructions reflect this -- the government is not proceeding

23   on Count Three of the indictment, and we would move to dismiss

24   that count.

25          THE COURT:  I'm sorry.  Say this again.

MabWden2

1              MS. KUSHNER:  It's a four-count indictment.

2              THE COURT:  Yes.

3              MS. KUSHNER:  The government is not proceeding on

4    Count Three.

5              THE COURT:  Oh, I wondered that from your proposed

6    jury instructions.  So Count Three is dismissed.

7              MS. KUSHNER:  Thank you.

8              We just want to clarify that while the defendant will

9    have his iPad and phone here there won't be any recording

10   through any of those devices during the course of the trial.

11             THE COURT:  Yes.  He's nodding affirmatively.

12             MR. DENNIS:  Affirmative.

13             THE COURT:  Yes.

14             MS. KUSHNER:  Third, while no plea offer was ever

15   extended, because the defendant expressed absolutely no

16   interest in it, a *Pimentel* letter was provided to the

17   defendant.

18             THE COURT:  I'm sorry.  For some reason I'm having a

19   little trouble hearing you.

20             MS. KUSHNER:  I'm sorry.  I pushed the microphone

21   away.

22             While no plea offer was ever extended to the

23   defendant, because he expressed no interest in that, a *Pimentel*

24   letter was provided, and even before that, since December of

25   2021, the defendant has been informed that the government would

MabWden2

1    oppose a one-point reduction at sentencing if defendant were to

2    proceed to trial.

3          THE COURT:  Yes, but I might as well tell Mr. Dennis

4    what the government already knows, I don't pay any attention to

5    the guidelines.  I think the guidelines are totally irrational,

6    so you may have a guideline range that's up to the wazoo, it

7    won't affect my sentence one way or the other.  Of course, you

8    may be acquitted, but if you're convicted, what I will look at

9    is, first and foremost, the human being that I'm about to

10   sentence -- that's always the most important thing to me; and

11   secondly, the victims and how they were affected.  Those two

12   factors weigh far more with me than any of this arithmetic

13   mumbo-jumbo that the sentencing commission engages in.  But

14   nevertheless, I'm glad to know that it's on the record that a

15   *Pimentel* letter has been provided.

16         OK.  Yes.

17         MS. KUSHNER:  And the fourth matter is we just want to

18   alert the Court that one of the pending motions *in limine* the

19   issue is going to become relevant with the second witness, and

20   the first witness is going to be relatively short.  So if the

21   Court wants to put aside time to address it, we're ready.

22         THE COURT:  OK.  Go ahead.

23         MR. DENNIS:  Your Honor, I still have to get my --

24         THE COURT:  I'll tell you what.  Why don't you all

25   come back at 2:20 instead of 2:30.

MabWden2

1          It's going to take you five minutes.  Were you

2   planning on more than an hour for lunch?

3          MR. DENNIS:  No.  I was planning on, actually, I

4   didn't have my notes to sort of incorporate what I've got into

5   my notes.

6          THE COURT:  OK.  Come back at 2:25 then.  I think we

7   can deal with this in five minutes.  I don't want to ever

8   detain the jury.  The jury are the most important people in

9   this courtroom, and they were told to come back at 2:30.

10          I did want to state on the record Mr. Dennis handed up

11   three proposed questions.  The first one was:  "Every person

12   looks at the world through a lens colored by their life

13   experiences.  My question is if you have had any experience in

14   your life that will make it hard for you to be fair when you

15   hear and see the evidence through the lens of your life's

16   experience."

17          I did not give that first request because I thought it

18   was too rhetorical and vague, but I did, of course, the ask the

19   jurors at the end whether there was anything that I hadn't

20   covered that made them think they couldn't serve as a fair and

21   impartial juror, so I think the substance of it was, in effect,

22   given.

23          The second question was:  "You have not heard any

24   evidence.  Do you have feelings already about how business is

25   done in the large international law firms that would make it

MabWden2

1    hard for you to hear the evidence fairly to me?"

2            I think that is nothing but an argument disguised as a

3    question, and so I rejected that.

4            The third one was:  "I want you to think for a moment

5    about the meaning of the expression 'beyond a reasonable

6    doubt.'  Do you think you can listen to the evidence and then

7    determine guilt beyond a reasonable doubt?"

8            Actually, I gave a stronger version of that at the

9    very outset.  As you may recall, the very first thing I said to

10   the jury was that the bedrock principle of our law is that a

11   defendant is presumed innocent until and unless the government

12   proves his guilt beyond a reasonable doubt.  And of course, I

13   will give them instructions at the end about what we mean by

14   reasonable doubt.  So I think as to No. 3, that was more than

15   covered.

16           I'll have my law clerk hand this back to Mr. Dennis,

17   because there were also some handwritten notes that I don't

18   want to keep.  Those are yours.

19           OK.  Very good.  We'll see you at 2:25.

20           MR. DENNIS:  Your Honor, will you send, will someone

21   be able to send --

22           THE COURT:  Yes.  We're going to work on that right

23   now.

24           (Luncheon recess)

25

MABGden3

<pre>
 1                        AFTERNOON SESSION

 2                            2:25 p.m.

 3            (In open court; jury not present)

 4            THE COURT:  Does the government want to be heard?

 5            MS. SIMON:  The government wanted to preview an issue

 6    for the court that was raised in the motion *in limine*,

 7    specifically, the government expects to elicit from its second

 8    witness testimony regarding two in-person interactions that the

 9    witness had with the defendant.  And I expect the witness will

10    testify regarding an incident where the defendant approached

11    him at a professional conference, and then the defendant sent

12    him over 20 text messages over the course of one night.  That

13    included the text message, I will find you.  And then the next

14    day shows up and in fact found the witness.

15            In addition, I expect that the witness will testify,

16    after that incident, he blocked the defendant's phone number.

17    But the evidence I expect will show that the defendant

18    attempted to get in touch with this witness after that point

19    and that several months after, there was another in-person

20    interaction where the defendant approached the witness at

21    another professional conference.

22            The government thinks this is direct evidence of the

23    charged crimes.  It puts the messages that the defendant sent

24    to the victim in context.  And it contextualizes both the

25    victim's own understanding of the messages when he received
</pre>

MABGden3

| | |
|---|---|
| 1 | them and the reasonableness of his belief that the messages |
| 2 | were annoying, harassing and threatening and also speaks to the |
| 3 | defendant's intent. |
| 4 | THE COURT:  Now, for the reasons I already sort of |
| 5 | expressed in connection with the motions *in limine*, I really |
| 6 | don't think I can rule on that until I hear what leads up to |
| 7 | it.  So when you get to the questions that raise this, say, |
| 8 | Judge, we're about to get to it and we'll have a sidebar and |
| 9 | I'll hear from the defendant as well, and then I'll rule. |
| 10 | MS. SIMON:  Of course, that's fine, your Honor.  The |
| 11 | government is happy to proceed that way if your Honor prefers. |
| 12 | I just wanted to make clear that it's going to come fairly |
| 13 | early in the witness' testimony, and the lead in will be |
| 14 | something to the effect of, after the defendant stopped working |
| 15 | at the law firm, did you see the defendant again. |
| 16 | THE COURT:  The answer to that is yes. |
| 17 | MS. SIMON:  Yes. |
| 18 | THE COURT:  That's not the end of the testimony. |
| 19 | MS. SIMON:  Certainly not, your Honor, but the context |
| 20 | will be -- |
| 21 | THE COURT:  If you want to, let's take that as an |
| 22 | example.  So the answer the witness gives is yes, what's your |
| 23 | next question? |
| 24 | MS. SIMON:  Where was that. |
| 25 | THE COURT:  And the answer is? |

MABGden3

1                    MS. KUSHNER:  At a professional conference.

2                    THE COURT:  What's your next question?

3                    MS. SIMON:  And what happened.

4               And he will explain the nature of the interaction with

5     the defendant, and then the in-person interaction with the

6     defendant.  And then he'll explain that, after that

7     interaction, that in-person interaction, he received several

8     text messages from the defendant that night and then very early

9     the next morning.

10                   THE COURT:  The interaction was of an antagonistic

11    sort?

12                   MS. SIMON:  Yes, your Honor.

13                   THE COURT:  So what's he going to say in that regard?

14    That's what I need to know.

15                   MS. SIMON:  I apologize, your Honor.  I expect the

16    witness will testify that the defendant approached him at this

17    professional conference and started yelling at him and was

18    raising several of his grievances about the firm and with the

19    witness in particular in a way that the witness found to be

20    intimidating.

21                   THE COURT:  I think that sounds like appropriate

22    background, so I will allow it.

23                   MS. SIMON:  Thank you, your Honor.

24                   MR. DENNIS:  Your Honor, there's one thing I would

25    like to ask of the Court.  Given that I'm representing myself

MABGden3

1   pro se and that minutes before one of the witnesses -- one of

2   the government's witnesses is going to testify, I'm hearing new

3   information, I'm requesting in advance now the opportunity to

4   go home and to prepare my cross-examination questions of this

5   witness.

6          THE COURT:  Denied.

7          Let's bring in the jury, and we'll hear opening

8   statements.

9          THE DEPUTY CLERK:  I'm missing one, Judge.  I have her

10  cell phone, so I can call her right this second and see where

11  she is.

12         THE COURT:  I know that right after we broke last, the

13  defendant was able to recover his electronic equipment.

14         And let me ask my law clerk, where do we stand on the

15  telephone connection to the parents?

16         LAW CLERK:  They are hearing us.

17         THE COURT:  So that's been done.  Great.

18         So I think the only other open matter is the subpoena

19  that, Mr. Dennis, you wanted a chance to look at your laptop

20  before we discuss that.  Are you ready to discuss that now?

21         MR. DENNIS:  Yes, I am, your Honor.

22         THE COURT:  So through no fault of his own, Mr. Dennis

23  and his process server were not able to serve the head of

24  Microsoft.  And so he has applied to have that service made by

25  mail.

MABGden3

1          The problem that we confront here is that the request,

2     at least for documents, are similar to requests that I have

3     already held not to be the proper subject of a subpoena because

4     they're not likely to lead to admissible evidence.  For

5     example, we have a whole bunch of requests about the no contact

6     list -- and I won't belabor the record by going through why

7     that is -- while it's part of this case, it's not part of this

8     trial.  But this is also a request for Mr. Bradford Smith's

9     personal appearance.

10          What is it you would suggest he would testify to?

11          MR. DENNIS:  Your Honor, with respect to Mr. Smith,

12     he's different from any of the other Microsoft executives.

13          THE COURT:  Can you bring the microphone just a little

14     bit closer to you.

15          MR. DENNIS:  Yes, sorry.

16          THE COURT:  You can sit down, but just bring it closer

17     to you.

18          MR. DENNIS:  He's different from any of the other

19     Microsoft executives because I've known Brad for over 20 years.

20     And so I've known him both professionally and personally.  So

21     by him being placed on the no -- and he was on my witness list

22     in the arbitration, because I expected him to be a witness to

23     testify on my behalf -- by putting him on the no contact list,

24     the government precluded me from having conversations with

25     someone who would have been a witness on my behalf.

MABGden3

```
1              THE COURT:  But my question is -- we've been through

2    that, and as you will recall, when you finally raised on

3    Friday, after many invitations from me to do so, the no contact

4    list, and I gave you permission then to contact the counsel for

5    the witnesses on the no contact list who were represented by

6    counsel and see if their clients wanted to talk to you.  But

7    what is it you think -- to be continued.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

MABGden3

1    (Jury present)

2    THE COURT:  Ladies and gentlemen, we're about to hear

3    opening statements from counsel.  I want to caution you at the

4    beginning that nothing that the lawyers or the parties say in

5    opening statements is evidence.  As I mentioned before, the

6    evidence comes from testimony, from exhibits, and there may be

7    something called stipulations.  Those are the only sources of

8    evidence.

9    So you may ask, why do we even have opening

10   statements.  Well, the answer, again, is the evidence is going

11   to come in a little bit at a time.  And so counsel are going to

12   give you their overview -- by "counsel," I'm including

13   Mr. Dennis in his role as counsel, in that he's representing

14   himself -- they're going to give you an overview of what they

15   think the evidence may prove or may fail to prove.  So this is

16   a chance to give you a kind of roadmap as to where they think

17   the evidence is going.  And they will, doubtless, have

18   different views of that, but by hearing their respective

19   positions, it will give you a little bit of context to evaluate

20   the evidence as it begins to come in.

21   I want to remind you that the government bears the

22   burden to prove guilt beyond a reasonable doubt, and so they

23   will go first.  And I also want to remind you that the basic

24   charges in this case relate to the alleged use of emails and

25   text messages for purposes of conveying threats or intimidation

MABGden3                    Opening - Ms. Simon

1  or other material likely to cause substantial emotional harm

2  and that the standard has to be not only that that occurred,

3  but also that the defendant intended that that would occur.

4          So against that background, let's hear first from the

5  government.

6          MS. SIMON:  Thank you, your Honor.

7          Sleep with one eye open.  We are coming for you.  I

8  will find you.  These are just a small fraction of the

9  thousands of messages that the defendant sent to his former

10  coworkers over the course of two years.  He harassed them in

11  the middle of the night, bombarded them with messages back to

12  back to back.

13          When the victims got the defendant's messages, they

14  were anxious.  They were distressed.  They were even scared.

15  They didn't know what the defendant might do.  They thought the

16  defendant might come to their home or office and that he might

17  even hurt them.

18          The defendant's messages upended the victims' lives.

19  That is why we are here today, because that man, the defendant,

20  Willie Dennis, engaged in a year's long campaign to harass,

21  intimidate and threaten his former colleagues at the law firm

22  where he used to work.  For that, he's charged with

23  cyberstalking.  It's time to hold him accountable for what he

24  did.

25          This opening statement is the government's opportunity

MABGden3                         Opening – Ms. Simon

to give you a preview of what I expect you are going to hear
and see over the coming days.  First, I will address what I
expect the evidence will show.  Second, I will address how the
government will prove beyond a reasonable doubt that the
defendant is guilty.

So what will the evidence show?

The evidence will show that the defendant was a
partner at a big law firm.  At some point, he became upset with
the firm and he started to send hostile repetitive emails to
his coworkers.  The sheer number of those messages was
disruptive to the workplace.  The defendant was asked to stop
multiple times, but he refused.

After the defendant stopped working at the law firm,
you'll learn, his conduct escalated.  He began to flood his
former coworkers, including the three victims in this case,
with thousands of disturbing text messages and emails.  In
those messages, the defendant called the victims degrading
names; rat, gutter rat, piece of shit, cotton head.  He falsely
accused them of illicit sexual conduct.  He threatened their
families.  He threatened their careers.  He claimed to invoke
the wrath of god against his victims.  He said that in the
Bible's words, his victims would be cut down and destroyed.  He
even invoked the horrors of mass shootings, implying that his
victims might suffer the same fate.

Sometimes his messages contained explicit threats like

the ones I mentioned earlier; sleep with one eye open, I will find you. Other times, the defendant's messages were more cryptic. The defendant did not always spell out exactly what he meant. But that was part of the point, to keep the victims guessing, unsettled, uncomfortable.

You will learn that the defendant sent his victims multiple disturbing messages, often in rapid succession. You'll learn that one victim received over 20 messages in the course of a single evening. Other victims, you'll learn, received thousands of messages from the defendant over the course of two years; sometimes over a hundred in a day. The victims did not respond to the defendant's messages, but the defendant continued to pummel them with unwanted messages anyway, again and again and again.

You will see that the victims' lives were disrupted by the defendant's endless barrage of messages. Not only that, they were also afraid; afraid that the defendant might do something violent. So they took steps to protect themselves.

One victim started wearing shoes with treads when he was on the subway so he would be ready to run in case the defendant snuck up on him. Another victim started sleeping with a loaded gun under his pillow after the defendant threatened to come to his home. Another victim moved to a completely different state to get away from the defendant. That's how scared they were.

MABGden3                    Opening - Ms. Simon

1          You will learn that the volume of the defendant's

2    messages were so overwhelming and their contents so disturbing

3    that one of the victims blocked the defendant's cell phone

4    number.  Others feared that if they blocked the defendant's

5    number and stopped seeing his messages, they wouldn't be ready

6    if the defendant actually acted on his threats, so they

7    continued to receive his messages day after day, despite the

8    fear and pain those messages caused.

9          Now, I expect you will also hear that the defendant

10   had various grievances with his former law firm.  I expect you

11   will learn that more than a year after he stopped working at

12   the firm, the defendant sued, and that lawsuit is still

13   ongoing.  But don't be distracted.  That's not what this case

14   is about.

15         This case is about what the defendant did to the

16   victims.  It's about the messages he sent them, how he

17   terrorized them.

18         As a result, the defendant is charged with three

19   counts of cyberstalking; one count for each targeted victim in

20   this case.

21         So how will the government prove its case beyond a

22   reasonable doubt?

23         You will see the defendant's own words for yourselves.

24   You will see many of the harassing, intimidating and even

25   threatening messages the defendant sent.  You will see how the

defendant inundated the victims with messages late into the
night, early in the morning, sometimes for days and even weeks
at a time.

         You will also hear from the victims directly.  They
will tell you about the awful, abusive messages they received
from the defendant, how those messages invaded and disrupted
their everyday lives, how they were forced to take steps to
protect themselves.

         You will also hear from law enforcement officers,
including the officer who arrested the defendant and seized his
cell phone and the FBI technician who extracted the defendant's
harassing messages from that very same cell phone.  You will
also see records connecting the defendant to that cell phone
and other email accounts that were used to send more harassing
messages.

         What I have just described to you is just an overview
of what I expect the evidence will show.  The actual evidence
will come in one piece at a time.  No single witness or single
message can give you the full story of what the defendant did.
But as the trial goes on, you will watch as each piece of
evidence helps to build the full picture of the defendant's
crimes.

         So as you hear and see the evidence throughout the
course of the trial, I'm going to ask you to do three things:
First, pay close attention to the evidence; second, follow

```
 1    Judge Rakoff's instructions on the law; and third, use your
 2    common sense, the same common sense you use every day to make
 3    all sorts of decisions in your own lives.  If you do those
 4    three things, you will reach the only verdict that is
 5    consistent with the law, the evidence and your common sense,
 6    that Willie Dennis is guilty.
 7             THE COURT:  Thank you very much.
 8             Now we will hear from Mr. Dennis.
 9             MR. DENNIS:  Ladies and gentlemen, good afternoon.
10    And thank you for taking the time to serve as jurors as I try
11    to avoid being sent to prison.
12             MS. SIMON:  Objection, your Honor.
13             MR. DENNIS:  I have never done any of this before.
14             THE COURT:  I'm sorry, I didn't hear.
15             MR. DENNIS:  Excuse me.
16             MS. SIMON:  I'm sorry, there was an objection, your
17    Honor.
18             THE COURT:  I didn't hear what he said right before
19    that.  What are you objecting to?
20             MS. SIMON:  I avoid trying to be sent to prison, your
21    Honor.
22             THE COURT:  I see.
23             So ladies and gentlemen, the question of any
24    punishment if the defendant is convicted is purely a question
25    for the Court, not for you.  So don't be concerned about
```

MABGden3                    Opening – Mr. Dennis

1  punishment in any way, shape or form.  That will be something

2  that, if and only if the defendant is convicted, the judge gets

3  to decide.

4          Go ahead.

5          MR. DENNIS:  I've never done any of this before, so

6  you're probably going to hear more objections as I go through

7  this.  But more importantly, I'm going to ask you to excuse me

8  because I have made a lot of –– I've made notes.  And we'll

9  have to refer to them often to stay organized, as I make my

10  opening statements.

11          The evidence will show that I am the son of two

12  hardworking parents.  My father worked for the New York City

13  Sanitation Department behind the truck for 31 years, who

14  invested most of their hard-earned money to provide me, my

15  brother and my sister with food, shelter and a good education.

16          I graduated from Columbia College and then Columbia

17  Law School.  And I worked during college and law school to help

18  pay the way through.  Then I practiced for over 30 years in New

19  York City at some of the highly regarded firms, including a

20  firm where I started at, which was called Mudge Rose Guthrie

21  Alexander & Ferdon, where I was personally trained by a

22  gentleman by the name of Robert Ferdon, who, as your Honor can

23  confirm, was one of the most respected attorneys in America for

24  his legal skills and his ethical standards.  And I worked at

25  the law firms of Akin Gump and K&L Gates, which K&L Gates is

1    one of the top firms in the country, in the world.  It's the

2    fifth largest law firm in the United States.

3          The evidence will show that during my 30-year career,

4    I developed strong relationships and brought to the firm many

5    millions of dollars in business with Fortune 500 companies

6    including Microsoft, Goldman Sachs, Dupont, MetLife, American

7    Express, Tyco, Toys "R" Us and Darden Restaurants, to name a

8    few.  If you don't know Darden, Darden is really more well

9    known for being a Red Lobster or Olive Garden, if any of you

10   know those chains.

11         The prosecution has read its charges against me, and

12   these charges give the burden to the prosecution to prove

13   beyond a reasonable doubt that I sent emails to four of my

14   former partners at K&L Gates with the intent to intimidate or

15   cause fear in these four individuals.  The evidence will show

16   that I actually sent these emails to many, many more partners

17   at K&L Gates, not just the four that the prosecution is focused

18   on in this courtroom.  And that my intention in sending these

19   emails was not to intimidate or to strike fear in any of them.

20   The evidence will show my purpose was to act like a reasonable

21   partner of the firm of K&L Gates and put the partners on notice

22   of very specific misconduct some of them had been doing

23   individually against me and some being against the interest of

24   the firm.

25         The evidence will show that I was concerned about two

1    things:  One was the firm's public reputation for tolerating

2    sexual harassment and gender discrimination; a second was that

3    a small group of leaders of the firm was violating the firm's

4    bylaws and taking my clients away from me, reducing my clients.

5            The evidence will show that the American Lawyer, one

6    of the most prestigious publications in the law, published an

7    article --

8            MS. SIMON:  Objection, your Honor.

9            MR. DENNIS:  -- stating, during a multiyear period,

10   every single sexual harassment case made by a woman attorney --

11           THE COURT:  Sustained.

12           Mr. Dennis, there's no way that's coming into

13   evidence.  That's hearsay.  I know you are not a trial lawyer,

14   but that's classic hearsay.  Please go on to something else.

15           MR. DENNIS:  Okay, your Honor.

16           The evidence will show that -- testimony from my

17   partners -- that I suggested reforming our process of reviewing

18   sexual harassment allegations before we were sued and hurt

19   financially.

20           MS. SIMON:  Objection, your Honor.

21           THE COURT:  Well, I want to really caution the jury

22   that, as I told you before, nothing that either side says at

23   this point is evidence.  Whether the evidence will show what is

24   being now stated or not, we'll see.  But I will let Mr. Dennis

25   continue.  But I do want to make sure that you understand that

1    none of this is evidence.  The question is what will come from

2    the witnesses and the documents.

3            Go ahead, Mr. Dennis.

4            MR. DENNIS:  So the evidence -- particularly, I know

5    the prosecution just sort of gave you different things that

6    they allegedly said I've done.  But I think what's most

7    important is if you put this in a timeline of what occurred.

8            So the evidence will show that on January 29th, I

9    emailed the chairman of K&L Gates basically telling him there

10   were $500 million in lawsuits attributable to Microsoft and

11   notifying them I intended to take this to the full partnership

12   the next morning at 11:00.  It will further show that on

13   January 30th at 1:44 a.m. -- and this will be one of the

14   witnesses who will be testifying -- informed me that the

15   firm -- this is less than eight hours later -- had suspended my

16   access to the offices, access to my emails, though the firm

17   continued to pay me, but there was nothing in the partnership

18   agreement that allowed them to do that.

19           To give you some context, I didn't know if any of

20   you -- it didn't come up during the questioning -- but if any

21   of you had any legal experiences, imagine that one day your

22   lawyer is representing you and then the next day he has no

23   resources; doesn't have a phone, doesn't have access to word

24   processing, but your case is still going on.  That day when

25   they did that, when they suspended all my resources, I lost all

1    my clients because I couldn't service them.  Clients called me,

2    said what am I doing.  I said, look, you have a matter going

3    on, keep going with the firm, don't stop because I'm not there.

4    This is between me and my partners.  That was the effect of

5    that.

6           Almost eight hours later, all of my emails, including

7    those on my message system were removed from all my mobile

8    devices.  Almost eight hours after that, I received an email

9    from one of the witnesses who will be testifying today or

10   tomorrow outlining a settlement component.

11          The evidence will show that 12 days later, on

12   February 11th, with all these other issues still resolved, my

13   wife's divorce attorney received documents from K&L Gates, my

14   partners, mostly about my finances, without my consent or

15   knowledge and without any subpoena being issued.  The evidence

16   will show that they sent a letter to my attorney asserting I

17   had harassed them, but stating there was no criminal action

18   being threatened.

19          The evidence will show on April 16th -- this is 2019

20   for the timeline, and I'm going in order -- I sent an email to

21   the leadership team and a hundred other partners talking about

22   how we could put in better me too policies, me too policies

23   that would, you know, be helpful for everyone.

24          The evidence will show that a few months -- a month

25   and a half after that, I was expelled from the firm.  The

1    evidence will show -- now we are getting to the point where --

2    what we discuss is that -- and it says in the indictment,

3    between September 4th, 2019 and September 27th, 2019, I sent at

4    least approximately 200 written communications to victims and

5    other members of the law firm.  What it will also show is that

6    on September 4th at 10:30 p.m. at night, two New York City

7    police officers --

8                 MS. SIMON:  Objection, your Honor.

9                 MR. DENNIS:  -- my home --

10                THE COURT:  You know that we discussed this before,

11    Mr. Dennis.  That has nothing to do with the issues in this

12    case.  Please confine yourself to the issues in this case.

13                MR. DENNIS:  Can we approach the bench for a second,

14    your Honor.

15                THE COURT:  No.  Please continue with other parts of

16    your opening.

17                MR. DENNIS:  Okay.

18                The evidence will show that three weeks later, on

19    September 24th, I was participating in a women's legal

20    conference and Chicago --

21                MS. SIMON:  Objection.

22                MR. DENNIS:  -- police officers were sent to surveil

23    me --

24                THE COURT:  So ladies and gentlemen, what you are

25    concerned with here is whether or not the government has shown

MABGden3                    Opening – Mr. Dennis

1    that Mr. Dennis did the things that they claim he did.  His

2    interactions with police, Chicago or wherever, have nothing to

3    do with what you have to decide.  Before a trial begins, all

4    these things get presented to me, and I work them out.  And I

5    have already ruled that this has nothing to do with your

6    determination in this case.

7              So please, Mr. Dennis, go on to something that was

8    permissible.

9              MR. DENNIS:  Objection, your Honor.  I would like to

10   have a conversation with the bench.

11             THE COURT:  All right.  Come to the bench.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

MABGden3                         Opening - Mr. Dennis

1          (At sidebar)

2          MR. DENNIS:  So these issues that I'm discussing are

3     issues that each of the witnesses that they're bringing to the

4     stand today are capable of talking about, and I should have the

5     right to cross-examine --

6          THE COURT:  No, this is a question of relevancy.  It's

7     not a question of knowledge.  It's a question of relevancy.

8     Whether or not police in New York or Chicago, wherever took

9     actions against you that you may feel were improper or

10    intimidating or whatever is an issue that was discussed

11    pretrial, and I ruled that it was irrelevant to the issues that

12    will go before the jury.

13         And more generally, I granted the motion *in limine*.

14    There was a specific motion *in limine* from the government

15    directed at this, which I granted.

16         Now, I understand you don't agree with all my rulings,

17    so be it.  But once I've ruled, I expect you to abide by my

18    rulings.  So I think you need to go on to something else.

19         Now, I allowed you -- actually, the government could

20    have objected to other things in your opening, but they didn't.

21    And I erred on the side of caution, allowed you to get very far

22    into stuff that was borderline.  But this is beyond the pale

23    because I have specifically ruled on it.  So let's go on.

24         MR. DENNIS:  Just for the record, my understanding was

25    the ruling was in quashing the subpoenas of those individuals

MABGden3                          Opening - Mr. Dennis

1    who I was calling to testify as to these matters.

2                (Continued on next page)

1          (In open court; jury present)

2          MR. DENNIS:  One of these things I say -- and I echo

3     what the Department of Justice said -- which is in deciding

4     justice, you need to understand the context.  Without the

5     context, just saying emails, not understanding what happened

6     before or after the emails makes it difficult to understand.

7     Because I can give you -- probably each one of you has an email

8     with one of your friends in one of your inboxes that says X, Y

9     and Z, I can say, wow, you were threatening that person.  But

10    give me the complete context of the relationship, prior, during

11    and after, and then I'll have a better idea of whether or not.

12         So to continue on with my timeline, the evidence will

13    show that on March 3rd, 2020, I filed a discrimination suit

14    against K&L Gates.  And the evidence will show that I received

15    a right to sue letter in August.  And then the evidence will

16    show that on October 28th of 2020, a sealed indictment --

17         MS. SIMON:  Objection.

18         MR. DENNIS:  -- this case, was against me without me

19    ever being interviewed.

20         THE COURT:  I'm sorry, I didn't hear the last thing

21    you said.

22         MR. DENNIS:  The last thing I said?

23         (Record read)

24         THE COURT:  I'll allow that.

25         Go ahead, Mr. Dennis.

MABGden3                    Opening - Mr. Dennis

1           MR. DENNIS:  So then on November 3rd, I filed a civil
2    suit against my partners at K&L Gates.  And then on
3    November 15th, you know, I filed a -- November 15th, a year
4    later, I filed a witness list with the American Arbitration
5    Association, a year later.  And on November 16th, a year and a
6    half later, I was arrested on the sealed indictment from 2020.
7    And the arrest record states that it was my intent to commit
8    homicide.  This is now changed to harassment.
9           So let's go on and talk a little bit -- that's a
10   little bit about the timeline that you're going to hear about.
11   Let's talk about, you know, intent.  So first and most
12   importantly, that was never my intent.  I was trying to show
13   the best interests of the ranks and file of K&L Gates and to
14   protect my own compensation by insisting on remedying what I
15   considered to be gender discrimination, race discrimination and
16   poor management.  The objective proof of my intent is the
17   business contacts, the multiple acts of management which
18   justified my emails.
19          The prosecution is mainly talked about the number of
20   emails.  And I expect, while presenting the case to you, you
21   will read a small portion of only pieces of the emails, not the
22   entire emails.  So they will ask you to convict me merely on
23   the content of a portion of a few number of emails without a
24   lot of the extra stuff going on.
25          As you begin to consider this case, I want you to

1    consider generally what's going on here.  I woke up this

2    morning, and I don't know if you guys saw this bombing that

3    went on in Ukraine --

4              THE COURT:  Would you please put that down.

5              MR. DENNIS:  Okay.  But you'll see where I'm going,

6    your Honor, real quickly.

7              So America is specifically surging in violent crime;

8    assault rifles being used against our children almost on a

9    monthly basis.  In our city, violent crimes are being

10   consummated against children, elderly on the subway systems,

11   buses, streets.  The perpetrators are without remorse and

12   assailants -- who knows.  With all this going on outside right

13   now, ask yourself why is the Department of Justice devoting all

14   of these resources --

15             MS. SIMON:  Objection, your Honor.

16             MR. DENNIS:  -- to convict a man who is 60 years old

17   of email harassment, with everything that's going on outside

18   around us right now.

19             THE COURT:  Let me instruct you, ladies and gentlemen.

20   First, of course, this is just one of thousands of criminal

21   cases that are brought every year, and they come with a whole

22   range.

23             Second and more importantly, the determination of

24   whether to indict someone is made by the grand jury.  It's not

25   made by anyone other than persons like yourselves who hear

1   evidence in what's called a grand jury and decide whether or

2   not to go ahead and charge someone with a crime.

3          Now, the charge is not proof of guilt beyond a

4   reasonable doubt.  That's your job, to determine whether the

5   government has proven guilt beyond a reasonable doubt.  But it

6   is the grand jury that decides whether or not to charge someone

7   with a crime.  And in this case, they charged this crime.

8          So the fact that other people may commit other crimes

9   is neither here nor there.  That will be a job for another jury

10  or many jurors if cases are brought there, but you're focusing

11  on the case before you.

12         Go ahead.

13         MR. DENNIS:  I would just remind the jury, which is

14  important, that this is a grand jury that I never got a chance

15  to speak to.  I was never interviewed.  This is the first time

16  publicly that I'm talking about all this.

17         But in any event, so the law partners that you are

18  going to see today, just to give you a sense, they're law

19  partners that come from the fifth largest law firm in the

20  world, over 2,000 lawyers across the globe, on the East Coast

21  from Boston to Miami, to Seattle, Chicago; internationally,

22  London, Paris, Beijing.  A law firm which has partners that are

23  able to communicate with some of the people in the highest

24  levels of government.

25         One of my partners is Rosemary Alito.  Her brother is

1  Samuel Alito, the Supreme Court justice.

2           MS. SIMON:  Objection, your Honor.

3           THE COURT:  Sustained.

4           I wish, Mr. Dennis, you would go back to -- you were

5  focusing on your intent and that which is relevant to this

6  case.  But who might be a sibling of one of your partners is

7  completely irrelevant.

8           MR. DENNIS:  Your Honor, I apologize.  What I was

9  trying to give the jury was an idea of the people who are about

10 to testify in front of you today, the victims.

11          THE COURT:  You'll have an opportunity to

12 cross-examine the people when they testify.

13          MR. DENNIS:  Okay.  All right.  So these partners --

14 and we're going to talk about them, but I want to -- this is my

15 overview, in terms of what I want you to look for, is this law

16 firm and the partners and myself, we're called in to handle the

17 toughest cases of the largest companies in the US and

18 internationally.  So we're accustomed to unleashing some of the

19 harshest attacks on the opponents of our clients; Microsoft,

20 AT&T, whoever they may be.  And we have war rooms where we

21 discuss all issues with no holds barred.  So this isn't your

22 normal -- when one of our largest clients like Microsoft comes

23 in and says, I've got a big problem, they want you to get the

24 army together and get the army marching.

25          So understanding that as the environment that we all

1    work in, including the people who are going to testify today

2    and tomorrow, it makes you -- one of the questions that you

3    have to consider is, what was it in an email that would

4    intimidate people like this.  So let me give you a little

5    background about some of the people who are going to be

6    testifying.

7            Eric Cottle, litigation partner for over 20 years,

8    okay.  He does toxic tort claims, including the representation

9    of companies in asbestos, silica and led pigmentation.  Let me

10   translate what that means to you because I was at the firm, we

11   represent companies like that.  You have asbestos that cause

12   you cancer.  We're the law firm that has to go to court and

13   say, you know what, this person did it on their own.  They

14   caused their problem, so don't blame my client just because

15   there was asbestos, it's this individual.  And we will do it

16   and he has done it, where he knows that the person who is

17   making the claim is only going to be testifying through

18   videotape because they're going to be dead by the time the case

19   comes to trial.

20           MS. SIMON:  Objection, your Honor.

21           MR. DENNIS:  That is the nature of his practice.  I

22   think that's relevant to know what does he talk about -- so

23   what would intimidate a man like that?  What would cause

24   problems for a man like that?

25           Most importantly, when you see Eric, Eric is a former

1    Olympic track and field athlete.  He's 6 feet 2, over

2    220 pounds, in excellent shape.

3            It's a fact that I am who I am.  I never owned a

4    weapon.  I'm scared of weapons.  And I'm a sane man.  So when

5    you look at his physical and understand what would it take,

6    what kind of email would it take to scare a man like this.

7            One of the other partners is going to be John Bicks.

8    He's a managing partner of the New York office.  John Bicks

9    basically represents -- he's a bankruptcy lawyer for the

10   company.  So a company is going out of business, they need a

11   lawyer, John Bicks is the one who is going to go to all the

12   creditors and say, you're not going to get paid or you're going

13   to get paid 10 cents on the dollar.

14           MS. SIMON:  Objection, your Honor.

15           THE COURT:  I'm going to allow this on the limited

16   basis that I understand the argument is being made that these

17   people are not easily intimidated, as shown by their

18   background.  I will -- that's one argument that I think can be

19   made.  We'll see whether it's borne out by the facts.

20           MR. DENNIS:  So I mean, I won't go through -- I talk

21   about the other partners who are coming in here.  These

22   aren't -- I was part of that -- these aren't your everyday

23   people who have nicey nice conversations most of the time.  In

24   fact, most of our conversations are pretty tough conversations

25   that we have with each other and that we have with our clients.

1   It's messages that we have to deliver that no one wants to

2   deliver, but we do.

3           So going back to -- I want you to look at the complete

4   context of everything that's happening here.  One of the things

5   I'll share with you, this is just -- as your Honor mentioned

6   earlier, the Southern District of New York is the most -- is

7   the most -- is the best, considered the foremost district in

8   the nation, in terms of where law is developed.  And all other

9   courts around the nation follow the Southern District of New

10  York.  It's that important in our nation's legal system.

11          So what you have is, in our Justice Department, you

12  have the best of the best lawyers.  So I mean, if you just look

13  at Ms. Kushner, University of Pennsylvania, NYU Law School --

14          MS. SIMON:  Objection, your Honor.

15          THE COURT:  Mr. Dennis, although I applaud your

16  bringing forward that Ms. Kushner has a distinguished legal

17  background, it has nothing to do with the issues in this case.

18          MR. DENNIS:  I just wanted to draw the understanding,

19  given the context of the email harassment and the level of fire

20  power that's in this room, and I'll leave it.  I think I -- I

21  won't go through, but I can just tell you all of the other

22  are -- legal -- lawyers.

23          In any event --

24          THE COURT:  No, I think you actually have gone the

25  half hour, but you did have some sidebars, so I'll give you a

1    couple more minutes if you need it.

2            MR. DENNIS:  As I stated, again, as you listen to the

3    witnesses and you hear the issue, I just want you to keep --

4    just keep the context in mind, context of this case and just

5    generally.  You guys didn't walk in here not reading the news

6    and not reading about what's going on in our legal system and

7    issues.  This isn't the first time you heard about emails being

8    used or not being used.  This is all -- so you don't -- that's

9    what you bring into the room as a jury, is understanding how

10   the world really works and making sure that the law is applied

11   properly.  That's what we want.  That's what it starts off

12   with; common law, common sense.  And then we built all these

13   things around it.  And it's this and that and the other thing,

14   and you've got guys like me, but it started off with common

15   law, meaning common sense.  You guys -- I want to thank you.

16   You guys are perfectly equipped and able to evaluate this case

17   and your determination will be a fair and just one.

18            Thank you.

19            THE COURT:  Thank you very much.

20            Please call your first witness.

21            MS. KUSHNER:  Your Honor, the government called Gladys

22   Frias Mora.

23   GLADY INIAS FRIAS MORA,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

1    DIRECT EXAMINATION

2    BY MS. KUSHNER:

3    Q.  Good afternoon.  Could you please state your name for the

4    court reporter.

5    A.  Gladys Inias Frias Mora.

6    Q.  And where do you work?

7    A.  I work for the national police of the Dominican Republic.

8    Q.  What is your title there?

9    A.  I am a first lieutenant.

10   Q.  Lieutenant Frias, how long have you worked for the national

11   police in the Dominican Republic?

12   A.  Approximately 13 years.

13   Q.  And are you assigned to a particular division currently?

14   A.  Yes, ma'am.

15   Q.  What division?

16   A.  I work for the division for the FBI in the Dominican

17   Republic.

18   Q.  And how long have you been in that role for?

19   A.  Since 2015.

20   Q.  And what do you do in that role?

21   A.  I work as an investigative officer.

22   Q.  And as a member of the national police for the Dominican

23   Republic, is anyone within that office allowed to work with the

24   FBI?

25   A.  No, ma'am.

MABGden3                          Frias Mora - Direct

1    Q.  And just to be clear, is the FBI also sometimes known as

2    the federal bureau of investigation?

3    A.  Yes, ma'am.

4    Q.  What do you have to do as a police officer in the Dominican

5    Republic to work with the FBI?

6    A.  First of all, you have to be a police officer, and then you

7    have to pass a polygraph exam so then you can become part of

8    the team for the FBI.

9    Q.  I want to direct your attention to November 16th of 2021.

10   Did you arrest anyone that day?

11   A.  Yes, ma'am.

12   Q.  Who did you arrest?

13   A.  Mr. Willie Dennis.

14   Q.  And sitting here today in the courtroom, do you see

15   Mr. Willie Dennis?

16   A.  Yes, ma'am.

17   Q.  Can you please describe an article of clothing that he's

18   wearing.

19   A.  He's wearing a blue jacket.

20   Q.  And where is he sitting exactly?

21   A.  Practically in front of me.

22          MS. KUSHNER:  Let the record reflect that the witness

23   has identified the defendant as Willie Dennis.

24          THE COURT:  Yes.

25   BY MS. KUSHNER:

MABGden3                        Frias Mora - Direct

 1  Q.  Lieutenant Frias, what authority did you have to arrest the

 2  defendant?

 3  A.  We had an arrest warrant and a deportation order against

 4  him.

 5  Q.  Do you know what country issued the arrest warrant?

 6  A.  Yes, ma'am.

 7  Q.  Which country?

 8  A.  The United States.

 9  Q.  And where did you arrest the defendant?

10  A.  In the province of Puerto Plata in the Dominican Republic.

11  Q.  And where exactly was the defendant in Puerto Plata?

12  A.  He was lodged, he was staying in the penthouse of a hotel

13  named as the Magnifico Hotel in Puerto Plata in the Dominican

14  Republic.

15  Q.  Was anyone else in the penthouse?

16  A.  No, ma'am.

17  Q.  I'm showing you what's been marked for identification

18  purposes.  It will probably be on the screen in front of you as

19  Government Exhibit 610.

20      Do you recognize it?

21  A.  Yes, ma'am.

22  Q.  How do you recognize it?

23  A.  I recognize it because it was me who took that photograph.

24  Q.  And what is a photograph of?

25  A.  It is a photograph of the block where the penthouse was

MABGden3                          Frias Mora - Direct

1    located, the penthouse where Mr. Willie Dennis was staying.

2    Q.  Is it a true and accurate photo of the block?

3    A.  Yes, ma'am.

4            MS. KUSHNER:  The government offers Government

5    Exhibit 610 into evidence.

6            THE COURT:  Any objection?

7            MR. DENNIS:  I object, your Honor.

8            THE COURT:  Overruled.

9            Proceed.

10           MR. DENNIS:  Can I state why.

11           THE COURT:  No.

12           (Government Exhibit 610 received in evidence)

13           THE COURT:  Proceed.

14           MS. KUSHNER:  Can we please publish for the jury

15   Government Exhibit 610.

16   BY MS. KUSHNER:

17   Q.  Where exactly is the penthouse in this photograph,

18   Lieutenant Frias?

19   A.  In the upper left-hand corner.

20           MS. KUSHNER:  Thank you.

21           We can take Government Exhibit 610 down.

22   Q.  In addition to arresting the defendant at the penthouse,

23   did you do anything else at the penthouse?

24   A.  Yes, ma'am.

25   Q.  What did you do?

MABGden3                          Frias Mora – Direct

1   A.   We executed a search warrant in the room where he was

2   staying.

3   Q.   And did you find anything?

4   A.   Yes, ma'am.

5            (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MabWden4                          Frias - Mora

 1   BY MS. KUSHNER:
 2   Q.  What did you find?
 3   A.  We found electronic devices, money, and documents.
 4   Q.  I'm showing you what's been marked for identification
 5   purposes as Government Exhibit 616.  Do you recognize it?
 6   A.  Yes, ma'am.
 7          MR. DENNIS:  Objection, your Honor.  The Court has not
 8   established why the government is presenting this information
 9   or why Mr. Dennis was in the Dominican Republic in the first
10   place.  There's no connection.
11          THE COURT:  That's your cross-examination.  I
12   understand that's what you want to get into, but that's for
13   cross-examination.
14          Go ahead.
15   BY MS. KUSHNER:
16   Q.  How do you recognize what's shown in front of you?
17   A.  Because I was the one who took the photo.
18   Q.  And in general, what is it a photo of?
19   A.  This photo is of the evidence, the items of evidence that
20   were recovered in the room that Willie Dennis was staying in.
21   Q.  Is it a true and accurate photo of that evidence?
22   A.  Yes, ma'am.
23   Q.  I'm now showing you what's been marked for identification
24   purposes as Government Exhibit 616A.  Do you recognize this?
25   A.  Yes, ma'am.

MabWden4                          Frias - Mora

1    Q.  What is it?

2    A.  Electronic devices.

3    Q.  Is it a zoomed-in version of Government Exhibit 616?

4    A.  Yes, ma'am.

5    Q.  And is it otherwise a true and accurate photo of the

6    electronic devices that were recovered from Willie Dennis's

7    room?

8    A.  Yes, ma'am.

9            MS. KUSHNER:  The government offers Government Exhibit

10   616A into evidence.

11           THE COURT:  I take it, Mr. Dennis, that your objection

12   is on grounds of relevance.

13           MR. DENNIS:  Yes.

14           THE COURT:  Let's have a sidebar.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

MabWden4                         Frias - Mora

1          (At sidebar)

2          THE COURT:  What's the relevance?

3          MS. KUSHNER:  I just want to establish that the cell

4     phone from which all the text messages came from was Willie

5     Dennis's phone, and it was recovered at the time of his arrest.

6          THE COURT:  The cell phone that you're later going to

7     introduce the contents of; is that it?

8          MS. KUSHNER:  Yes, and because we don't have the

9     physical phone, because we returned it, and there's no

10    stipulation, we want to make sure that the phone is tied

11    directly to him.

12         THE COURT:  That's right.  I granted the return of the

13    phone on the motion made by Mr. Dennis.  I think then this is

14    necessary for chain of custody.

15         MR. DENNIS:  OK.  I object because I don't understand

16    the relevance of showing photographs of money all around as if

17    giving the impression to the jury that there's something else

18    going on.  She wants to --

19         MS. KUSHNER:  The purpose is not to introduce that

20    larger photo.

21         THE COURT:  No, no, no.  I assume, and this is why I

22    overruled your earlier objection, I assume you're going to

23    cross-examine about you were just there, and I don't know

24    whether it was a business trip or a vacation or whatever, but I

25    doubt very much that this officer will have any independent

MabWden4                        Frias - Mora

1    knowledge of why you were there.  So that's fair to bring out.

2    But what they're getting into right now is chain of custody.

3    That, I think, is relevant.

4            MR. DENNIS:  I'm not denying chain of custody.  I mean

5    they're putting on -- is there a way to short circuit this?

6            THE COURT:  Well, you could have stipulated, but you

7    declined to stipulate.  That is the point.

8            MR. DENNIS:  Maybe Mr. Kelly didn't explain it right.

9            THE COURT:  No, no, no.  This was --

10           MR. DENNIS:  This was recently?

11           THE COURT:  Well, the --

12           MR. DENNIS:  I mean I don't know.

13           THE COURT:  Do you want to stipulate that the phone

14   records they're going to put in later, the phone messages, all

15   came from the phone that was seized from you?

16           MR. DENNIS:  Take that under consideration; I don't

17   remember seeing all the phone records.  But you're saying these

18   are all the phone records that came from my 646-418-3229

19   number?

20           MS. KUSHNER:  Yeah, exactly.

21           MR. DENNIS:  Yeah.  What's wrong with that?

22           THE COURT:  All right.

23           MS. KUSHNER:  I just want to be clear on what is being

24   stipulated to.

25           THE COURT:  What I'm going to tell the jury right now,

MabWden4                          Frias - Mora

1    to move this along, is that the parties have stipulated that

2    certain records that will be introduced later from a particular

3    phone -- you'll give me the number --

4            MR. DENNIS:  Actually, your Honor, before you -- will

5    I still get a chance to cross-examine?

6            THE COURT:  Yes.

7            MR. DENNIS:  I don't want to stipulate.  I still want

8    to have a chance to cross-examine.

9            THE COURT:  OK.

10           MR. DENNIS:  OK.

11           THE COURT:  So let's just go forward.

12           MR. DENNIS:  Yeah, let's go.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

MabWden4                          Frias - Mora

1          (In open court)

2          MS. KUSHNER:  Just so the record's clear, the

3     government is offering Government Exhibit 616A into evidence.

4          THE COURT:  Received.

5          (Government Exhibit 616A received in evidence)

6     BY MS. KUSHNER:

7     Q.  Lt. Frias, what is on the top right-hand side of this

8     photograph?

9          MS. KUSHNER:  If we could please publish it for the

10    jury.  Thank you.

11    A.  An Apple brand computer and cell phone, iPhones.

12    Q.  And are those the two phones right next to the Apple

13    computer?

14    A.  Yes, ma'am.

15    Q.  Showing you what's been marked as Government Exhibit 618,

16    do you recognize this?

17    A.  Yes, ma'am.

18    Q.  How do you recognize it?

19    A.  I was the person who took that photograph.

20    Q.  And what is it a photograph of?

21    A.  The photograph is of a gray Apple brand computer and of a

22    black iPhone.

23    Q.  And are these two of the items recovered from the

24    defendant's room?

25    A.  Yes, ma'am.

MabWden4                         Frias - Mora

Q.  And is it a true and accurate photograph of those two
items?

A.  Yes, ma'am.

          MS. KUSHNER:  The government offers Government Exhibit
618 into evidence.

          THE COURT:  Any objection?

          MR. DENNIS:  No.

          THE COURT:  Received.

          (Government Exhibit 618 received in evidence)

BY MS. KUSHNER:

Q.  Lt. Frias, where were you when you took this photo?

A.  To be exact, in the penthouse where Willie Dennis was
staying.

Q.  And do you see the white sticker on the back of the phone?

A.  Yes, ma'am.

Q.  Was that sticker already on the phone when you took this
photo?

A.  Yes, ma'am.

          MS. KUSHNER:  You can take it down.

Q.  And turning your attention to Government Exhibit 604, do
you recognize what's shown here?

A.  Yes, ma'am.

Q.  How do you recognize it?

A.  I was the person who took that photograph.

Q.  And what is it a photograph of?

MabWden4                          Frias - Mora

1   A.   It's the photograph of an iPhone cell phone that is black.

2   Q.   And is it a true and accurate photo of that phone?

3   A.   Yes, ma'am.

4          MS. KUSHNER:   The government offers Government Exhibit

5   604 into evidence.

6          THE COURT:   Any objection?  Mr. Dennis, any objection?

7          MR. DENNIS:   No objection.

8          THE COURT:   Received.

9          (Government Exhibit 604 received in evidence)

10  BY MS. KUSHNER:

11  Q.   And is this phone the same phone that was photographed in

12  Government Exhibit 618?

13  A.   Yes, ma'am.

14  Q.   And turning your attention to Government Exhibit 619, do

15  you recognize this?

16  A.   Yes, ma'am.

17  Q.   How do you recognize it?

18  A.   I was the one who took that photograph.

19  Q.   And what is it a photograph of?

20  A.   The photograph is of a gray Apple computer and of a black

21  iPhone cell phone.

22  Q.   And is it a true and accurate photograph of those two

23  items?

24  A.   Yes, ma'am.

25          MS. KUSHNER:   The government offers Government Exhibit

MabWden4                          Frias - Mora

1   619 into evidence.

2           THE COURT:  Any objection?

3           MR. DENNIS:  No objection, your Honor.

4           THE COURT:  Received.

5           (Government Exhibit 619 received in evidence)

6   BY MS. KUSHNER:

7   Q.  Is this another photograph of the same phone discussed

8   in --

9           THE COURT:  Counsel, I really think we need to move

10  this along.

11  BY MS. KUSHNER:

12  Q.  Where were you when you took the photo?

13  A.  To be exact, in the room where Willie Dennis was staying.

14  Q.  Did the search team do anything to keep track of evidence

15  items it recovered from the defendant's room?

16  A.  No, ma'am.

17  Q.  Did anyone take an inventory of the items that were

18  recovered from the defendant's room?

19  A.  Yes, ma'am.

20  Q.  And when was that done?

21  A.  While we were carrying out the search warrant.

22  Q.  And was that inventory of items memorialized anywhere?

23  A.  Yes, ma'am.

24  Q.  And where were you when the inventory was being written

25  down?

MabWden4                           Frias - Mora

1  A.  Notes were taken while the search warrant was being carried

2  out, and then we went to the office of the attorney general,

3  the Dominican Republic attorney general.

4  Q.  While the inventory was being written down, do you recall

5  whether any identifiers were written down for the cell phones

6  we've been discussing?

7  A.  Yes, ma'am.

8  Q.  Do you recall identifiers were written down for that cell

9  phone?

10 A.  Yes, ma'am.

11 Q.  What kind of identifiers?

12 A.  The phone's IMEI number and the serial number.

13 Q.  And did you know the serial number at the time it was

14 written down?

15 A.  Yes, ma'am.

16 Q.  And were you present when the serial number was written

17 down?

18 A.  Yes, ma'am.

19 Q.  Was it accurately recorded at the time?

20 A.  Yes, ma'am.

21 Q.  And did you review -- and do you recall the serial number

22 of the phone that was written down?

23 A.  No, ma'am.

24 Q.  I'm showing you what's been marked for identification

25 purposes as 3531-04.  Is this a reflection of the inventory

MabWden4                         Frias - Mora

1   that was written down at the time of the defendant's arrest?

2   A.  Yes, ma'am.

3   Q.  Directing your attention to item No. 2, can you please just

4   read that to yourself and then look up.

5        Does that refresh your recollection as to what serial

6   number was written down for the phone at the time?

7   A.  Yes, ma'am.

8   Q.  Can you tell the jury right now, without looking at that

9   document -- without looking at that document -- what the serial

10  number is?

11  A.  No, ma'am.

12  Q.  And why not?

13  A.  It's a very long number.

14  Q.  Can you please read the number from the document you're

15  looking at for the jury?

16  A.  Yes, ma'am.

17  Q.  Go ahead.

18  A.  89014104270935535434.

19  Q.  And was that the serial number that was written down?

20  A.  Yes, ma'am.

21  Q.  Where did you ultimately bring the defendant?

22  A.  He was brought to the United States.

23  Q.  And how do you know that?

24  A.  Because I was part of the custodial chain for the

25  defendant.

MabWden4                         Frias - Mora

1   Q.  Did you travel with the defendant to the United States?

2   A.  Yes, ma'am.

3   Q.  Did you bring anything else with you?

4   A.  Yes, ma'am.

5   Q.  What did you bring?

6   A.  The evidence that was collected at Mr. Willie Dennis's

7   penthouse.

8   Q.  And how did you get to the United States?

9   A.  On a commercial flight.

10  Q.  Where did you fly in to?

11  A.  To the United States.

12  Q.  Did you fly in to a particular airport?

13  A.  Yes, ma'am.

14  Q.  Where?

15  A.  Newark.

16  Q.  And what day was that?

17  A.  November 18, 2021.

18  Q.  What happened when you arrived at Newark?

19  A.  We turned the defendant over to FBI agents together with

20  all the evidence that was secured at the penthouse.

21  Q.  Including the phone we've been discussing today?

22  A.  Yes, ma'am.

23  Q.  After that, did you have any other involvement in this

24  case?

25  A.  No, ma'am.

MabWden4                    Frias Mora - Cross

1          MS. KUSHNER:  One moment.

2    Q.  Lt. Frias, can you just clarify what you did with the cell

3    phone when you arrived in the United States?

4    A.  It was given over as evidence to an FBI agent.

5          MS. KUSHNER:  Thank you.  No further questions.

6          THE COURT:  Cross-examination.

7    CROSS-EXAMINATION

8    BY MR. DENNIS:

9    Q.  Lt. Frias*, mucho tiempo.*

10        I guess the first question I want to ask is I want to

11   confirm that the witness was at my apartment the day of the

12   arrest.

13        THE INTERPRETER:  Is that a question, counselor?

14        MR. DENNIS:  Yes.

15   A.  Yes, sir.

16   Q.  OK.  I would like to ask the witness, what does the

17   following phrase mean, "*intento de homocidio*"?

18        THE INTERPRETER:  As per the interpreter, attempted

19   homicide.

20   A.  When a person tries to kill another.

21   Q.  OK.  And so -- try to phrase this the right way.

22        I assume -- well, I will ask.  Was the witness aware that

23   this was in the -- this was in the papers that were served in

24   me, served to me the day that I was arrested?

25   A.  I don't understand.

MabWden4                         Frias Mora - Cross

1             MR. DENNIS:  Before she answers, here's a document

2    right here that was served on November 16.

3             THE COURT:  Wait a minute.  Wait a minute.  Wait a

4    minute.  If you want to show a document to the witness --

5             MR. DENNIS:  OK.

6             THE COURT:  -- then just bring it to her.  Don't show

7    it to anyone else.

8             MR. DENNIS:  OK.

9             Right here.

10            THE COURT:  Do you recognize this document at all?

11            THE WITNESS:  Yes, sir.

12            THE COURT:  OK.  What is it?

13            THE WITNESS:  It was an informational notes,

14   informational notes that were prepared at the office.

15            THE COURT:  OK.  Go ahead.

16            MR. DENNIS:  Let me ask her why it was, why I was

17   given a.

18            THE INTERPRETER:  Counsel, I do not ask questions.

19   I'm the interpreter.  You ask her.

20            MR. DENNIS:  Oh, I'm sorry.

21   Q.  Why was that document given to me?

22            MR. DENNIS:  That's fine.

23   Q.  The day that I was arrested, do you recall me asking -- do

24   you recall me asking to be able to see an attorney?

25   A.  I don't remember that.

1    Q.   During the ride to Santo Domingo, do you recall me asking

2    to see an attorney?

3    A.   No, sir.

4    Q.   Were you under the impression, based on the language in

5    this document, that I was being arrested because I had

6    attempted to murder someone?

7    A.   No, sir.

8    Q.   What did you interpret my crime to be?

9    A.   We only had, sir, an arrest warrant against you.

10   Q.   OK.  How many law enforcement officials were with you that

11   day at the apartment?

12   A.   The entire division.

13   Q.   (Laughter) More than ten?  Was it more than ten?

14   A.   Yes, sir.

15   Q.   And were they all armed?

16   A.   Yes, sir.

17           MR. DENNIS:  Uh-huh.

18           Your Honor, I don't have -- can I pass this to the

19   jury to see so that they saw just the language?

20           THE COURT:  No, but I thought you were, forgive me if

21   you don't want me to put this question.  But the question, I

22   thought, based on the sidebar, you were going to put to the

23   witness was -- and I'll put it -- did you have any idea why

24   Mr. Dennis was present in your country at that time?

25           THE WITNESS:  Yes, sir.

1              THE COURT:  And don't tell me what it was, but tell me

2      what it was based on.

3              THE WITNESS:  Fine.  The arrest warrant was an --

4              THE INTERPRETER:  The investigation was based on --

5      interpreter's correction.

6              THE WITNESS:  The investigation was based on a search

7      warrant and an order of deportation against Mr. Willie Dennis.

8              THE COURT:  Deportation from where?

9              THE WITNESS:  From the Dominican Republic to the

10     United States.

11             THE COURT:  I guess maybe I didn't make my question

12     very clear.  Did you know whether Mr. Dennis was there in the

13     Dominican Republic because he was there on business or because

14     he was there on vacation or whether he was there for some other

15     reason?  Did you have any knowledge bearing on that?

16             THE WITNESS:  Well, I did not know his reasoning or

17     his -- for being there.  However, part of the investigation was

18     that Mr. Dennis was a fugitive from the law.

19             THE COURT:  Well, I'm going to strike that last part

20     of the answer as not responsive, but we'll keep the first part.

21             I take it, Mr. Dennis, that's the question you were

22     trying to raise at the sidebar.

23             MR. DENNIS:  Yes.  I would like to ask the witness --

24             THE COURT:  OK.  If you want to go further --

25             MR. DENNIS:  Yeah.

MabWden4

1          THE COURT:  If you don't want it stricken, that's

2     fine.

3     BY MR. DENNIS:

4     Q.  Does she know, do you know when I entered the country?

5          THE INTERPRETER:  Sir, please do not use the third

6     person.  Speak to the witness directly.

7          MR. DENNIS:  Oh.

8          THE INTERPRETER:  Thank you.

9          THE COURT:  So the question is --

10    BY MR. DENNIS:

11    Q.  When did I enter?  When did I enter the Dominican Republic?

12    A.  I don't remember that information.

13    Q.  Do you know if I entered the Dominican Republic in the fall

14    of 2019?

15    A.  I don't remember that information.

16    Q.  How many arrests have you made for email harassment in the

17    Dominican Republic?

18          THE COURT:  Sustained.  Put another question.

19          MR. DENNIS:  I don't think I have any further

20    questions, your Honor.

21          THE COURT:  All right.

22          MR. DENNIS:  Would I be able to, if I came back with

23    more, talk to the witness?  This is all getting used to -- I

24    really didn't expect --

25          THE COURT:  Well, no.  This is your chance to put any

MabWden4

1   questions you wanted to.  If you don't have any other

2   questions, we'll hear from the government, and then if they

3   have nothing, we'll excuse the witness.

4          MR. DENNIS:  OK.

5          THE COURT:  Anything from the government?

6          MS. KUSHNER:  No, your Honor.

7          THE COURT:  Thank you so much.  You may step down.

8          (Witness excused)

9          MR. DENNIS:  Your Honor, is it all right if I take a

10  restroom break?

11         THE COURT:  I understand the need for a break, but I

12  was hoping, because we started so late this afternoon --

13         I'll tell you what, ladies and gentlemen.  In a moment

14  of weakness, we're going to let you go now for the day.  Don't

15  take it as a precedent, but we will end at 4 o'clock today.

16         Now, tomorrow, we're going to start promptly at 9:30,

17  so my suggestion is be in the jury room by at least ten minutes

18  before 9:30 so we can start right away.

19         Have a very good evening.  We'll see you soon.

20         Let me, once again, remind you not to discuss the case

21  with anyone.  By the way, I don't think this case is being

22  covered in the papers, but if for any reason you see anything

23  in the media about it, turn away immediately.  Don't pay any

24  attention to it, please.

25         (Continued on next page)

MabWden4

1          (Jury not present)

2          THE COURT:  Please be seated.

3          MR. DENNIS:  Your Honor, literally, can I just go to

4     the men's room for one second?

5          THE COURT:  Oh, yes.  Go ahead.  I'm sorry.  We'll

6     take a five-minute break, and then we'll resume.

7          (Recess)

8          THE COURT:  Mr. Dennis, come on up.

9          I think the only remaining item was we were in the

10    midst of discussing the subpoena to Mr. Bradford Smith of

11    Microsoft, and the jury was ready, so we interrupted.

12         As I had pointed out, the document portion of the

13    subpoena deals with a lot of things that the Court has already

14    ruled irrelevant in other contexts, in other subpoenas.  But I

15    was asking Mr. Dennis if Mr. Smith were called by him as a

16    witness, what is it that you believe Mr. Smith could say that

17    would be helpful to your case.

18         MR. DENNIS:  Your Honor, my -- I'm sorry.

19         In the subpoena, as the judge recognized in any --

20    certainly I don't need the documents.  It was really the

21    witness testimony.  As I said in the subpoena application, it

22    was 12 days after notifying Mr. Smith that, among other

23    things -- so I just don't want it to be one thing, but I'm

24    going to give you three or four things.  It was 12 days after I

25    notified Mr. Smith, which was on November 16 of 2020, that

MabWden4

1    there was strong information, based upon my 14 years of partner

2    at KL Gates and understanding IT and being a technology lawyer

3    and knowing the CTO at the time is now the former CTO, that the

4    servers in -- KL Gates's servers in Beijing, Shanghai, and

5    Taipei had been penetrated by Chinese agents acting for the

6    Chinese Communist Party, and provided him with certain

7    information, which showed that this was based on the

8    information of someone who had been a partner 14 years at the

9    firm, who was very familiar with technology issues, very

10   familiar with spyware, very familiar with -- this wasn't from a

11   labor employment attorney.  This was my bread and butter and

12   had been since, since 19 -- 1995, when I basically represented

13   a lot of companies that are now -- or 1996, after Mudge closed,

14   when I started representing a lot of companies that now form,

15   are considered part of Silicon Valley.  And 12 days after

16   sending Mr. Smith that email, the indictment was filed against

17   me on October 28, 2020.

18          And so as we've discussed before, your Honor, I

19   certainly feel, and the more -- the more I see is that former

20   U.S. Attorney Berman talked about political influence between

21   June and December of 2020, and certainly I agree with your

22   Honor that he did everything he could to attempt to, you know,

23   not let that happen, but of course, he was out of office.  He

24   was not there, and so Senator Durbin decided to look further

25   and decided that it's important, to maintain the public

MabWden4

1    confidence in the rule of law, to look further into the

2    comments and into, you know, basically some of the things that

3    Mr. Berman said had occurred.

4          And I, based on all the -- I don't consider them

5    coincidental anymore, the fact that, that the indictment was

6    handed down to me October 28, 2020, and as I was discussing

7    earlier, I understand the influence and power of my partners,

8    because I was there for 14 years.  So I believe, and I believe

9    there was, I believe there was influence in this case.  I

10   don't -- I mean it was obviously before all of the current

11   attorneys were there.  So I mean, you know, with different

12   leadership, but I believe there was influence in getting the

13   indictment --

14          THE DEPUTY CLERK:  We just lost everything.

15          THE COURT:  No, we didn't.

16          THE DEPUTY CLERK:  All the computers just went out.

17          THE COURT:  No, they're not.  I'm getting it on mine.

18   You may have lost it, but I didn't.

19          Go ahead.

20          (Discussion off the record)

21          THE COURT:  I will speak louder.

22          What I said was that everything that Mr. Dennis just

23   said was dutifully recorded by the reporter, and I can see it

24   on my screen as well.

25          MR. DENNIS:  OK.  I think we have a --

MabWden4

1          THE COURT:  All right.  The point is -- this is

2    familiar territory, Mr. Dennis -- you have an elaborate

3    conspiratorial theory that K&L Gates, using their alleged

4    influence, were the ones who orchestrated the indictment

5    against you.  It's an interesting theory, but it's one for

6    which there is no nonspeculative information.  There's nothing

7    that would be admissible under the rules of evidence to support

8    that theory, even assuming, which I doubt, that that would be

9    in any way, shape, or form relevant to this jury.

10          If, in fact, the indictment was orchestrated by K&L

11    Gates through their influence, of which I think there is no

12    meaningful evidence whatsoever, but even assuming for the sake

13    of argument that that were true, that has nothing to do with

14    any issue this jury is concerned with.  They're concerned with

15    whether there is evidence of whether the charges brought by the

16    grand jury against you are true or false or, more precisely,

17    whether the government has proven the charges beyond a

18    reasonable doubt or failed to do so.  So even if your theory

19    were less speculative than it is, your remedy would not be with

20    this jury or with evidence before this jury.  You might bring a

21    motion before this Court.  You've certainly discussed it before

22    this Court, and I've indicated I don't see any hard evidence of

23    it, but it has nothing to do with this jury, and that's why I'm

24    going to --

25          MR. DENNIS:  Well, just --

MabWden4

THE COURT:  Yes.

MR. DENNIS:  The one area that your Honor and I, and obviously the Court's ruling is going -- that we, that one factual area is that, and I said, made this argument repeatedly, is that I'm entitled to my right to confront my accuser.  Now, how we define my accusers --

THE COURT:  Well, I already told you so far as this trial is concerned, those consist of the people who are taking the stand.

MR. DENNIS:  And so that where I think we see it is that those partners, and I, from being a partner at that firm, did not and were unable to come in and produce this testimony without first going to the executive management team of the firm and getting their approval.  Firms like that do not operate with parties acting unilaterally.

THE COURT:  First of all, I'm not going to get into a discussion, although I was a partner at two major firms, but in my recollection, for what it's worth, particularly at Fried Frank, the firm I had the privilege of being with before coming on the bench, was the partners mostly did what they wanted to do.

But more to the point, if you want to cross-examine a witness on the stand, "Before you agreed to testify in this case, did you seek clearance from the executive committee," or something like that, that might be a fair question.  That's

MabWden4

very different from what we were just discussing.

            I thought, by the way, and this I offer for clarity to
the government, even though Mr. Dennis said a lot of irrelevant
stuff in his opening statement, one thing he said that I
thought was pertinent -- and I hadn't thought about before --
is I think he is entitled to bring out the, if you will, tough
mental state of the alleged victims to show that they would not
easily be intimidated and that, furthermore, he knew they
wouldn't be easily intimidated, and therefore, he didn't intend
to intimidate them; he was just talking in language that they
understood, or something like that.  So Mr. Dennis, I am going
to allow questions along those lines.

            MR. DENNIS:  Thank you, your Honor.

            THE COURT:  All right.  I think we've covered
everything I wanted to cover.  Anything else we need to take
up?

            I am quashing the subpoena.

            MS. KUSHNER:  Thank you, your Honor.

            The government obviously has no objection to the
defendant cross-examining witnesses about the tough mental
man's club environment, but we just want to make sure --

            THE COURT:  I should also note for the record that, of
course, the partners at Fried Frank were shy, quiet pussycats,
but we'll leave that for another time.

            MS. KUSHNER:  But in terms of its prejudicial,

MabWden4

|       |                                                                              |
| ----- | ---------------------------------------------------------------------------- |
| 1     | inflammatory effect, we would, and the defendant brought this                |
| 2     | up in his opening, ask that he be precluded from asserting or                |
| 3     | implying that these lawyers were taking on cases where they                  |
| 4     | just expected the witness to die or where they --                            |
| 5     | THE COURT:  Where they just?                                                 |
| 6     | MS. KUSHNER:  Expected the witness to die and for                            |
| 7     | asserting that the lawyers were knowingly representing a                     |
| 8     | company that knew what they had done -- that knew that they had              |
| 9     | done what the plaintiff was alleging they had done to them.                  |
| 10    | THE COURT:  I'm not going to preclude across the                            |
| 11    | board, but I do think a question like that, a specific                       |
| 12    | question, that sounds like improper questioning, but we'll take              |
| 13    | it one question at a time.                                                   |
| 14    | MS. KUSHNER:  OK.  The other issue raised by the                            |
| 15    | defendant's opening, the Court, of course, had previously ruled              |
| 16    | that the government could not introduce the fact that he was --              |
| 17    | THE COURT:  Oh, yes.  The door has been opened wide on                       |
| 18    | that.  Mr. Dennis, and I can well understand his strategy in                 |
| 19    | that regard, decided to bring out that he had been fired, but                |
| 20    | now it's fair game for the government to get into that too if                |
| 21    | you wish.                                                                     |
| 22    | MS. KUSHNER:  Thank you, your Honor.                                         |
| 23    | THE COURT:  All right.                                                       |
| 24    | MR. DENNIS:  Your Honor, one other question.  Can the,                       |
| 25    | because I'm representing myself *pro se*, and I need to prepare              |

MabWden4

1   this evening, can the government tell me who their first

2   witness is going to be tomorrow?

3           THE COURT:  Yes, of course.  I was just going to ask

4   them that.  Thank you for raising that.

5           Who is your first witness tomorrow?

6           MS. KUSHNER:  Your Honor, we're calling Eric Cottle.

7           THE COURT:  OK.  There you are.

8           MR. DENNIS:  Any other witnesses, as I'll be preparing

9   tonight?  Eric Cottle --

10          THE COURT:  Who do you expect --

11          MR. DENNIS:  Who are you calling tomorrow?

12          MS. KUSHNER:  We anticipate calling Eric Cottle, Jeff

13  Maletta, an AT&T custodian.  Those are the next three

14  witnesses.  And then Stephen Flatley from the FBI.  Prior to

15  that it would be Christian Isolda, also from the FBI.  And

16  after that it would be John Bicks and then Calvina Bostick and

17  then a summary witness.

18          THE COURT:  OK.  So there you are.

19          I have another matter on the bench here at 4:30, so I

20  think this brings us to a conclusion.  We'll see you tomorrow

21  promptly at 9:30.

22          (Adjourned to October 12, 2022, at 9:30 a.m.)

23

24

25

INDEX OF EXAMINATION

Examination of:                                      Page

GLADY INIAS FRIAS MORA

Direct By Ms. Kushner  . . . . . . . . . . . .52

Cross By Mr. Dennis  . . . . . . . . . . . . .69

GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 610    . . . . . . . . . . . . . . . . . . . .55

 616A   . . . . . . . . . . . . . . . . . . . .62

 618    . . . . . . . . . . . . . . . . . . . .63

 604    . . . . . . . . . . . . . . . . . . . .64

 619    . . . . . . . . . . . . . . . . . . . .65