MAHGDEN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                          20 Cr. 623 (JSR)

WILLIE DENNIS,

                                          Trial
              Defendant.

------------------------------x

                                          New York, N.Y.
                                          October 17, 2022
                                          9:00 a.m.

Before:

                        HON. JED S. RAKOFF,

                                          District Judge
                                          and a Jury

                            APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
SARAH KUSHNER
STEPHANIE SIMON
KIMBERLY RAVENER
     Assistant United States Attorney

WILLIE DENNIS, Pro Se

Also Present:

Colleen Geier, Paralegal
Elisabeth Wheeler, FBI

MAHGDEN1

1              (In open court; jury not present)

2              THE COURT:  So it's now about eight minutes after

3    9:00.  This session was called for 9:00 o'clock, so we could go

4    over -- there is Mr. Dennis.  I'm sorry, Mr. Dennis.  So we're

5    ready to proceed.

6              So Mr. Dennis, are either of your witnesses here yet?

7              MR. DENNIS:  Your Honor, I will not be calling

8    witnesses.

9              THE COURT:  Okay.  So let's turn to the draft

10   instructions of law to the jury.

11             With respect to instructions number one through nine,

12   which are standard instructions, any objection or addition or

13   other comment from the government?

14             MS. KUSHNER:  No, your Honor.

15             THE COURT:  Any objections, additions or other

16   comments on instructions one through nine from the defendant?

17             MR. DENNIS:  Your Honor, if you would give me a

18   moment.

19             THE COURT:  Do you need another copy?

20             MR. DENNIS:  Yes, please.

21             THE COURT:  Okay.

22             (Pause)

23             THE COURT:  So with respect to instructions numbers

24   one through nine, which are the standard instructions, any

25   comment, addition or correction from the defendant?

MAHGDEN1

1           MR. DENNIS:  No, your Honor.

2           THE COURT:  Very good.

3           On Page 12, what's the name of the FBI examiner?

4           MS. KUSHNER:  Stephen Flatley.

5           THE COURT:  Stephen with a V or a P-H?

6           MS. KUSHNER:  P-H.

7           THE COURT:  Stephen.

8           MS. KUSHNER:  Flatley, F-L-A-T-L-E-Y.

9           THE COURT:  Turning to instruction number ten.  And

10   this of course is the main instruction on the three counts.

11          Any objections, corrections or additions from the

12   government?

13          MS. KUSHNER:  Your Honor, the government has a few

14   suggestions and additions.  The first, in describing the second

15   element, the instructions currently read to "intimidate means

16   to threaten with bodily harm," and that's not in the statute.

17   So we would ask that the "with bodily harm" be excised and that

18   the instruction be changed to read something along the lines of

19   "to intimidate means to threaten or frighten the victim or

20   compel him or her to act."

21          THE COURT:  Well --

22          MR. DENNIS:  Your Honor, I object.

23          THE COURT:  I will hear from you in a minute.  I just

24   want to get the wording the government is suggesting.

25          To intimidate, in the government's view, means to

MAHGDEN1

1    frighten?

2            MS. KUSHNER:  To threaten, as the Court has, or to

3    frighten the victim or compel him to do or not do something.

4            THE COURT:  What is it that you say the victims in

5    this case were compelled to do or not to do?

6            MS. KUSHNER:  To leave New York, to support him in the

7    lawsuit.

8            THE COURT:  Well, I don't recall that any of the

9    emails suggested that that's what the victims should do.

10           MS. KUSHNER:  There are messages to Ms. Bostick, for

11   example, where the defendant commands to her, quote, speak.

12   Quote, to leave New York, to stop practicing.

13           MR. DENNIS:  Objection.

14           THE COURT:  I'm going to get to you in just a second.

15           To intimidate means to frighten or to seek to cause a

16   victim to what?

17           MS. KUSHNER:  To act or not to act in a certain way,

18   to compel.

19           THE COURT:  So cause a victim --

20           MS. KUSHNER:  To act in a manner the victim would not

21   have otherwise acted.  So that's the government's view.

22           Anything else from the government before we get to

23   Mr. Dennis?

24           MS. KUSHNER:  Just to confirm that the word threaten

25   is still in the instruction and the word bodily harm is no

MAHGDEN1

1    longer in the instruction.

2              THE COURT:  I understand, that's what you were --

3              MS. KUSHNER:  Okay.  And then the other request from

4    the government would be -- and this is just based exactly on

5    the language in the statute -- that in addition to saying --

6    this is in the second paragraph and the third element

7    paragraph -- in such manner as to cause or attempt to cause.

8              THE COURT:  Does someone have a copy of the statute or

9    what's the number?

10             MS. KUSHNER:  2261(A) subsection (2)(b).

11             THE COURT:  Causes, attempts to cause or would be

12   reasonably expected to cause substantial emotional stress.  So

13   this goes to the third element.

14             MS. KUSHNER:  Yes, your Honor.

15             THE COURT:  I'm sorry, I thought you were still on the

16   second element.

17             MS. KUSHNER:  No.  Sorry.  In the second paragraph of

18   the instruction, it references that third element, so it says

19   to harass or intimidate another person in such manner to cause

20   or attempt to cause.  And then the same change in that third

21   element paragraph, course of conduct caused or attempted to

22   cause.

23             THE COURT:  So let me hear now from Mr. Dennis.

24             MR. DENNIS:  Your Honor, prior to making any

25   statements regarding this issue, I would like to see -- I would

MAHGDEN1

1    like to get a copy of exactly what the government proposes

2    to -- the changes that the government proposes this morning,

3    and I'd like an opportunity to review it against the statute.

4         THE COURT:  No.  No.  I'll read it to you.

5         MR. DENNIS:  I'd like to have a copy to read myself.

6         THE COURT:  Well, now wait a minute.  I gave you this

7    proposed charge on Thursday, and I said that we would discuss

8    it as early as Friday.  You had instead the entire weekend,

9    it's now Monday.  In a charging conference, the Court hears

10   from each side as to what words they want to change or add and

11   and they're just suggesting a couple of sentences changed.

12        MR. DENNIS:  Objection, your Honor.

13        THE COURT:  I'll read it to you again if you'd like.

14        MR. DENNIS:  I'd like to make an objection to what you

15   just stated, your Honor.

16        My objection is this case has been sitting before the

17   Department of Justice since October -- at least since

18   October 28th, 2020, these instructions and the charges that

19   they wanted to -- and the elements that they wanted to prove,

20   they've had two years.  They also had these changes since

21   Thursday, but they also knew about the charges more than a year

22   before they came before me.  My life is -- I'm the one who is

23   going to serve in prison.  I don't think it's unreasonable for

24   me to say I'd like to read the language myself since I'm the

25   one facing imprisonment.

MAHGDEN1

1          THE COURT:  You have the language that the Court

2    proposed.

3          MR. DENNIS:  If that language stays, I'm fine with it,

4    your Honor.

5          THE COURT:  So I think what you are saying, forgive

6    me -- because I know you feel agrieved -- but I think what you

7    are saying is you don't agree with their proposed changes.

8          MR. DENNIS:  What I'm saying is I'd like to read

9    exactly the changes.

10         THE COURT:  I'll read to you the very few changes they

11   suggested.

12         MR. DENNIS:  Excuse me, your Honor, is there a reason

13   why I can't read them myself?  I think the court reporter --

14   would you ask the court reporter --

15         THE COURT:  If you want to copy them down as I read

16   them, I'll read them slowly.

17         So with respect to the paragraph that begins, "The

18   second element is that the defendant did so with the intent to

19   harass or intimidate his alleged victim."  They have no problem

20   with that wording.  Then the next sentence is to harass or, as

21   some would say, harass, but we won't get into that distinction,

22   means to cause worry or distress.  They have no problem with

23   that.  The third sentence, and the one they have a problem with

24   is To "intimidate means to threaten with bodily harm either the

25   victim or the victim's family."  They want to substitute for

MAHGDEN1

1    that sentence "To intimidate means to frighten or to seek to

2    cause a" --

3            MR. DENNIS:  Can you go slowly, your Honor, please.

4            THE COURT:  Yes.

5            To intimidate means to frighten.

6            MR. DENNIS:  Frighten -- I'll say the words as I'm

7    writing them down.

8            THE COURT:  Or to seek.

9            MR. DENNIS:  Or to seek.

10           THE COURT:  To cause a victim.

11           MR. DENNIS:  To cause a victim.

12           THE COURT:  To act in a manner.

13           MR. DENNIS:  To act in a manner.

14           THE COURT:  That the victim.

15           MR. DENNIS:  That the victim.

16           THE COURT:  Would not have otherwise intended.

17           MR. DENNIS:  Would not have otherwise intended.

18           THE COURT:  So that's their proposed change.

19           MR. DENNIS:  Intended -- so to repeat, just to make

20   sure -- to intimidate means to frighten or to seek to cause a

21   victim to act in a manner that the victim would not otherwise.

22           THE COURT:  Would not have otherwise intended.

23           MR. DENNIS:  Would not have otherwise intended.

24           THE COURT:  Yes.

25           MS. KUSHNER:  Your Honor, the government doesn't want

MAHGDEN1

1   to remove the Court's language to threaten.  To intimidate

2   means to threaten or, and then the government's additional

3   language.

4            THE COURT:  Well, in any event, let me hear from

5   Mr. Dennis.

6            MR. DENNIS:  Well, I just want to make sure before I

7   respond that I have the language that is trying to be inserted

8   because it wasn't what you just read.

9            THE COURT:  Mr. Dennis, do I understand that you have

10  no objection to the language the Court originally proposed?

11           MR. DENNIS:  No objection to that.

12           THE COURT:  So I'm inclined to deny their proposal for

13  reasons I'll get to in a minute.

14           I think that, first, this statute, to some extent

15  suffers from being vague, not unconstitutionally vague, but

16  vague in that it's not addressed to the specifics of a

17  particular case.  But the instructions of law that need to be

18  addressed to what the evidence, taken most favorably, for these

19  purposes to the government, could support.

20           Now, I think to simply say to intimidate means to

21  frighten is too unparticularized for a case like this.  Indeed,

22  I think there arguably would be First Amendment issues if it

23  were so liberal.  And that why, given that there were specific

24  emails that the government asserted were threats of bodily

25  harm, that I substituted that.  But remember that these are

MAHGDEN1

1    alternatives.  So I think maybe the best way to handle this is,

2    on the first sentence, the second element, quote, the second

3    element is the defendant did so with the intent either to

4    harass or to intimidate his alleged victim, making clear that

5    the government doesn't have to show both; they can show one or

6    the other.

7         Then I would substitute in the next sentence, to

8    harass means to frighten or to cause worry or distress.  And

9    then I would leave the second sentence as I originally had it.

10   To intimidate, means to threaten with bodily harm either the

11   victim or the victim's family.  I think that fits the

12   particulars of this case and avoids any First Amendment

13   objection.

14        So going on to Mr. Dennis, to the only other change

15   the government suggested --

16        MR. DENNIS:  Your Honor, I would like to --

17        THE COURT:  Yes.

18        MR. DENNIS:  I would like to now see the language that

19   the Court is suggesting.

20        THE COURT:  No.  But I will read it to you again.

21        MR. DENNIS:  Read it and then give me a moment to

22   think about it.

23        THE COURT:  Okay.  As I have indicated, this was --

24        MR. DENNIS:  The government had this case for two

25   years.

MAHGDEN1

1          THE COURT:  I'm going to give you a moment to think
2     about it.
3          So it now reads, the second element is that the
4     defendant did so with the intent either to harass --
5          MR. DENNIS:  The second element is that the defendant
6     did so --
7          THE COURT:  With the intent -- if you look -- it is
8     the exact same words I have there, I've just added the word
9     either.
10          MR. DENNIS:  Either.
11          THE COURT:  To harass.
12          MR. DENNIS:  To harass.
13          THE COURT:  Or to intimidate, that was to make is
14     grammatically correct, his alleged victims.
15          It's the same words that I had a minute ago that you
16     agreed to, except I added either and the word to.
17          Now, the more substantive change, slight substantive
18     change is, to harass means to frighten -- this is the second
19     sentence -- so I'm adding the word frighten or to cause worry
20     or distress.  So the only words being added there --
21          MR. DENNIS:  Each word has to be so important, I'm
22     sure.
23          THE COURT:  Please, just hear what the changes are
24     that I'm now proposing.
25          To harass means to frighten or to cause worry or

MAHGDEN1

distress and I've only added the words frighten or to.  And

I've accepted your suggestion that I not change the next

sentence to the government's suggestion, rather leave it the

way I originally had it, which you said was fine with you.  To

intimidate means to threaten with bodily harm, et cetera.

So the only changes I have made is to the grammatical

change in the first sentence, so I added either and to.  And

then the second sentence to add the word frighten.

Any objection?

MR. DENNIS:  Yes, I do object.

THE COURT:  On what ground?

MR. DENNIS:  On several grounds, your Honor.  The

first ground meaning that by adding one word means that there's

one other way that could lead to a conviction of me at this

point.  So it's just not one word, it's a word that is very

powerful.  So as opposed to --

THE COURT:  It's supported by the statutory language.

MR. DENNIS:  Well, then if --

THE COURT:  I'm giving the government less than

they're entitled to under the statute only because I feel we

need to make these instructions closer to the evidence in this

case.  But there's no question that to frighten is one of the

things prohibited by the statute.

MR. DENNIS:  As you were pointing out, in terms of how

long I had this, your Honor, my other objection is this is the

MAHGDEN1

 1    government's business.  They've had it much longer than I have.
 2    And so the issue -- you're saying why didn't I review it; why
 3    didn't this come up sooner?
 4         THE COURT:  I understand your objection.  It's
 5    overruled.
 6         So the only other change --
 7         MR. DENNIS:  And your Honor, my third part of my
 8    objection is that, based on the draft that I received, I have
 9    been making my arguments with the idea of worry -- causing
10    worry or distress, not frighten.  So I've gone through this
11    whole trial thinking that the standard was that harass meant to
12    cause worry or distress --
13         THE COURT:  What did you think intimidation meant?
14         MR. DENNIS:  All I know is the words you just changed.
15    If the words changed, you just added something that wasn't
16    there during the course of the trial.
17         THE COURT:  No, no.  That's completely false.
18         MR. DENNIS:  The word frighten was not in this charge.
19         THE COURT:  The record should reflect that the Court
20    has not sought to contradict every inaccurate statement made by
21    Mr. Dennis since that would take hours to do.
22         MR. DENNIS:  Objection.
23         THE COURT:  Duly noted.
24         Now, if you would prefer to have me put the word
25    frighten in the sentence on intimidate, I'm fine with that.

MAHGDEN1

1    But on the --

2              MR. DENNIS:  Your Honor, to make things easy and

3    move -- what I'm requesting the Court is that the language that

4    was delivered on Thursday, this language remain the same.

5              THE COURT:  Let me think about that for a minute.

6              THE DEPUTY CLERK:  All jurors present.

7              THE COURT:  The only other change, if you want to

8    write it down, Mr. Dennis, that the government is suggesting

9    that we make -- I think you may have already written it down --

10   was under the third element.

11             MR. DENNIS:  No, I have not written that down yet,

12   please.

13             THE COURT:  No, the same page.

14             MR. DENNIS:  I'm just trying to get -- go ahead, your

15   Honor.  I'm ready, your Honor.

16             THE COURT:  The third element of this is that this

17   course of conduct caused, and then they would add attempted to

18   cause, which is straight out of the statute.  And they would

19   continue the rest exactly the way I had it.  So the only thing

20   they're adding there is attempted to cause.

21             Any objection?

22             MR. DENNIS:  Yes, your Honor.  I object.  I object.

23   As I said, as a pro se defendant, with a government that has

24   done this many times, I think -- I based my defense on the

25   language that was here, that was given to me, and I object to

MAHGDEN1

1    any changes because any changes are meant to help the

2    government to convict me.

3         THE COURT:  It was given to you as a draft.  It says

4    at the very top draft.  And it was given to you on Thursday.

5    You have had your --

6         MR. DENNIS:  Well, my objection --

7         THE COURT:  You had already formulated your defenses

8    in your opening statement, long before this was given to you.

9         MR. DENNIS:  My objection remains that any language

10   that's being changed is giving the government an advantage to

11   convict me.  So I object.  I think it makes sense.

12        THE COURT:  Duly noted.

13        So here is my final ruling on this, and then we'll

14   move on.

15        The paragraph beginning with the words "The second

16   element" will now read, "The second element is that the

17   defendant did so with the intent either to harass or to

18   intimidate his alleged victim.  To harass means to cause worry

19   or distress.  To intimidate means to frighten or to threaten

20   with bodily harm either the victim or the victim's family."

21   And then the rest of that paragraph remains the same.

22        Then in the next sentence, it will now read, "The

23   third element is that this course of conduct caused, attempted

24   to cause, or would be reasonably expected to cause," et cetera,

25   same as in the original.

 1          Any objection to the remaining instructions?  Again,

 2   these are standard instructions 11, 12 and 13.  Any objections

 3   from the government?

 4          MS. KUSHNER:  No, your Honor.

 5          Just briefly, on instruction ten, the Court had left

 6   certain blanks for the victims' names.

 7          THE COURT:  I'm sorry?

 8          MS. KUSHNER:  For the last two sentences --

 9          THE COURT:  Oh, no, I have them now in the verdict

10   form.  And Count One is Mr. Cottle, Count Two is Mr. Bicks and

11   Count Three is Ms. Bostick; right?

12          MS. KUSHNER:  No, your Honor.  In the indictment --

13   which I know the jurors don't receive.

14          THE COURT:  Who are your three victims?  Who is your

15   victim in Count One?

16          MS. KUSHNER:  John Bicks.

17          THE COURT:  Okay.  So that will be.

18          Who is your victim in Count Two?

19          MS. KUSHNER:  Eric Cottle.

20          THE COURT:  Who is your victim in Count Three?

21          MS. KUSHNER:  Count Three we move to dismiss --

22          THE COURT:  I'm sorry, it's really in the indictment

23   Count Four, but I think what will change it is instead of

24   calling it Counts One, Two and Three, why don't we say, in the

25   first charge he is charged with cyberstalking John Bicks; in

MAHGDEN1

1    the second charge, he is charged with cyberstalking Eric

2    Cottle; in the third charge, he is charged with cyberstalking

3    Calvina Bostick, and we'll conform the verdict form to that

4    language, that way we don't get into whether it's Count Three

5    or Four.

6           MS. KUSHNER:  Thank you.  And no other suggestions.

7           THE COURT:  Anything else from the defendant?

8           MR. DENNIS:  Your Honor, now we made -- I'd like to

9    just have a moment.

10          THE COURT:  Take a minute.

11          Mr. Dennis, let's finish the government's witness.

12    We'll take another break, and I'll give you one more

13    opportunity to be heard on this charge.

14          MR. DENNIS:  Okay, your Honor.

15          THE DEPUTY CLERK:  May I bring in the jury.

16          THE COURT:  Yes.

17          And let's get the witness on the stand.

18          (Continued on next page)

19

20

21

22

23

24

25

MAHGden1                     Cobb - Direct

 1              (Jury present)

 2              THE COURT:  Good morning, ladies and gentlemen.  I

 3    hope you had a good weekend, but now it's back to the salt

 4    mine.  So we'll continue with the witness that we were starting

 5    with on Friday.

 6              MS. SIMON:  Thank you, your Honor.

 7              Ms. Geier, can you please pull up Government

 8    Exhibit 103-39, page 4, please.

 9    CONTINUED DIRECT EXAMINATION

10    BY MS. SIMON:

11    Q.  Agent Cobb, I just want to -- before the break, at the end

12    of last week, we were focusing on these message here in

13    Government Exhibit 103-39.  Can you please read who is in the

14    from field.

15    A.  Willie Dennis.

16    Q.  Can you please read who is in the to field?

17    A.  Cally.

18    Q.  Can you please read the body of the message.

19    A.  Yes.

20              Is John around?  It your mouth wide open?

21              MS. SIMON:  Please go to the third message on this

22    page, Ms. Geier.

23    Q.  Agent Cobb, can you please read the from field, the to

24    field and then the body of the message.

25    A.  Yes.

1          Willie Dennis to Cally.  I am sure the conversation

2     regarding national securities issues our firm faces right now

3     bores you.  Getting ready for D patrol.  By the way, how long

4     have you been on Tinder?

5     Q.  Thank you.

6          Turning to Exhibit 103-13.

7          MR. DENNIS:  Your Honor, objection to those text

8     messages without my ability to cross-examine Cally Bostick

9     again.

10          THE COURT:  You have made that objection before.

11          MR. DENNIS:  Yes.

12          THE COURT:  And it was overruled before.  Thank you

13     for renewing it.  It is still overruled.

14     BY MS. SIMON:

15     Q.  Agent Cobb, can you please read the from field, the to

16     field and the body of the message.

17     A.  Yes.

18          From Willie Dennis to Cally.  Did you meet this guy on

19     Tinder?  He has on the Timberlands.  What did you have to give

20     him to do this job?  Did John encourage you?

21     Q.  Turning to page 4 of this exhibit.

22          Can you please read the from field, the to field and

23     the body of the message aloud of this first message.

24     A.  From Willie Dennis to Cally.  Two faced hypocrite.  Speak.

25     Q.  And then the second message.

MAHGden1                          Cobb - Direct

1    A.  From Willie Dennis to Cally.  Murderer.

2    Q.  And the same for the message on the seventh page.

3    A.  From Willie Dennis to Cally.  Wench... a good way to create

4    an atmosphere for someone to get killed.

5    Q.  Turning to Government Exhibit 103-29.

6            Can you please read the from field, the to field and

7    the body of both of these messages.

8    A.  From Willie Dennis to Cally.  A selfish idiot.

9            From Willie Dennis to Cally.  When I take your

10   deposition, you will be done.

11   Q.  Now, turning to Government Exhibit 105-50.

12           Agent Cobb, who is in the from field of this message?

13   A.  Willie Dennis.

14   Q.  And who is in the to field of this message?

15   A.  Cally, John Bicks, Rob Matlin and Whitney Smith.

16   Q.  Can you please read the body of the message aloud.

17   A.  Yes.

18           Cally, when you leave the fields this weekend, are you

19   and John getting together?

20           MR. DENNIS:  Objection, your Honor.

21           Your Honor, on Friday, you described this process as

22   being the government's opportunity to summarize.  I don't -- I

23   don't understand -- I don't see a summary.  I just see a

24   continued testimony of Cally Bostick.  I don't know how you

25   describe this as a summary.

MAHGden1                         Cobb - Direct

1          THE COURT:  So the government introduced a large

2    number of emails that allegedly were sent by you.  They

3    questioned witnesses about some, but by no means all of those.

4    They are permitted on summary witnesses to bring to the jury's

5    attention the other emails and the commonalities, if any, of

6    those emails to particular issues in this case.

7          You can cross-examine and you can, on your summation,

8    point out to the jury -- as you already had in your

9    objection -- that some of these emails were not ones that were

10   specifically addressed by the witnesses, though others were.

11   But the government has a right to bring this overall

12   commonality to the attention of the jury.

13          Overruled.

14          Go ahead.

15   BY MS. SIMON:

16   Q.  Agent Cobb, who was the sender of the message you just read

17   aloud?

18   A.  Willie Dennis.

19          MS. SIMON:  One moment, please, your Honor.

20          THE COURT:  Yes.

21          (Conferring)

22          MS. SIMON:  No further questions.

23          THE COURT:  Cross-examination.

24          MR. DENNIS:  Good morning, ladies and gentlemen of the

25   jury.

1    CROSS-EXAMINATION

2    BY MR. DENNIS:

3    Q.   Good morning, Mr. Cobb.

4    A.   Good morning.

5    Q.   I just wanted to go over -- since your testimony started on

6    Friday, I want to review some of your testimony.  I think, on

7    Friday, the question was asked of you -- and I just want to

8    confirm it -- are you on a particular squad.  The testimony

9    shows your answer was yes.  Is that correct?

10   A.   Yes.

11   Q.   What squad is that was the question that was presented.

12   Your answer shows, the violent crimes task force, C19.  Is that

13   correct?

14   A.   Yes.

15   Q.   What kind of crimes do you investigate was the question.

16   Your response was, we investigate violent criminal acts, that

17   includes adult kidnappings, armed bank robberies, Hobbs Act

18   robberies, assassinations and murder for hire.  Is that

19   correct?

20   A.   Yes.

21   Q.   Thank you.

22          Once again, this is testimony from Friday, the

23   question was, Agent Cobb, you have a binder sitting in front of

24   you, Government Exhibit 112-1 is the last document.  Is that

25   binder -- I'd like to draw your attention to it.  Your response

MAHGden1                           Cobb - Cross

1    was okay.  Is that correct?

2    A.  Yes.

3    Q.  Agent Cobb, what does it say at the top of the Government

4    Exhibit 112-1.  Your response, it says, searched items, 519.

5    Is that correct?

6    A.  Yes.

7    Q.  Question then was put to you, what is this document.  And

8    your response is, this is a search history for an electronic

9    device.  Is that correct?  Is that your response?

10   A.  Yes.

11   Q.  Then it says, what time period does this search history

12   cover.  Your response was, it covers July, October and November

13   of 2020; is that correct?

14   A.  Yes.

15   Q.  Why did the search history since July -- why was it -- why

16   was not August and September covered in the search history?

17   A.  That, I'm not sure, sir.  I reviewed the evidence provided

18   by the case team.

19   Q.  So July was covered, that's correct?

20   A.  Yes.

21   Q.  August was not covered, September was not covered; is that

22   correct?

23   A.  Yes.

24   Q.  Then October was covered and then November of 2020, okay.

25   All right.

1              So then the next question is, have you reviewed this

2    document in preparation for your testimony here today, and your

3    answer was yes.  Is that correct?

4    A.   Yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MahWden2                        Cobb - Cross

1   Q.  So, correct me if -- in the event that in reviewing the

2   emails and the text messages, if there was anything -- I'm

3   going to withdraw that question from there.

4           OK.  In your text messages -- in the material that you

5   reviewed, did you see any emails or text messages from me to

6   Cally relating to any law enforcement processes that were going

7   on?

8   A.  No, sir.

9   Q.  Just let me clarify, but you didn't review August and

10  September, correct?

11  A.  That's correct.

12  Q.  OK.  Did you review or did you see any text or other, or

13  any other form of messages regarding the surveillance of me in

14  Chicago?

15          MS. SIMON:  Objection, your Honor.

16          THE COURT:  Sustained.

17  BY MR. DENNIS:

18  Q.  In the messages that you reviewed from me to Cally, did you

19  see any messages relating to the hiring of the security firm to

20  provide protection for Cally in Chicago?

21  A.  No, sir, I do not recall.

22  Q.  Once again, you did not see the text messages or emails in

23  August or September?

24  A.  No.

25  Q.  Did you see in reviewing the text messages or emails from

MahWden2                    Cobb - Cross

1    me to Cally any mention of my concern that the women in Chicago

2    were in danger?

3              MS. SIMON:  Objection.

4              THE COURT:  Sustained.

5    BY MR. DENNIS:

6    Q.  Did you see any emails or texts from me telling Cally that

7    my life was in danger by police being --

8              THE COURT:  Sustained.

9              I remind the jury that nothing that counsel says by

10   way of a question is evidence of anything.

11             MR. DENNIS:  I will remind the Court that there has

12   been testimony that there had been contact between KL Gates and

13   the New York City Police Department.  I will remind the Court

14   that there has been admission that's now in testimony that KL

15   Gates hired a security firm to protect Cally in Chicago.

16             THE COURT:  Well, that's very kind of you to remind me

17   of that, but I think your role right now is to be asking

18   questions of the witness.  Ask questions of the witness, and

19   don't testify.

20             MR. DENNIS:  The Court is preventing me from asking

21   relevant questions.

22             THE COURT:  No.  I'm preventing you from trying to put

23   before this jury stuff that is not part of the evidence in this

24   case.  But if you would do me the honor of simply putting

25   questions, that would move things along.

MahWden2

1          MR. DENNIS:  Your Honor, I certainly will.  Excuse me,

2    because my freedom is at risk, and I'm trying to really

3    understand what the facts are.

4    Q.  Mr. Cobb, how long have you been with the FBI?

5    A.  About three, three and a half years.

6          MR. DENNIS:  I hope you have a wonderful career.  No

7    more questions, your Honor.

8          THE WITNESS:  Thank you.

9          THE COURT:  Redirect.

10          MS. SIMON:  No, your Honor.

11          THE COURT:  Please, you may step down.  Thank you very

12    much.

13          THE WITNESS:  Thank you, your Honor.

14          (Witness excused)

15          THE COURT:  Does the government rest?

16          MS. SIMON:  Yes, your Honor.

17          THE COURT:  All right.  When the government rests,

18    ladies and gentlemen, I have to hear some legal issues outside

19    the presence of the jury, so we'll give you about a ten-minute

20    break right now.

21          (Continued on next page)

22

23

24

25

MahWden2

1              (Jury not present)

2              THE COURT:  Please be seated.

3              Mr. Dennis, to help you out, at this stage, you need

4    to make a renewed motion to dismiss the case, which you need to

5    do to preserve your rights on appeal.  I take it you move at

6    this point to dismiss the case.

7              MR. DENNIS:  Yes, your Honor, I do.

8              THE COURT:  And that motion is denied.

9              Second, are you planning to take the stand?

10             MR. DENNIS:  No, your Honor, I'm not.

11             THE COURT:  All right.  Third, we had finished with

12   all of the charge except the last three charges, and I said I

13   would give you an opportunity if you had any problems with any

14   of those -- those are instructions 11, 12, and 13 -- to take a

15   minute and read those and let me know if you have any

16   objection.

17             By the way, while we're waiting, has the government

18   prepared an electronic thumb drive, or the equivalent, to give

19   to the jury with the exhibits?

20             MS. KUSHNER:  Yes, your Honor.

21             THE COURT:  And does it include the one defense

22   exhibit as well?

23             MS. KUSHNER:  We'll double-check and make sure that it

24   does.

25             THE COURT:  Yes.  We need to have that included as

MahWden2

1   well.  It was included in the index.

2           My courtroom deputy says that now that we no longer

3   have the same jury equipment that we had during the pandemic;

4   it's really much easier to just put the exhibits into

5   documentary form, and we'll wheel those in to the jury with the

6   defense exhibit and with the index.

7           MS. KUSHNER:  OK, your Honor.

8           THE COURT:  OK.  So if you can do that, that would be

9   much appreciated.

10          MS. KUSHNER:  Your Honor, one new thing in instruction

11  No. 12, it says that the Court will send in to the jury room

12  computerized versions of all the exhibits admitted into

13  evidence except for the telephones, and we didn't obviously

14  have any physical telephones.

15          THE COURT:  Let me change that.  Thank you for

16  catching that.  We will send to the jury room all the exhibits

17  that were admitted into evidence except for the telephones,

18  which they may request if they like.

19          MR. DENNIS:  Your Honor, I'd like to, with respect to

20  instruction No. 12, I'd like for the jury to also have

21  available to them in the room the transcripts of the witness

22  testimony.

23          THE COURT:  No.  As I point out repeatedly in the

24  instructions, if they want to ask for testimony, they can, but

25  it's not automatically sent in.

MahWden2

1           MR. DENNIS:  Obviously, since I was --

2           THE COURT:  Pardon?

3           It says, for example, in instruction 12, if you want

4    any of the testimony provided, that can also be done in either

5    transcript or read-back form.  But please remember it's not

6    always easy to locate what you might want, so be as specific as

7    you possibly can be in requesting portions of the testimony.

8           MR. DENNIS:  OK.  As a *pro se* defendant who has only

9    one exhibit on file and my defense was basically relying upon

10   the testimony and the cross-examination of the witnesses, I'm

11   requesting that transcripts be made available immediately --

12          THE COURT:  Yes.  OK.

13          MR. DENNIS:  -- for --

14          THE COURT:  Duly noted.  Denied.

15          Mr. Dennis, anything else?

16          MR. DENNIS:  If you give me a second, your Honor.  I'm

17   still reviewing it, please.

18          THE COURT:  Yes.

19          By the way, I made the identical change about

20   eliminating the word "computerized" on page 4 of the

21   instructions as well.

22          MR. DENNIS:  Your Honor, on instruction No. 13 --

23          THE COURT:  Yes.

24          MR. DENNIS:  -- if there's not unanimity, what occurs?

25          THE COURT:  Excuse me?

MahWden2

1          MR. DENNIS:  If there's not a unanimous decision

2     amongst the jurors, what will happen?

3          THE COURT:  You will be retried, so I will set a date

4     for that if that's the verdict.  They have three alternatives.

5     They either unanimously acquit, unanimously convict, or they

6     cannot reach a verdict, in which case you are retried.

7          Now, if they unanimously convict on one or two counts

8     but not on all three, then -- although it's up to the

9     government -- my guess is the government will not seek a

10    retrial on the third count if the jury is divided on it.  For

11    example, I could well imagine they might convict with respect

12    to Mr. Bicks and Ms. Bostick and not be able to reach a verdict

13    on Mr. Cottle.  That's just one possibility.  In that case,

14    theoretically, the government could retry you on the count

15    against Mr. Cottle, but my guess is they would not do that in

16    that situation.

17         Anything else?

18         MR. DENNIS:  And these instructions will be read to

19    the jury at what point?

20         THE COURT:  As soon as the summations are over but

21    before they start their deliberations.

22         MR. DENNIS:  No other comment.

23         THE COURT:  All right.

24         MR. DENNIS:  May I use the restroom, your Honor?

25         THE COURT:  Yes, go ahead.

MahWden2

1              MR. DENNIS:  Thank you.

2              THE COURT:  We'll give the government a five-minute

3    break as well.  And as soon as the break is over, we'll start

4    summations.

5              MS. RAVENER:  Your Honor, could we take an opportunity

6    to get set up?

7              THE COURT:  All right.  We'll give you a ten-minute

8    break.

9              MS. RAVENER:  Thank you.

10             (Recess)

11             THE COURT:  All right.  Let's bring in the jury.

12             How much of your allotted time do you plan to use on

13   your first summation?

14             MS. KUSHNER:  About an hour.

15             (Jury present)

16             THE COURT:  Please be seated.

17             Ladies and gentlemen, the evidence is now before you.

18   The defendant has chosen not to present any evidence.  That is

19   his constitutional right.  The burden of proof always is on the

20   government, and you cannot infer anything negative with regard

21   to the defendant from the fact that he chose not to put on any

22   evidence.  He has a constitutional right to put the government

23   to its proof, and that's how he has chosen to proceed.

24             We now come to closing arguments of the parties.

25   First, I want to remind you, as I did before opening

MahWden2                    Summation - Ms. Kushner

statements, that nothing that counsel says is itself evidence.
The evidence is now before you.  It consists of the testimony
and the exhibits.

So you may ask why do we have closing arguments?

The answer is that there is a fair amount of evidence,
a fair amount of exhibits, and it may be useful to you to hear
what counsel for both sides think the evidence shows or fails
to show, as the case may be.  So this is their opportunity to
put their best interpretation on the evidence favorable to
their respective positions.

Because the government bears the burden of proof, they
have both an opening summation and a rebuttal summation.  Each
side is given 90 minutes.  The government will use about 60
minutes for their initial summation.  The defendant will then
have up to 90 minutes for his summation, and then the
government will have up to 30 minutes for their rebuttal
summation.  After all that is done, I will give you my
instructions of law, and then the case will be yours to begin
your deliberations.

Let's start with the government's beginning summation.

MS. KUSHNER:  In 2019 and 2020, this man, Willie
Dennis, turned words into weapons to intimidate and harass his
former colleagues, including Eric Cottle, John Bicks, and
Calvina Bostick.  The defendant disrupted the lives of his
victims, and because the defendant had worked with and knew his

MahWden2                    Summation - Ms. Kushner

1    victims, he knew exactly how to strike at the heart of what
2    they cared about most.  The defendant scared and humiliated
3    Eric Cottle at a professional conference with their mutual
4    business contacts.  The defendant threatened John Bicks's
5    family, his children.  He threatened to go to their home, and
6    he threatened to smear John Bicks's professional reputation.
7    And the defendant threatened Calvina Bostick, a young woman
8    partner who worked her way up through the ranks.  The defendant
9    told her that she had to stop practicing in New York; that he
10   was going to follow her; that he wanted her to sleep with one
11   eye open.  And he also tried to smear her hard-earned
12   reputation and career.
13          Let's be clear.  The defendant's texts were not about
14   some business dispute.  They weren't about tough talk among
15   fierce lawyers.  His messages weren't part of any conversation.
16   They were one-sided attacks.  His texts spewed grotesque lies,
17   demeaning names, and threats of violence against his victims.
18   And whether through direct threats or cryptic messages, the
19   defendant succeeded in in upending his victims' lives.  These
20   victims lived in a constant state of worry, fear, anxiety.
21   They changed how they commuted to work.  They enhanced security
22   around their home.  They changed their pattern of living.  That
23   is why we are here today, and it is time to hold the defendant
24   accountable for threatening his colleagues, for sending them
25   terrifying, vile messages, for instilling fear and anxiety in

1    them, people who had simply tried to work alongside him.

2            Now, over the last few days, you've seen and you've

3    heard a lot of evidence.  You heard from the victims

4    themselves.  You saw them take that stand and face the man who

5    had sent those threatening messages to them.  They talked about

6    those messages with you.  They told you exactly how those

7    messages made them feel -- scared, terrified, concerned,

8    anxious.

9            You saw a lot of electronic evidence in this case as

10   well.  You saw many of the emails and text messages the

11   defendant sent.  You saw the data from the defendant's own

12   phone that showed his search history, a search history in 2020

13   that almost exclusively had to do with searching about K&L

14   Gates and its attorneys.  You also saw the data from the

15   defendant's own phone that showed you each text thread he

16   created for a victim and exactly how many texts he sent on that

17   text thread.  You can go back.  You can look at all those

18   exhibits, and we'll talk about those in a moment.

19           Ladies and gentlemen, this is the government's

20   summation.  It's the government's opportunity to explain how

21   all of that evidence fits together, to explain how it proves

22   beyond a reasonable doubt that Willie Dennis is guilty of

23   cyberstalking.

24           So here's what we're going to cover in the summation:

25           First, I'm going to talk briefly about the charges

MahWden2                    Summation - Ms. Kushner

1    against the defendant, and as you know, Judge Rakoff will give

2    you, and has given you, detailed instructions on the law.  And

3    what he says governs.  You must follow the instructions that he

4    gives you.  But for now, just to put the evidence into context,

5    I'm going to briefly go over the elements of the cyberstalking

6    charges, and then I'm going to explain how the evidence that

7    you've seen and you've heard proves beyond a reasonable doubt

8    that the defendant is guilty of the crimes with which he is

9    charged.

10        I'll explain how the defendant's text messages and

11    emails caused each victim substantial emotional distress, and

12    then I'll explain how you know that the defendant's intent in

13    sending those messages was to harass and intimidate his

14    victims.

15        Now, the defendant is charged with cyberstalking, with

16    three counts, one for each victim you saw and you heard:  Eric

17    Cottle, John Bicks, and Calvina Bostick.

18        The elements of cyberstalking are pretty simple.  You

19    have to find that the defendant sent two or more text messages

20    or emails with the intent to harass or to intimidate and that

21    the defendant caused or attempted to cause or would be

22    reasonably expected to cause substantial emotional distress.

23        And in addition, the government has to prove by a

24    preponderance of the evidence that venue is proper -- meaning

25    the case was properly brought -- here in the Southern District

MahWden2                    Summation - Ms. Kushner

1   of New York, which includes all of Manhattan.

2            Now, I'm not going to spend a lot of time on the first

3   element, because you know it's been met.  That's because

4   there's no dispute that the defendant sent way more than two

5   text messages or emails to each victim in this case.

6            Eric Cottle received 23 back-to-back text messages in

7   one night.  Eric Cottle blocked the defendant's number after

8   that, but even then, the defendant continued to try to send him

9   emails and texts.

10           John Bicks, you know, got thousands of texts from the

11  defendant -- 4,785 text messages, to be clear -- and that's

12  just from late 2019 to early 2021.

13           And similarly, Calvina Bostick received over 5,000

14  messages between late 2019 and early 2021.

15           As I expect Judge Rakoff will instruct you, just two

16  messages is enough for you to find that the defendant engaged

17  in a course of conduct to harass or intimidate a victim.  In

18  other words, if the defendant sent only two messages but those

19  messages were intended to harass or to intimidate his victims

20  and caused or attempted to cause or be reasonably expected to

21  cause his victims substantial emotional distress, that is

22  enough.  You can find from single days alone in this case that

23  the defendant cyberstalked his victim.

24           You also know that venue is proper here.  You heard

25  each victim testify that they saw or received at least one

MahWden2                    Summation - Ms. Kushner

1   harassing text or email that the defendant sent them while they

2   were physically present at K&L Gates's offices in New York,

3   here in Manhattan.  And you also heard Calvina Bostick explain

4   that she received many of the defendant's text messages while

5   she was home at her apartment in Harlem, which, of course, is

6   also in Manhattan.

7           So let's focus on the third element -- whether the

8   victims suffered substantial emotional distress.  And that term

9   means exactly what it sounds like.

10          You know that the defendant's course of conduct -- his

11  texts, his emails -- caused each victim in this case

12  substantial emotional distress.  You saw the emotions on the

13  victims themselves and you heard the words that they testified

14  to.

15          Eric Cottle told you he was concerned for his own

16  safety.  He was concerned that someone, the defendant, would

17  carry out on his actions and his threats.  You heard Eric

18  Cottle explain to you how serious he took this, the threats,

19  the 23 emails the defendant sent him in one night, backed up by

20  the defendant physically approaching and getting in the face of

21  Eric Cottle.  You heard that after that event how Eric Cottle

22  was concerned that the defendant might show up at an awards

23  ceremony for Calvina Bostick; that he wouldn't feel safe going

24  to that conference unless security was there.  As he told you,

25  that's not normal.  It's not normal to think you need security

1   to attend with you a professional event.

2          You also know that John Bicks suffered substantial

3   emotional distress.  He told you that the defendant's messages

4   made him feel alarmed, scared, terrified.  He testified how he

5   felt when the defendant sent him messages about his own

6   children -- this one, for example, Government Exhibit 801,

7   where the defendant says I'm going to come to your house to

8   water your plants and your sons can help me.  John Bicks was

9   afraid that the defendant was actually going to go to his own

10  home to try to interact with John Bicks's children and his

11  wife.  And you also heard John Bicks testify about the violent

12  biblical scriptures that the defendant quoted to him in

13  messages, how scared he was by those messages, how afraid he

14  was of what the defendant might do next.

15         And finally, you saw and you heard from Calvina

16  Bostick.  She told you about the substantial emotional distress

17  that she suffered from as a result of the defendant's own

18  words.  She told you she felt threatened, vulnerable, fearful.

19  She was frightened.  The defendant made her feel like she was

20  in danger.  She felt attacked.  She was totally freaked out.

21  Ms. Bostick told you how the messages also caused her anxiety.

22  She couldn't sleep.  She couldn't concentrate.

23         So you know, based on all the testimony from the

24  victims, that they, in fact, suffered substantial emotional

25  distress.

1          But how else do you know that the victims suffered

2    substantial emotional distress?

3          You know this from the actions that they took in

4    response to the defendant's ongoing messages.

5          What did Mr. Cottle do?

6          He left a professional conference early.  He went back

7    home.

8          And why did he do that?

9          Because of the 23 text messages the defendant sent him

10   back to back to back, followed by the defendant's in-person,

11   aggressive behavior.  And you know that immediately after this

12   encounter, Eric Cottle blocked the defendant's text messages.

13         Why?

14         Because he didn't want to be harassed anymore.

15         What else did Eric Cottle do?

16         He changed his entire daily routine.  He told you how

17   scared he was commuting to work on the subway.  He stopped

18   traveling with his headphones in.  He was very vigilant of

19   exactly where he stood on the train platform.  He was aware of

20   who got on and who got off the train.  He made sure to wear

21   shoes that had rubber soles so he could easily run and not slip

22   if the defendant approached him.  He heightened his vigilance

23   around the office, what entrance or exit to take, whether it

24   was even worth stepping outside to get lunch that day.

25         These are steps that someone takes because they're in

MahWden2                    Summation - Ms. Kushner

1    distress, because they're worried, because they're frightened.

2    And Eric Cottle took all these steps because that's exactly how

3    he felt.  He suffered substantial emotional distress.

4             We know that John Bicks suffered substantial emotional

5    distress from the steps he took as well.

6             What did Mr. Bicks do?

7             He sat down with his children.  He showed his children

8    a photo of the defendant and warned them to call 911 if they

9    ever saw the defendant approaching their home.  He had to speak

10   with his elderly parents about the threats the defendant was

11   making.  John Bicks moved his parking garage at work.  He moved

12   it closer to the office to minimize the outside time he would

13   spend walking from his car to the office building.  In the home

14   he and his family had lived in for 17 years, he started putting

15   the alarm on every night for the first time.  And he upgraded

16   his security system.  He added cameras.  And on the nights that

17   the defendant was particularly active in his messages, John

18   Bicks slept with a loaded gun next to his bed to protect

19   himself, his kids, and his wife, something he had never done

20   before.  Those are also all steps that someone takes because

21   they are suffering substantial emotional distress.

22             And what did Calvina Bostick do?

23             You know that she had to take serious measures to

24   protect herself from the defendant.  She was concerned about

25   workplace violence.  She thought that the firm should be

1    holding active shooter drills so that they could protect

2    themselves from the defendant.  She also had to change her

3    daily routine.  She had to have security stationed outside the

4    door of her apartment, and when she left the apartment,

5    security had to go with her.  She didn't leave the apartment

6    unless she absolutely had to.  She stopped going regularly for

7    her morning jogs, fearful that the defendant might approach

8    her.  She became a recluse.  And ultimately, in September of

9    2020, Ms. Bostick not only moved out of New York City, she

10   moved to a completely different state, in an entirely separate

11   region of the country.  That's because, even with security

12   outside of her door, she couldn't get comfortable.  She was on

13   edge.  She didn't feel safe.  So she moved.

14          In November of 2020, when Calvina Bostick believed

15   that the defendant was no longer in New York, she moved back to

16   New York City.

17          But what did she have to do to make sure that she was

18   safe and felt safe?

19          She had to move out of her apartment that she loved of

20   14 years in Harlem and move to a completely different

21   neighborhood, somewhere where her address wouldn't be public,

22   where the defendant couldn't easily find her.  And that's what

23   she did in January of 2021.

24          She did all those things only because of the

25   defendant's messages to her and how fearful they made her.

MahWden2                    Summation - Ms. Kushner

So based on the victims' testimony about how they felt and what they did in response to the defendant's messages, you know that each of them actually suffered substantial emotional distress. You saw the victims for yourselves. You saw their pain.

Now, these victims were not exaggerating. They told you that their relationship with the defendant had once been collegial. They worked together. They were even friendly. That's what made it all the more shocking that the defendant turned on them and started sending these terrifying messages.

Now, based on the defendant's opening statement and some of his cross-examination in this case, I expect the defendant may argue that his victims were not actually scared of him; that they were used to tough talk among fierce lawyers, or that there's some context that these text messages need to be understood in.

Now, to be clear, and as Judge Rakoff will instruct you, the defense has no burden. It is the government's burden to prove beyond a reasonable doubt each element, and we embrace that burden. But when the defendant makes certain arguments, you are entitled to scrutinize them and to ask yourselves, does this make any sense whatsoever?

And you know any argument that these text messages were about a business dispute or just reflective of tough talk among lawyers is wrong. You know that for all the reasons I

MahWden2                    Summation - Ms. Kushner

1    just discussed, for all the reasons the victims told you when

2    they were on the stand.  There's no context that would justify

3    the messages the defendant sent his former colleagues, the

4    direct threats, but also harassing messages, accusing them of

5    having affairs with each other, accusing Calvina Bostick of

6    trolling on Tinder for men, and, of course, telling John Bicks

7    and Calvina Bostick that they were evildoers who were going to

8    become biblical symbols.

9            In no universe could these messages, these many

10   messages, be part of any acceptable way to communicate with

11   your former colleagues.  But even if these victims had

12   particularly thick skin or were used to profane language, that

13   wouldn't matter.  It wouldn't matter because, as I expect Judge

14   Rakoff will instruct you, the defendant can also be found

15   guilty of cyberstalking if his course of conduct attempted to

16   cause or would be reasonably expected to cause the victims

17   substantial emotional distress.  In other words, you don't even

18   have to find that the victims themselves suffered substantial

19   emotional distress.  You can simply find that what the

20   defendant did and said would have reasonably caused them to

21   suffer in that way.  And I think you'll agree that the sheer

22   number of messages the defendant sent each victim would be

23   reasonably expected to cause them substantial emotional

24   distress or that the contents of the messages would be

25   reasonably expected to cause them substantial emotional

distress.  So you can find that that element is met on that

basis too.

          So what is left?

          The only question you really have to decide is whether

the defendant had the intent to harass and intimidate his

victims.

          Ladies and gentlemen, you know the answer to that.

You know the defendant's intent was to harass and to

intimidate.

          And how do you know that?

          There are multiple ways.  You know that from the sheer

number of text messages.  You know it from the content of the

messages themselves.  You know it from the fact the defendant

continued to message his victims despite receiving multiple

warnings to stop.  You know it from the defendant's physical

actions, and you know it from the defendant's own words.  So

let's go through these.

          The sheer number of messages shows the defendant's

intent.  Over one night, Mr. Cottle received 23 back-to-back

text messages -- in the course of a single night.  There's no

benign reason for sending someone back-to-back messages like

that.  It's to harass and to intimidate.  The defendant ended

this text rant with the words, "I will find you."  And then lo

and behold, the next morning, the defendant did find Eric

Cottle.  He approached him.  He got aggressive with him.  He

MahWden2                    Summation - Ms. Kushner

scared him.  He scared him so much that Eric left the

conference early and blocked the defendant's messages.  So you

know the defendant's tactics succeeded.

You also know from Jeff Maletta that in the immediate

days following that event, the defendant tried to email Eric

Cottle back to back emails.  You saw one of the emails the

defendant sent Eric Cottle -- this one, at Government Exhibit

207-9, which reads, "Also, Eric, if you find this email

menacing as Mr. Tea," the deputy general counsel, "has

suggested you do, please let me know.  You can tell me.  Best,

Willie."

So this message shows you the defendant was explicitly

informed that the messages he had just sent Eric Cottle and the

emails that came in the ensuing days were menacing to Eric

Cottle.

And yet what did the defendant continue to do after

that?

He continued to send menacing emails and text

messages.

And as for John Bicks and Calvina Bostick, you know

the defendant sent them hundreds upon hundreds of text messages

in 2020 alone, back to back, 24/7, all hours of the day and

night.  And let's look into some of these numbers.

Here, for example, which summarizes the charts that

FBI Examiner Flatley walked you through, which are Government

MahWden2                    Summation - Ms. Kushner

1  Exhibits 120-1 through 120-7 and 120-9 and -10, the text
2  threads, you can see here that in late August and early
3  September of 2020, how many messages the defendant was sending
4  John Bicks and Calvina Bostick on a daily basis.  Let's look at
5  September 1, for example, 2020.  That day alone, the defendant
6  sent Calvina Bostick more than 140 text messages and nearly 120
7  text messages to John Bicks.  And similarly, in October,
8  hundreds of messages -- on October 5, 180 text messages to
9  Calvina Bostick; on October 10, over 80 messages to John Bicks.
10  And the conduct continued in November as well.  On November 27,
11  2020, for example, the defendant sent each John Bicks and
12  Calvina almost a hundred text messages.
13          Ms. Bostick also testified that the mere series of
14  text messages made them harassing and intimidating.  And the
15  defendant's intent here is even more transparent given the fact
16  that not one victim responded to a single text message or email
17  the defendant sent them after his termination in May of 2019.
18  So the defendant knew these messages were unwanted.  There was
19  no conversation happening, but he continued to bombard his
20  victims with message after message.
21          Now, of course, the blatantly disturbing content of
22  the messages themselves shows you the defendant's intent was to
23  harass and intimidate his victims.
24          (Continued on next page)
25

MAHGden3                    Summation - Ms. Kushner

1              MS. KUSHNER:  We won't go through them all, there are

2       many, but I'll highlight a few right now of some of the

3       harassing messages the defendant sent each victim.  This one,

4       for example, at Government Exhibit 109-1, where the defendant

5       texted Cottle, I would not spin the wheel again if I were you.

6       That's frightening.  It's harassing.  Same with the 23 messages

7       the defendant sent Cottle in June of 2019.

8              And the defendant sent harassing messages to John

9       Bicks as well.  Here, Government Exhibit 102-2, when we are

10      done, you are going to wish you had never met me.  Or this one

11      to John Bicks, you are a bad person that deserves to be

12      severely punished.  And that's Government Exhibit 102-8.

13             We could go on.  Messages like you are going to get

14      yours and you need to pay the most.  These are the types of

15      messages the defendant was sending John Bicks over and over and

16      over again.

17             And the messages the defendant sent about John Bicks'

18      children and his wife.  This message here, sent on May 27th,

19      2020 in the middle of the night; and John, what is your wife's

20      name, save me some research time.  That's Government

21      Exhibit 104-1.  And this message on August 28th when the

22      defendant told John Bicks, kids are in.  These are threats to

23      involve family members in what the defendant wants you to think

24      was a simple business dispute.  You know that's not true.  John

25      Bicks testified how terrified the messages, especially those

MAHGden3                    Summation - Ms. Kushner

invoking his children or his wife, made him feel.  He was
scared to death.

         And of course, the many messages in which the
defendant threatened John Bicks and Calvina Bostick that they
were going to become biblical symbols.  We'll get back to those
in a moment.

         The messages to Calvina Bostick were just as harassing
and intimidating.  He texted her, you need to practice outside
of New York.  Because if you stay in New York, I am going to
follow you.  And that's Government Exhibit 103-14.

         The defendant also told Calvina Bostick that he wanted
her to fear him.  You don't have to respect the black man,
right.  What about fear him?  Ms. Bostick told you that to her
these messages were trying to intimidate her, that he, the
defendant, wanted Calvina Bostick to fear him, to be afraid.
And that's exactly how she felt.  You know the defendant sent
Calvina Bostick text messages telling her to leave or else, or
threatening to add her to a civil lawsuit.

         The defendant sent her threatening messages like this
one, do you still take the train to work.  A message Calvina
would have received around 3:00 a.m. in the morning on
October 9th, 2020.  And that's Government Exhibit 103-34.

         And of course, the defendant threatened Calvina
Bostick with incarceration, somehow landing her in prison,
quote, unless I am successful getting you incarcerated.  That's

MAHGden3                    Summation - Ms. Kushner

1    also Government Exhibit 103-34.

2              And he sent her direct threats too.  Cally, we are

3    coming for you.  But Cally, sleep with one eye open, Government

4    Exhibit 107-56.

5              The defendant not only wanted to harass and intimidate

6    his victims through direct threats, he wanted them to worry and

7    to fear from other threatening messages as well.  You do not

8    have to find that the defendant threatened with harm or

9    frightened his victims.  I expect Judge Rakoff will instruct

10   you that it is enough if the defendant's messages caused the

11   victims worry or distress.  And you know the defendant intended

12   to do those things as well.

13             So you can find the defendant guilty even if you find

14   the defendant's intent in sending the number and types of

15   messages that he did was simply to cause worry or distress in

16   each victim.  That is enough.

17             I want to briefly go over some of the other harassing

18   messages that the defendant sent the victims, messages

19   threatening that they would become biblical symbols.  Calvina

20   Bostick explained to you how terrified she was of these

21   messages, that she understood she was going to suffer some kind

22   of harm.  What came to her mind was the crucifixion of Christ.

23   These were threats.

24             The defendant would also sometimes text both John

25   Bicks and Calvina Bostick together, threatening, telling them

1    that this is a biblical moment and anyone who refuses to see,

2    acknowledge and change will be answerable to god.  He asked

3    them what do you think god is telling me to do.  We are at the

4    end, so no need to lie any longer.  God is truly reading all of

5    our minds during this biblical moment.  We are lucky there is a

6    god and there will be deliverance.  These messages were meant

7    to cause worry, distress in the victims and to frighten them.

8         Now, you also know that the defendant intended to

9    harass and intimidate his victims because he was warned that

10   his messages were doing just that.  And he was directed to stop

11   multiple times.  That shows you his intent.

12        I briefly want to go over the content of these types

13   of messages too, which you know about, messages in which the

14   defendant accused Calvina Bostick and John Bicks of having an

15   affair.  You are lying, John Bicks, have you told your wife?

16   With a link to Calvina Bostick's bio page.  Or asking Calvina,

17   I know you like married men... but in the office.  Is your

18   Tinder account still active?

19        And of course, the defendant also tried to harass his

20   victims by calling them some of the most vile, demeaning names

21   you can imagine.  You gutter rat piece of shit, he told John

22   Bicks.  He accused John Bicks of being a racist, of being an

23   anti-Semite.  He asked in a text message to John Bicks, is your

24   Klan meeting this weekend?  And he called John Bicks John

25   "Bigot" Bicks for fun.  You know that he also accused John of

MAHGden3                    Summation - Ms. Kushner

1    having the ovens going.  He sent him multiple texts about the

2    ovens, including texts in which John Bicks' Jewish partner,

3    Rob, was included on.  In this message the defendant said, Rob,

4    so just march the kids into the ovens.  You heard John Bicks

5    testify that his understanding of what the text messages asking

6    him if he had turned the ovens on meant.  Quote, it's a

7    reference to the ovens that were used as part of the genocide

8    of Jews during the Holocaust as part of World War II.

9           Accusing someone of being a racist or a anti-Semite is

10   meant to harass someone.  And that's exactly what the defendant

11   did here.

12          He sends a message accusing John Bicks of something so

13   vile, I won't even read it aloud again.  It's Government

14   Exhibit 104-1.

15          And he did the same exact thing to Calvina Bostick.

16   He called her cotton head.  She testified how embarrassed she

17   was.  She felt that he was trying to strip her of her dignity

18   and demean her.  He called her racial slurs; cotton head.  Of

19   course that has a connotation to the African-Americans who were

20   enslaved in our country, and that's what he referred to her as.

21   There's no explanation or other explanation for this name.  You

22   just saw Gary Cobb testify on the stand and read into the

23   record a text message from the defendant to Calvina about

24   whether she and John were going to get together after she got

25   off the plantation fields.  These are not obscure.  They are

1    direct and purposeful.  They're meant to harass and to

2    intimidate.  Cotton head wasn't the only name that the

3    defendant called Calvina Bostick.  In message after message, he

4    called her biscuit head, murderer, gutter rat.  Again, there is

5    only one reason to call someone these names and to send them

6    back-to-back messages; it's to intimidate and harass them.

7          You also know that the defendant tried to demean

8    Calvina Bostick and call her hard-earned reputation and career

9    into question, sending her messages like this one; cotton head,

10   you don't have to read, too many big words, not enough

11   pictures, will be tough going for you.

12         He also harassed John Bicks and Calvina Bostick by

13   insinuating that he was going to slander them publicly and try

14   to ruin their professional reputations, to undermine, as John

15   Bicks testified, my integrity or hurt me in some other way.

16         You heard Calvina Bostick testify that she was fearful

17   that the defendant was going to try to smear her name and

18   spread false statements about her, which was even more hurtful

19   to her given that the defendant had witnessed her go up through

20   the ranks as a junior associate to become a partner, that she

21   had no room to make mistakes.  So the threat of harming her

22   public and professional reputation, which the defendant knew,

23   was an extremely scary thing to fear.

24         The defendant also tried to command Calvina Bostick to

25   do things, the things that he wanted.  He told her speak, smart

MAHGden3                   Summation - Ms. Kushner

ass.  Calvina Bostick testified she felt that these messages

were trying to exert some type of control or power over her,

which you know they were.  He also told her to leave New York,

to stop practicing here, to get up and start packing.  And the

defendant accomplished his goal.  Calvina Bostick did have to

move, she did have to leave New York, she did have to walk away

from her colleagues and her profession that is here because of

the defendant.  You can see some of these messages at

Government Exhibit 103-20.

        So as I mentioned earlier, you also know the

defendant's intent because of the cease-and-desist warnings he

received and his refusal to abide by them.  You know, for

example, in January of 2019, Jeff Maletta emailed Willie Dennis

telling Willie, I have become aware that despite repeated

requests to stop, you are once again sending multiple emails to

partners around the firm.  Jeff told Willie that the emails

have false allegations.  Jeff directed the defendant to stop

immediately.  He told the defendant in plain terms, at a

minimum, this amounts to harassment.  The defendant knew the

messages he was sending were harassing.

        Even after that January 2019 warning, which was not

the first warning.  You know the defendant continued to message

the victims.  And so in September of 2019, the law firm, yet

again, sent the defendant a cease-and-desist letter, which you

know the defendant received because it was found in all four

MAHGden3                    Summation - Ms. Kushner

inboxes of his various personal Gmail accounts.  The letter

again spelled out exactly what the messages were doing to its

victims.  You have been notified repeatedly that your

communications are offensive, menacing, they are unwelcome.

They must stop.  He was told in plain terms, there's no doubt

that your conduct constitutes harassment and menacing.

Did the defendant stop after this message?  No.  His

conduct escalated.  Some of the most vile, terrifying, numerous

messages that he sent came after this.  He persisted for more

than a year after this.  His goal in ignoring these warnings

and to keep on going was to intimidate and harass his victims.

Now, how else do you know that the defendant's intent

was to intimidate and to harass.  You know it from the

defendant's physical actions.  You know it by the way that the

defendant approached Eric Cottle at that conference in June of

2019, that he made Eric Cottle concerned that there was no

security in the place, that it was going further than just

annoying Eric Cottle.  It was scaring him.  He had to leave and

get out of here.

Finally, you know the defendant's intent because of

his own words.  He told the victims what his intent was.  In

the summer of 2019, the defendant told Calvina Bostick in a

deli that he was going to handle his grievances with the firm

his way.  And what was that way?  As Ms. Bostick testified,

it's a way that wasn't legal.  In other words, he didn't intend

1    to do things legally.  And he didn't.  He carried out his own

2    campaign of intimidation and harassment.

3            He also told John Bicks and Calvina Bostick in a text

4    message, quote, everything is intentional.  Everything is

5    intentional.  There's no mistake in what the defendant's intent

6    was here.  The evidence of his intent is overwhelming.  The

7    defendant knew exactly what he was doing at every step, with

8    every message.  The timing of them, the number of them, it was

9    all intentional.

10           And ladies and gentlemen, you know the defendant's

11   conduct has had lasting impact and effect on the victims.  You

12   saw Calvina Bostick on the stand; you saw those tears, you saw

13   her crying, you saw how painful it was for her to be here.  You

14   heard Mr. Bicks testify how scared he still is to this day that

15   the defendant might continue the conduct he put the victims

16   through in 2019 and 2020.

17           So ladies and gentlemen, at the end of the day, this

18   is not a close case.  You know from the evidence and from your

19   common sense that the defendant, Willie Dennis, intentionally

20   sent text messages and emails to Eric Cottle, John Bicks and

21   Calvina Bostick to harass and intimidate them and that he

22   caused them substantial emotional distress.  Those victims have

23   suffered at the hands of the defendant.  Hold the defendant

24   accountable.  Return the only verdict that is consistent with

25   the evidence, with the law and your common sense.  Find Willie

1    Dennis guilty.

2              THE COURT:  Thank you very much.

3              Now we'll hear from the defendant.

4              MR. DENNIS:  Your Honor, could we please move the

5    podium so I could face my peers, as we did in the opening

6    statements.  The opening statements, we were allowed to stand

7    in front of the jury.

8              Can we have the podium moved?

9              THE COURT:  I'm sorry.  You want to move that up?

10             MR. DENNIS:  Yeah.

11             THE COURT:  Go ahead.

12             MR. DENNIS:  Your Honor, may I take a two-minute

13   restroom break while they're doing it.

14             THE COURT:  Ladies and gentlemen, we'll give you a

15   ten-minute break.  And then we'll resume.

16             (Jury excused)

17             (Continued on next page)

18

19

20

21

22

23

24

25

MAHGden3

1              (Jury not present)

2              THE COURT:  I'll see you in ten minutes.

3              (Recess)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MAHGden3                    Summatiion – Mr. Dennis

1          (Jury present)

2          THE COURT:  Mr. Dennis.

3          MR. DENNIS:  Good morning, ladies and gentlemen of the

4     jury.  Good morning again.

5          Let me thank you again, each one of you, for your care

6     and attention in observing these proceedings, which will

7     determine the outcome of my life and the lives of my children.

8     I know it's been a -- you have gotten a lot of information over

9     a number of days, and I would periodically look up and I

10    could -- you know, I could see sometimes when I had the

11    witnesses -- the special agents testifying and just detail

12    after detail after detail, it was hard for me to follow, and

13    I'm the one in jeopardy.  So I thank you to the extent that you

14    made the effort to follow it yourselves.  Hopefully -- this is

15    my only chance to argue for my freedom, my only chance --

16         MS. SIMON:  Objection, your Honor.

17         MR. DENNIS:  My only chance --

18         THE COURT:  Just --

19         MR. DENNIS:  We're going to have a long --

20         THE COURT:  I think we should minimize the objections,

21    given that Mr. Dennis is just proceeding.

22         But I do want to remind the jury that the question of

23    punishment is for the Court, not for the jury.  Your job is to

24    determine whether he is guilty or not of the charges, and I

25    determine what the sentence should be, if any.

1          Go ahead.

2          MR. DENNIS:  This is my only chance to tell you why

3     the prosecution did not prove its case within a reasonable

4     doubt.  I'm looking each one of you in the eye and telling you

5     I did not commit the crime that they're -- or the crimes that

6     they're accusing me of.

7          As we begin, I want to go back to my opening statement

8     that I discussed where I talked about, I think, that -- this is

9     a process of -- that goes on in this country of justice, and

10    it's a group effort.  It's an effort of the prosecution, effort

11    of the Court, my effort and the jury.  You guys bring -- you

12    bring the value to the system.  You bring what I call the

13    common sense to the situation.

14         The prosecution just told you that I had to go to

15    prison because it was my intention to intimidate and cause fear

16    for physical safety to my business colleagues when I sent

17    business emails.  After those business emails, which -- if you

18    may recall from the record -- and one of the things I'm going

19    to ask each one of you, my record of -- what I'm going to ask

20    you to rely upon is the witness testimonies, what they said on

21    the stand.  So when you are in the jury room, I'm going to ask

22    you to immediately ask for the transcripts so you have the

23    testimony in front of you.

24         What we saw was, after I sent those emails, after Jeff

25    Maletta came to visit me in New York in November of 2018, there

1    were attacks on my family, attacks on my career and attacks on

2    my compensation.

3          I told you at the start of the trial what I thought

4    the evidence would show.  Now, the evidence is before you and I

5    want to tell you what it means.  All I do, again, is ask you to

6    use your common sense and demand -- because it's my freedom --

7    that you have the complete picture.  The prosecution cannot get

8    the conviction if you demand the whole picture of everything

9    that transpired.

10         Don't just ask what you saw and what you heard, was it

11    the truth, but what the prosecution chose not to show you.  One

12    is they can only get their conviction if they do two things:

13    One is that you are allowed to convict me on my emails; not me,

14    not my intentions, just a slew of emails that you saw.  They

15    don't want you to ask why did I send them.  They showed you a

16    slew of emails as if he just started sending them, but there

17    was never an attempt to say why did he send them.  They don't

18    want you to know what the purpose of these emails was.

19         The other is they want you to see me as an angry man,

20    angry old man, that is sending emails out of completely

21    unjustified rage, just sitting there, just sending them.  So

22    they reduce me to just an old man sending out emails, being

23    very angry to get you to focus on the tiny part of this whole

24    picture.

25         The prosecution has not brought before you any of the

1    executive committee members who had me arrested in retaliation.

2            We talked briefly about these names that we

3    couldn't -- that no one could say in court.  And as soon as

4    they were said, don't say their names.  And if you remember, a

5    number of them were in Pittsburgh.  We didn't have anyone from

6    the executive committee of the firm, despite the fact that in

7    the Southern District of New York, we know the Federal Bureau

8    of Investigation is involved, but we had mid level individuals

9    from the firm, partners who were not -- who were contract

10   partners.  We didn't have the people who generally you would

11   find in a courtroom like this, none of them were there, none of

12   them came.  A small group of K&L Gates executive committee

13   members retaliated against me for challenging their misconduct

14   and had me arrested and brought to trial.

15           The prosecution cherry-picked a few people, who came

16   to court with just a sliver of the truth.  Rather than the

17   whole picture of our working as colleagues over a 14-year

18   period, sharing time with family and friends -- once again,

19   they painted me as an angry, meanspirited person who was

20   responding to the executive group's retaliation.

21           The whole picture -- and I think you saw as part of

22   the evidence that they knew me as a legal professional for more

23   than a decade.  They knew I was their professional peer and a

24   gentleman.  They knew my children and how I raised them to

25   respect god and treat others as they want to be treated.  They

MAHGden3                    Summatiion - Mr. Dennis

1    knew the firm had sent men with guns against me, not the other

2    way.

3            I submit, then, that the witnesses who came before you

4    were not truthful.  John Bicks, living in an exclusive New

5    Jersey neighborhood, told you he was sleeping with a loaded gun

6    next to his bed stand.  Eric Cottle, Eric, 6 feet tall, he

7    testified when he was leaving his house each day, he was

8    looking outside, whether I was lurking, he had special running

9    shoes so he could run away on the subway, though he later

10   admitted he had never seen me on the subway.

11           Despite our long relationship, Cally, along with John

12   and Eric never called me, never contacted -- never called me,

13   never sent me an email or a text saying, I feel intimidated or

14   I feel threatened.  They never -- except until later on --

15   contacted local law enforcement, as what normal people would do

16   in situations like this.  But instead, before contacting local

17   law enforcement, before contacting me, Cally decided to move

18   out of state.  I would have thought there would have been other

19   steps one would take before going to that level.  But I'm going

20   to detail some of the evidence to demonstrate what I'm saying.

21           I'm not like some of these witnesses.  I'm not going

22   to be slick and I'm not going to do word play; I don't

23   understand, I don't recall, did you say this.  I'm going to try

24   to use just straightforward words to help you understand that

25   the meaning of the words can only be understood from the

MAHGden3                    Summatiion – Mr. Dennis

1    content.  I'm happy to be responsible for my own words, but

2    only in the context I sent them.

3         Okay.  On cross-examination, you saw, as the

4    prosecution pointed out, you saw the fear, you saw the

5    intimidation, you saw the emotional turmoil that all these

6    witnesses testified to.  On cross-examination, you saw a

7    different side.  As I told you early on -- and I'm going to

8    repeat this from my opening summation, opening statement --

9    lawyers who work in a law firm called in to handle the toughest

10   cases for these companies, both in the US and internationally,

11   a law firm that consists of partners that are accustomed to

12   unleashing some of the harshest attacks on anyone who opposes

13   their clients, a law firm, in order to prepare such attacks,

14   have legal war rooms where the attorneys discuss all the issues

15   with no holds barred before going to the public with the story.

16        Okay.  So can we call up Exhibit 502, please.

17        I didn't tell her in advance.  I should have.

18        By the way, these are the transcripts that I'm asking

19   you to -- this is my evidence I'm asking you to --

20        THE COURT:  There it is.

21        MR. DENNIS:  There it is, okay.  We're going to look

22   at this real briefly.

23        If you recall the word "we" that we talked about, the

24   very first word of the sentence.  And I asked Jeff Maletta who

25   is the we in this line.  And Jeff said the we was himself;

MAHGden3                    Summatiion - Mr. Dennis

1   Michael Caccese, chairman of the firm; James Segerdahl, the

2   global managing partner of the firm; Charles Tea, the deputy

3   managing counsel; and John Bicks, managing partner of the New

4   York office, who actually testified.  And for those of you --

5   just the way these books are designed is that you have direct

6   examination and you have cross-examination, which means me.

7   That statement is on page 252 within these -- within the

8   transcript.

9       So John Bicks, on cross-examination testified that he

10  took no part in the decision whatsoever.  I'm going to just

11  sort of make sure -- so that you -- so you have Jeff Maletta,

12  the general counsel of this international global law firm,

13  Harvard graduate, Stanford Law School, discusses this decision,

14  which basically ended my legal career, ended my relationship --

15  ended my legal -- firm -- he states these were the people that

16  were responsible.  And it was sent to me at 1:44 a.m. in the

17  morning.

18      And John Bicks, when questioned about it -- two days

19  later, you ask him, John, were you a -- he says, Willie, I was

20  not part of that decision, no.

21      Okay.  So general counsel, Washington, DC, this is our

22  team.  The person who sits in New York, I was not part of that

23  decision, page 531 of the cross-examination, line 7.  I was not

24  part of that decision.

25      Who is telling the truth?  It's not a big deal.  It's

1    just my freedom at stake.

2              So then -- and so my suspension occurred on

3    January 29th.  So then Cally testifies that she did not learn

4    of my suspension -- I'm going to read exactly what she stated.

5    This is what she stated.  I did not know about the expulsion --

6    this is from her testimony -- this is actually the first time

7    I'm hearing about it.  I did not know you were suspended prior

8    to being expelled.  You know, I didn't know -- this is just one

9    email.  I didn't know what to say to that.  I don't know if I

10   had many questions, but -- so this is a person who is fearful,

11   terrified of me, and I didn't know that you were suspended, so

12   she just found out today.

13             Eric Cottle didn't know that I was suspended.  What

14   did John Bicks testify?  In the days after the suspension I had

15   several discussions about this.  I had a discussion, a brief

16   discussion with all of the partners in the New York office so

17   they were aware of the actions that they were -- taken.  In the

18   days after, I had a brief discussion with all the partners in

19   the New York office.  February, maybe, beginning of February.

20   We had witnesses here who basically said that they didn't know

21   until they were testifying.

22             So with respect to this testimony, who is telling the

23   truth?  Jeff?  John?  Eric?  Cally?  I don't know.  Should we

24   all -- should we call all four back before you decide the fate

25   of my life?

MAHGden3                 Summatiion - Mr. Dennis

1          I ask you to take this under consideration during your

2     deliberations and determine why anyone would tell untruths

3     about their participation or knowledge of my suspension.

4     Please remember, as noted in the testimony, that the suspension

5     notice was sent six hours after I sent the firm an email

6     accusing them of mismanaging the firm's relationship with

7     Microsoft.

8          Okay.  October 28th -- and I just want to focus in on

9     the testimony, because I'm sure your Honor will, as part of his

10    charge to you, will bring to your attention the credibility of

11    the witnesses and their testimony.  Everyone can say they're

12    scared, but are they credible persons; does that in any way

13    contribute towards possibly you having some sort of doubt.

14         So I am just going to try to -- my goal here is just

15    to give you -- I am going to work through the transcripts, but

16    hopefully when you guys have the material, you will work

17    through them more, but I'm going to give you things that I

18    saw -- and this is what they know, being big lawyers.  You hear

19    something one day, someone else will say something two or three

20    days, and most people won't remember it.  You will only

21    remember if you get a chart and compare everyone's statements;

22    wow, same incident, everyone is saying something different.

23         So let's just go through another one that I noticed as

24    I was going through it over the weekend, which hopefully you

25    guys were having a lot more fun.  At one point we were trying

to understand how did the FBI become involved in this case.  So
during the cross-examination, Jeff Maletta, the question was
put to Jeff was, when did he first become aware that the FBI
was investigating this matter.  Jeff's response on 302,
page 302, the first knowledge I had that the government was
investigating this matter was a telephone call from the FBI.
The first knowledge that I had that the government was
investigating the matter was a telephone call from the FBI.
And this is something that I missed until I was reading the
transcript.  Then two pages later he says -- we're asking him,
when did you learn that it was Cally Bostick.  He said, it was
sometime before the FBI called me -- no, that's not accurate.
I learned the possibility that it might happen before I was
called by the FBI.  So did you have knowledge that the FBI was
involved before or did you learn about it when they first
called?

         I mean, for me, I'm just sort of like, I'm not going
to -- can you, on testimony like that -- should Jeff not come
back and let's have clarity before I'm put in a position of
jeopardy?  It would be -- you know.  It's these discrepancies
that come up throughout this.  It's the word play.

         And I would say to you, you know -- I'll put this
question to you, we talked about -- I don't know if you
remember, John Bicks talked about having a meeting in the
offices of K&L Gates with members of the New York City Police

 1   Department.  And the transcript got kind of confusing, but I'm

 2   going to -- but the idea -- the concept went around -- this is

 3   going to show you the way lawyers are.  The concept was around

 4   the word complaint, right.  And everything got real narrow,

 5   because everyone was basically saying, well, no complaint was

 6   ever filed, right.  Probably, in a literal sense, that's

 7   probably right.

 8           But let me ask you a question, if two police officers

 9   come to your home and sit down and talk to you, you tell

10   them --

11           MS. SIMON:  Objection.

12           MR. DENNIS:  -- about something, is that not a

13   complaint?  In the normal word, the common sense.

14           THE COURT:  Well, I will allow this.  Go ahead.

15           MR. DENNIS:  I'm going to go through these things as

16   well as I can, but there's a whole section I have in my

17   summation.  And maybe I could -- I was going to walk you

18   through some of the exhibits, but we'll just talk about it

19   generally.

20           So let's say, for each of the victims, this case began

21   at least as early as August of 2020, at least as -- let's just

22   say, that seemed to be where they generally -- and I can -- I

23   can go to later some specific statements, but let's say around

24   August of '20 -- so it's been going on for over two years now.

25   What struck me, in terms of -- as we go back to the story,

MAHGden3                    Summatiion - Mr. Dennis

you're in the war room, you put the story together, and then

you come out and you serve it to the public.  What struck me

was that these people who were crying on the stand, talking

about loaded guns under their bed, next to their bed where

their family is, they only talked about it amongst themselves,

if you saw them repeat it, two times, three times, maybe once.

They never -- common sense, if you are fearful for your life

and that -- where you are moving out of state or you're buying

a gun, making sure it's loaded, and you are all living in the

same or working in the same office building on the same floors,

and you have only talked about it three, four, five times, how

scared are you really?  Are you really scared?

         I mean, I have citations where they'll talk about it.

I can find one or two, talks about it three times, I talked

about it four times, I only talked about it with one person, I

didn't talk about it with anybody -- you're moving out of

state, aren't you telling everybody why you're moving -- why

you're moving out of state and what you are doing and why

you're doing it?  But Cally says -- actually, I might -- let me

see if I can find this quote.  She says something along the

lines of, I didn't talk about it with anybody because it was a

personal issue.

         You see what I spent my weekend doing, and I didn't do

it that well.

         This is John.  We lived in our house in Ridgewood for

MAHGden3                    Summatiion – Mr. Dennis

17 years, never turned on the alarm.  I started putting the

alarm on every night.  We had to upgrade the security system, I

had to make a decision to upgrade the security system, to add

cameras so we could be aware of what was going on when I was

not there.  I am not necessarily proud of it to say -- saying

it, there were nights when Willie was particularly active and

when I would sleep with a loaded gun next to my bed.  That's

510.

          And I remind you, as you take all this into context,

is that everyone else has said that they've been threatened,

said that they felt that their lives were in danger.  But as

the law enforcement official from the Dominican Republic

stated, when I was arrested, how many law enforcement officials

were that day at the apartment?  The entire division.  Was it

more than ten?  Yes.  Were they all armed?  Yes, yes, sir, she

said.

          So out of everyone who has been in this courtroom --

this is the first time I've been surrounded by guns -- but out

of everyone who has been in this courtroom, my life has been

endangered the most.

          (Continued on next page)

1          MR. DENNIS:  Truly in danger, because they didn't come

2     sweetly and nicely.  So I don't think that for witnesses who

3     created this chain reaction, I think it's really -- to ask them

4     to come and tell the complete truth and the whole truth, I

5     don't think is unreasonable.  You put someone's life in

6     jeopardy, in danger like that, to come in and just be

7     accurate -- no, I don't recall, I don't remember, I don't --

8     you remembered everything to put that chain reaction in place,

9     you remembered enough of that.  But now, you don't even

10    remember when I was suspended.  You didn't even know until

11    today; you learned along with the jury.

12          OK.  See what else we have.  These are just things

13    that I'm -- please ask for the transcripts right away and start

14    looking at what the witnesses testified to.

15          John Bicks.  We're going back to how did this whole

16    chain reaction begin?  And even now, two years after it was

17    done, these witnesses, you know, I asked, well, have you

18    identified how they got your emails or how they identified you?

19    John Bicks, I can't tell you.  I don't know.  When are you

20    going to know, after I'm shot?

21          Find that Cally, I guess -- Cally didn't go to the

22    police department, apparently, but gave it to her lawyers, who

23    then advised her that maybe they should take it to the FBI and

24    needed her consent.  Now, I'm going to tell you something,

25    because I worked with these guys, and I'm a lawyer, just like

MahWden4                    Summation - Mr. Dennis

them.  Any of my clients, any of my clients, you come to me --
I've had incidents like this -- and you tell me that an
employee or that someone else you're really fearful of, the
first thing I'm going to advise you as your attorney is, OK,
we've got to get on top of this.  I want you to go file a
police complaint, and I'm going to go with you, because your
life is in danger.

        That's what big-time lawyers do.  That's how we
protect our clients.  We don't, well, let's talk about it, let
me see the email.  We get into action and we figure out the
facts, just like you would do for any family member, any child,
any spouse that you loved.  It wouldn't be -- it's like, you
feel like you're in imminent danger, you're certainly going to
do it before you move out of state.  You're going to go to the
police, and you're going to be, like, hey, I got a problem.
But none of them took the actions that I think each and every
one of you would have taken immediately upon learning that your
life were in danger or you felt your life or a family member.
They did the opposite.  So these are big-time lawyers.  They
would advise you -- in other words, John would say to you, oh,
OK, I shouldn't -- you know what I advise you to do?  Get a
loaded gun and sleep next to it.  Don't go to the police.
Don't go here.  Get a loaded gun.  Just the exact opposite of
what we need in this country, that sort of advice, that sort of
behavior.

1        Uh-huh.  OK.  All right.  Anyway, I think as you look

2   at -- did they behave -- it's kind of -- did they behave in the

3   way that you would have behaved if, given the threat that they

4   felt or you felt similarly threatened.  I think you just know

5   yourselves.  Talk about it.  What would we have done?  I mean I

6   just -- I go on.  I mean it's just -- I mean, you know, I'm

7   just looking at quotes I have.  Cally and Eric in the same

8   office.  They both, we didn't talk about it.

9        How many times did you talk?

10        Very few, very few.  Maybe two.  Maybe two times.

11        How many times did you -- that's under the Cally

12   Bostick.  I didn't have the page number, but that's under

13   Cally's testimony.  Maybe two conversations, over two -- more

14   than two years.

15        How do you question someone who makes statements like

16   that?  I mean -- OK.

17        Can you call up, Ms. Geier -- I know I didn't tell you

18   in advance.  Can you call up exhibit A for the defense?

19        OK.  All right.  That's -- uh-huh.

20        THE COURT:  Mr. Dennis, if you have your exhibit A,

21   you can pass it to the jury.

22        MR. DENNIS:  OK.  I don't have it, but I can just sort

23   of -- I can talk you through it.  It's not really complicated.

24        This was an exhibit that I asked John Bicks to review,

25   and I had asked him --

1          THE COURT:  There it is.

2          MR. DENNIS:  That's it, right?

3          Can the jury see that?

4          OK.  And so if you remember -- you probably don't

5    remember, so I'm just going to -- I'm going to ask you, because

6    this is kind of important.

7          Thank you, guys, for being so patient with me.  I'm

8    just going to get right here.  Oh, here we are.

9          Anyway, I'll find it.  I'll just continue with this,

10   but let you know what you're looking at, why you're looking at

11   it.  Within John Bicks's cross testimony, I asked John, you

12   know, would you, or, you know, I asked him to recall any

13   contact that he had with any of these local law enforcement,

14   and he testified to -- the first interaction that I recall with

15   the police department would have been, it would, I can't recall

16   again if it would have been late in 2019 or sometime early in

17   20 -- sometime in early 20 -- sometime early in 2023 -- late,

18   sometime early in -- oh, 2020, that the firm made a report to

19   the local precinct that covers 599 Lexington Avenue.

20         To let you know, local precinct is the firm, local

21   precinct is around the corner.  I do recall that we ended up

22   meeting an officer with, a squad detective and a senior

23   officer.  So came to the office, right around the corner.  They

24   came to the office.  They met with them.

25         Then I said, can you please call up exhibit A for the

MahWden4                    Summation - Mr. Dennis

1    defense, which is what you're looking at.

2         John, was that one of the individuals that you met

3    with who came to your office?

4         Page 543:  Yes, it was.

5         Why am I raising this issue?  Look at the date on

6    that.  First, we met maybe late -- early 2020.  If you look at

7    that, you look at the date and you look at -- remember we

8    talked about our timeline.  If you look at when a lot of the

9    emails that were submitted by the prosecution, they occurred

10   during that same period of time.  So the question I put to you,

11   I won't even -- how do you think I got possession of that card?

12   How do you think I got one?  They met with the partners in my

13   office.  John says the same person.  How do you think I got a

14   copy of that card?

15        The indictment states that between or about September

16   4, 2019 -- September 4, keep looking at that date -- and on

17   about September 27, 2019, Mr. Dennis sent at least

18   approximately 200 written communications to victims and other

19   members of the firm.  I submit to you that sometime between

20   when I got that card I was a victim as well -- again.  More

21   guns around me and my family.

22        I ask the jury to consider why did John and Jeff not

23   advise Cally or Eric about the meeting and ask them to

24   participate?  You guys are so -- come in.  Let's all bring --

25   why is everything so segmented and siloed?  Their story.

1          So in other words, Cally never reported her fears to

2     the NYPD, which, think about -- I mean which is right around

3     the corner.  Eric is terrified.  He's running into the

4     building.  It's right around the corner.  On your way in, when

5     you're getting coffee, going for lunch, let's just stop in and

6     give them some more emails.  They're coming in all the time.

7     Let's -- What would I do?  I would advise -- you know what I'm

8     going to do?  We're going to make them get involved in this.

9     Every time he sends you an email, every email, we're going to

10    take them over, I'm going to walk you over to the office, we're

11    going to put them on the desk sergeant, we got some more.

12    Here, what are you guys going to do?

13          You're right around the corner from them.  Why aren't

14    you all over them because your life is in danger?

15          Anyway, all right.  Oh, here it is.  Right.  Right.

16    Here it is, page 5 -- if you look at Cally's, you know, her

17    transcript on cross-examination, obviously I'm looking, she and

18    John are in their office.  She's only had one conversation with

19    John about the issue.  Otherwise, he told her, he referred her

20    to Washington, D.C.  Went to Washington, how is Washington,

21    D.C., the office, Jeff Maletta, going to help her in New York

22    City against --

23          OK.  So we're going to go back to, maybe, is there a

24    possibility that any of my emails or text messages could have

25    been related to any of this stuff?  Maybe.  Is it too much to

MahWden4                    Summation - Mr. Dennis

1    ask that at least everyone, I mean if you feel that -- fine,

2    but come and tell the truth.

3            Yes.  So I would certainly say if you're in the --

4    when you deliberate, I'd ask you to take a look at page 670,

5    which is part of the testimony of Cally, but I'm going to

6    read -- I'm going to read a little bit about it, read a little

7    bit of it.  OK.  All right.  OK.  I'm going to read it to you.

8    OK.  I'm going to read to you from page 669.  OK.  I'm sorry.

9            "Can you name the persons who you talked to?"  That's

10   the question.

11   "A.  So I talked to the general counsel, Jeff Maletta.

12   "Q.  How many times did you talk to Jeff Maletta?

13   "A.  About concerns for my safety?"

14           And Jeff Maletta, so we keep it in context, is in

15   Washington, D.C.

16   "A.  Concern for my safety?  Many times."

17           Jeff Maletta's in Washington D C.  The police

18   department's right around the corner.

19   "A.  Especially when it escalated.  I wanted the firm to get a

20   hold of it, control of it.

21   "Q.  So you spoke to Jeff Maletta many, many times?

22   "A.  Yes.

23   "Q.  OK.  Who else?

24   "A.  John Bicks initially.  But again, I was advised to only

25   speak to Jeff Maletta about it, which is what I did.  I spoke

1    to, to people at the firm that are not just colleagues but

2    friends of mine.

3    "Q.  With respect to John -- with respect to -- did John Bicks,

4    in your conversations with John Bicks, did he offer any

5    solutions or any sort of action that you could take in order to

6    ensure your protection?

7    "A.  Actions that John Bicks could take?

8    "Q.  As the office managing partner of the New York office,

9    yes.

10    "A.  No.  I knew that the office had security, but no, he

11    didn't offer me any solutions."

12            Managing partner of an international, global law firm.

13    He doesn't -- and your partner's life is in jeopardy, and you

14    don't offer her a single solution?

15    "A.  But no, he didn't offer any other solutions.  Again, he

16    directed me to work through my issues with Jeff, my concers

17    with Jeff."

18            How concerned were you?  And how concerned was John

19    about it?

20    "Q.  So let me understand this right.  You felt threatened.

21    You felt like your life was in danger, and he directed you to

22    work with Jeff Maletta, who was in Washington, D.C.?

23    "A.  Yes.

24    "Q.  With respect to your testimony today, have you spoken to,

25    or did you speak to Jeff Maletta prior to testifying?

MahWden4                    Summation - Mr. Dennis

1  "A.   No.

2  "Q.   Have you spoken to Eric Cottle?

3  "A.   No.

4  "Q.   Have you spoken to John Bicks?

5  "A.   About my testimony?

6  "Q.   Yes, that you were going to testify here.

7  "A.   No.

8  "Q.   Now let's just confirm, what floor are you on in the New

9  York office?

10  "A.   I'm on the 32nd floor.

11  "Q.   What floor is John Bicks on?

12  "A.   John's on the 31st floor.

13  "Q.   What floor is Eric on?

14  "A.   Eric's on the 33rd floor."

15          So then we go on:

16  "Q.   So are you aware of any actions that the firm may have

17  taken in order to protect your security and make sure that you

18  were safe?

19  "A.   Yes.

20  "Q.   Tell me the official actions, any official actions they

21  may have taken.

22  "A.   Oh, was security at my apartment."

23          They hired security for her apartment.  Still no

24  police report yet.

25  "A.   Yes.  They helped me move.

1    "Q.  Did they" -- here's a question:

2    "Q.  Did they ever suggest reporting this to the New York City

3    Police Department?

4    "A.  No."

5         So we have another vigilante running out there.  She's

6    going to take justice into her own hands.  John's going to

7    probably give her a loaded gun.

8         So -- anyway, so this goes on.  But I think that --

9    yeah, if you just look at this testimony, and once again, as

10   the Department of Justice is pointing out, you know, you sort

11   of apply it to a reasonable standard, like common sense

12   standard.

13        So then, I'm going to -- I'm getting close to wrapping

14   up.

15        So, you know, so it's --

16        Right here probably.  OK.  So, you know, one of the

17   things that I think -- all right, one of the things that I

18   think occurred during the course of this trial is we --

19   everyone had the opportunity to discuss all the measures that

20   they had taken in order to, you know, protect themselves, you

21   know, because you have on the one side, OK, this is what I'm

22   fearful of.  This is what's going on.  These are the dangers.

23   Then you have, OK, tell us about everything that you did --

24   hopefully seeing a balance or a match between the threat and

25   your response.

1          So Jeff and Cally and John were selective about

2     measures that they took.  They were selective, and as I said,

3     they never talked about -- they always, they always moved

4     towards, most of their solutions were basically self-help, you

5     know.  But we, we probed them some.  And so as we were probing

6     them, I'm just going to read to you.  OK.  I'm going to read to

7     you.  This is page 676 of Cally's -- Cally's testimony:

8     "Q.  So Cally, I think we left off about a security measure.

9     Any security measures that KL Gates had taken to protect, can

10    you describe or will you describe the security measures taken

11    in September 2019 at the Corporate Counsel Women of Color

12    conference."

13          September 2019, and if you may remember, that's a

14    conference that -- we heard testimony -- consists of basically

15    over a thousand women attorneys, African American, Asian,

16    Latina attorneys.  And the firm hired security to protect the

17    women lawyers at KL Gates that were attending the conference.

18    "Q.  So the firm hired security to protect" -- I'm going to

19    insert, but she didn't say this -- "only the women from KL

20    Gates at the conference.

21    "Q.  Where was the conference located?

22    "A.  Chicago.

23    "Q.  Did you know the name of the security company?

24    "A.  I don't.

25    "Q.  What information did Mr. Maletta provide to you about the

1   security that he was hiring?

2   "A.  Just that he was looking to get permission to have

3   security for us because many of us didn't feel safe attending."

4            So, now, you haven't reported it to anyone in New

5   York.  Now you're going out of state, and security is coming

6   with you, maybe to the conference.  I wonder if the other women

7   in the room, if they were aware.  Things happen to women as

8   well as men, actually.

9   "Q.  Did Mr. Maletta come to Chicago?"

10           Jeff once again, international law firm, global law

11  firm, major clients.

12  "A.  I don't remember.  OK?

13  "Q.  In your prior years, has the firm ever hired security for

14  the conference?

15  "A.  Not to my knowledge."

16           We go on.  The Court gives me an opportunity for

17  Ms. Bostick to, to review some documents.  And it ends with:

18  "Q.  Ms. Bostick, I want to ask again, to your knowledge, did

19  Jeff Maletta expect -- did he inform you that he expected to be

20  in Chicago for this conference and to work with the security to

21  be in Chicago?

22  "A.  Yes.

23  "Q.  And his purpose for being in Chicago was to?"

24           Her answer was "to meet with security."

25  "Q.  So the general counsel of an international, global law

MahWden4                    Summation - Mr. Dennis

firm, flying to Chicago where there are over, I have here 800
women to meet with security?
"A.  Yes."

        Didn't get a chance to find out or delve into if they
were armed or not.  But if they were, that just meant that
there were more guns around me -- another chance where an
accident could have happened.

        And so once again, but it's sort of like these emails,
there's no context.  These emails are just being sent?  Could
the context have been you endangered all these people?  You and
John?  You're not having an affair with him.  It's a
conspiracy, and you're endangering other women who gave you
business, who helped to bring you along.  And now, because it's
to your financial interest, you will let them be exposed, for
no reason whatsoever, to nonsense.  You ought to be ashamed of
yourselves is what I'm saying.

        But in any event, so, you know -- and so it was never
about an affair.  It was an analogy that you two are conspiring
against me, you might as well be lovers.  But your conspiracy
is not one in which -- based on anything physical.  It's a
conspiracy that --

        OK.  You want to bust my chops?  You want to give me a
hard time?  OK.  But 1,000 God-fearing women attorneys who are
walking around and this is going on and they have no knowledge
about it.  And they helped you.  They put you to where you are

MahWden4                    Summation - Mr. Dennis

1   today.

2              Could you have not said to the firm, No, this is,

3   haven't reported to the police, but now it's -- this has gone

4   far enough.  Let's not -- you know, let's not get all the women

5   involved and, you know, let's not -- you know, I used to

6   have -- I have, you know, I worked on Wall Street and then, for

7   30 years and worked with a lot of great attorneys.  You all

8   know that what this really all is about is about money.  I mean

9   you saw the wealth.  Tailored lawyers and living in exclusive

10  neighborhoods.  It's about money.

11             I used to ask this question of people.  No one ever

12  got the answer, because it's a silly answer, but if you work on

13  Wall Street, do you know how much -- do you know how much a

14  person -- and I'm not asking you to answer, because I'm going

15  to answer it for you.  I said, how much do you need to make?

16  How much do you need to make if you work on Wall Street?  What

17  is the barometer?  And people would throw out all sorts of

18  numbers, and I'd give them a real simple answer:  Just a little

19  bit more.  No matter how much they have, just a little bit

20  more.  And people are willing to do so many different things

21  for just a little bit more.

22             I think that -- I think that, you know -- sometimes I

23  get -- it's so much.  It's, you know, it's obviously my life,

24  and it's obviously -- these are all people I knew for many,

25  many, many years, and we had a lot of good experiences

MahWden4                    Summation - Mr. Dennis

together, and you know, unfortunately, it's going to be -- but you know, I know you have a serious job to do.  I'm asking you to remember the traditional oath, sworn under God, to tell the truth, the whole truth, and nothing but the truth.

The prosecution's witnesses did not tell the truth. And you saw it on their faces.  The prosecution did not tell the whole truth because they could not show you the whole truth.  The information that was withheld, the information that you didn't get a chance to see would have not, even but for the testimony, even the testimony, I think, would result in you acquitting me.

As you review those emails, the text messages, reflect on the testimony of the witnesses, I ask you to consider the kind of man you see before you.  Do you see a man who would ever threaten the physical well-being of or harm anyone in person or by way of text or email?  The professional and gentlemanly way I've behaved in my 14-year career at KL Gates, even though I had been respected, had my clients taken, stolen, my compensation systematically just -- what I did was not a crime.  And nothing I did is deserving of prison.

Thank you very much.

THE COURT:  All right.  Ladies and gentlemen, I think we'll give you your lunch break at this time, and we will reconvene at 20 minutes before two.

(Jury not present)

MahWden4                    Rebuttal - Ms. Simon

1              THE COURT:  All right.  We'll see you in an hour.

2              (Luncheon recess)

1                         AFTERNOON SESSION

2                             1:40 p.m.

3          (Jury not present)

4          THE COURT:  In the meantime, let me have my law clerk

5     hand out to each side a copy of the verdict form.

6          (Jury present)

7          THE COURT:  Please be seated.

8          All right.  Ladies and gentlemen, now we'll hear the

9     rebuttal summation from the government.

10         MS. SIMON:  The defendant said a lot of things in his

11    closing statement.  I'm not going to address every point the

12    defendant made.  I know how carefully you watched the evidence

13    in this trial, but there are a few main arguments the

14    defendant's made that I'd like to address right now.

15         At the outset, I want to be clear about one thing.

16    The defendant has no obligation to do anything at this trial.

17    As Judge Rakoff told you, the government has the burden of

18    proof.  That's our responsibility, and we embrace it.  But, as

19    Ms. Kushner pointed out in the government's opening summation,

20    when the defendant makes arguments, like he just did, it is

21    perfectly appropriate for you to assess those arguments.

22    Consider whether they make any sense and whether they're

23    consistent with the evidence that you heard and saw over the

24    course of the trial.  And it is perfectly appropriate for the

25    government to respond to those arguments, to direct you back to

MahWden4                    Rebuttal - Ms. Simon

1    the law, the evidence, and of course, your own common sense.

2              What the government presented to you at this trial and

3    in its opening summation is the evidence, the facts.  That's

4    not what you heard from the defendant.  A lot of what you heard

5    from the defendant was designed to distract you from those

6    facts.  For example, when the victims learned about the FBI

7    investigation, how many people came to arrest him in the

8    Dominican Republic, the alleged attacks on his family, for

9    which you saw no evidence whatsoever, see these arguments for

10    what they are -- arguments designed to distract you from the

11    facts, from the overwhelming evidence in this case, evidence

12    that proves beyond a reasonable doubt that the defendant is

13    guilty.

14              Think for a moment why the defendant is trying to

15    distract you.  He's trying to distract you because if you focus

16    on the facts, on the evidence, it's all over for him.  It's

17    obvious that the defendant is guilty.  The defendant knows

18    that, and so Mr. Dennis is doing all sorts of things to try to

19    distract you, to get you to focus on other things besides the

20    overwhelming evidence of his guilt.  So I urge you, don't be

21    distracted.  Whether the defendant was wrongfully terminated

22    from his job at K&L Gates, whether he was upset at the way the

23    law firm treated him, whether security came to a women's

24    conference, it does not matter.  All that matters is that the

25    defendant sent the text messages and emails you saw during the

1    course of this trial; that the defendant sent those messages

2    with the intent to harass or to intimidate his victims and that

3    the victims experienced substantial emotional distress as a

4    result of those messages.  Focus on the evidence, the messages

5    themselves, how the victims told you they felt after receiving

6    those messages.  The hard evidence exposes the defendant's

7    arguments for what they are -- sideshows, distractions.

8              Here's another distraction the defendant's using.  The

9    defendant talked a lot about what you don't have, what's not in

10   evidence in this case.  See it for what it is -- another

11   distraction, a distraction from the mountain of evidence

12   against him.

13             A few points on this.

14             Yes, as I mentioned, the government has the burden in

15   this case.  The defendant has no burden whatsoever.  But if the

16   defendant wanted to call a witness or wanted to try to present

17   you with additional evidence that was actually relevant to your

18   consideration in this case, he could have.

19             MR. DENNIS:  Objection, your Honor.

20             MS. SIMON:  And let's just --

21             THE COURT:  Overruled.  That's a fair response to the

22   argument that was made by the defendant.

23             Please continue.

24             MS. SIMON:  And let's stop to think for a minute why

25   the defendant is talking about what's not in evidence.  It's

MahWden4                    Rebuttal - Ms. Simon

because he knows that if you look at the evidence, if you look
at the facts, if you use your common sense, then it's over for
him.  He knows that.

          Focus on what is in evidence -- the text messages, the
emails, the sworn testimony of the victims, not what the
defendant said but what's in evidence.  The emails and text
messages you saw on their face are intimidating, threatening,
and harassing.  The sheer volume of them is harassing.  You
don't need to speculate.  There isn't any excuse for what the
defendant did.  It doesn't make any sense.

          Here's another argument the defendant made to you in
his closing statement.  He said what he sent the victims were
just business emails.  Business emails?  Give me a break.

          First of all, the defendant said emails because he
doesn't want you to focus on the text messages.  The text
messages sink him.  If you look at the text messages, you know
that they're not about business disputes.  You don't call
someone a gutter rat piece of shit in a business dispute.  You
don't send someone messages at all hours of the day and night
in a business dispute.  You don't threaten to come to someone's
home or threaten to turn someone into a biblical symbol or
falsely accuse someone of trolling for dudes to sleep with on a
dating application in a business dispute.  You don't invoke
slavery and you don't invoke the Holocaust in a business
dispute.  It doesn't make any sense.  Plus the defendant's

MahWden4                    Rebuttal - Ms. Simon

1    conduct, as you heard, persisted for more than a year after he

2    was expelled from K&L Gates.  He had no business left to do at

3    the law firm or any of those victims for months and months.  He

4    turned instead to the full-time job of tormenting his victims,

5    just to exact some kind of weird revenge on them.

6           The defendant suggested to you that this was all about

7    money.  Maybe it was all about money to the defendant.  Perhaps

8    that's why he sent these victims thousands of messages years

9    after he was fired, because he wanted more money from the firm.

10   But the victims didn't have a financial incentive in this case.

11   They didn't have a business dispute with the defendant.  You

12   know what this is.  Just more nonsense from the defendant.

13          In his closing, the defendant also made several

14   references to context, to the whole picture.  He seems to think

15   that the back story of his grievances with the law firm somehow

16   explains or justifies the messages he sent to the victims

17   months and even years later.  He's flat wrong.  The defendant

18   may have been upset at the firm.  He may have thought the firm

19   wronged him.  He may have even felt that one or more of the

20   victims wronged him.

21          So what?  Just because the defendant was upset with

22   his former law firm did not give him the license to send

23   thousands of harassing messages to his former coworkers.

24   Nothing the firm allegedly did to the defendant justifies his

25   conduct.

1          Think about it.  If someone thought that a bank, their
2     bank, had wrongfully removed money from their bank account, it
3     couldn't go rob the bank.  If they did that, they'd be guilty
4     of bank robbery.  The same is true here.  Just because the
5     defendant believed, rightly or wrongly, that he had been
6     mistreated by the firm didn't permit him to harass and
7     intimidate his former coworkers over text and email.  There's
8     just no justification for what he did.
9          The defendant's disputes with the firm don't provide
10    context.  It's only relevant insofar as it shows that the
11    defendant had an axe to grind with his former employer, that he
12    wanted revenge against his former coworkers, the people who he
13    perceived had wronged him.
14         Focus on the evidence.  You saw many of the
15    disturbing, harassing, and threatening messages for yourselves.
16    Concentrate on the ones the defendant sent after he was fired
17    from the law firm in May 2019, the ones saying "I will find
18    you," the ones threatening to turn his victims into a biblical
19    symbol, the ones calling victims degrading, even racist, names.
20    What more do you need to know?  The messages speak for
21    themselves.  You can tell just by looking at them that they
22    were sent with the intent to harass or intimidate the victims.
23    The defendant can't walk away from the messages he sent.
24         The defendant said that he would be happy to be held
25    responsible for his own words.  Hold him responsible.

1           It's also clear from the defendant's summation that he

2    thinks he was the victim in all of this.  It's always the firm

3    versus Willie Dennis, the members of the management committee

4    versus Willie Dennis, the government versus Willie Dennis, even

5    the victims versus Willie Dennis.  He's gone so far as to

6    suggest that the witnesses are involved in some giant

7    conspiracy against him, that they're somehow responsible for

8    failing to stop him from sending them threatening messages.

9           What trial was he at?  He's not a victim.  You know

10   who the real victims are -- John Bicks, Eric Cottle, and

11   Calvina Bostick.  The defendant made them victims.  You saw the

12   messages the defendant sent them, how he sent them back to back

13   to back at all hours of the day and night.  You heard how those

14   messages made the victims feel, how the messages upended their

15   lives.  Don't let the defendant fool you.  There's simply

16   nothing to his outlandish allegation that he's the victim of

17   some giant conspiracy.

18          You heard the victims.  They weren't out to get the

19   defendant.  They all thought they had pretty good relationships

20   with him before he turned on them.  It was the defendant's own

21   conduct that connected these victims.  They didn't ask to

22   receive all the messages they did.  It was the defendant who

23   did that to them.

24          The defendant also argued to you that the victims

25   couldn't have been in fear for their lives in response to his

MahWden4                    Rebuttal - Ms. Simon

conduct for many reasons.  He said because they were lawyers

used to tough talk or because they didn't discuss the

defendant's conduct with each other enough or because they

didn't go to law enforcement early enough, even questioned the

witnesses' credibility.  There is a lot wrong with those

arguments.

        First, the messages on their face would have put

anyone in fear.  The fact that the defendant kept sending these

messages back to back to back would have made anyone fearful.

You could convict the defendant based on his words alone, the

messages he sent.  But in any event, you know that the victims

were actually in fear of the defendant.  You know that because

they told you.  You observed their demeanors when they

testified.  You saw Calvina Bostick break down in tears in the

mere sight of the defendant.

        The victims knew that the defendant had an axe to

grind with the firm, and that only increased the anxiety,

stress, and -- yes -- fear, they felt from the defendant's

messages.  The fact is they didn't know what the defendant

might do.  They didn't know whether he would carry out his

threats, and that unpredictability was part of what made the

defendant's conduct threatening.

        You also heard about the steps the victims took to

protect themselves.  Eric Cottle became more vigilant during

his daily commute and didn't attend certain professional

1    conferences.  John Bicks activated his home alarm and slept

2    with a gun.  Calvina Bostick stopped going for her daily run,

3    got security for her home, and even moved out of state.  Those

4    are things people do when they're scared for their physical

5    safety.

6         The defendant wants you not to believe the victims.

7    He wants you not to believe them because their testimony is

8    devastating for him.  You saw the victims.  You heard them.

9    You saw the emails and text messages that corroborate them.

10   You know they're telling the truth.

11        Taking a step back, there's another problem with the

12   defendant's arguments.  It's misleading on the law.

13        I expect that Judge Rakoff will instruct you that the

14   government needs to prove only that the defendant's course of

15   conduct caused, attempted to cause, or reasonably could be

16   expected to cause substantial emotional distress.  That may

17   include fear, but fear isn't necessary.  And you know the

18   victims experienced substantial emotional distress.  You heard

19   the victims.  They told you how they felt anxious, concerned,

20   or worried.  And yes, even scared.  And you saw their demeanors

21   when they saw -- when they talked about what happened to them.

22        The defendant's tough-talk bit is just another one of

23   his many distractions.  Just because the victims worked in a

24   stressful environment or were used to delivering difficult news

25   to clients doesn't mean they're not distressed when a former

1    colleague sends them streams of threatening messages.  You saw

2    for yourself the defendant's messages weren't of a business

3    nature.  They were vile.  The tough-talk argument just doesn't

4    make any sense.

5              The same is true regarding the defendant's arguments

6    that if witnesses were scared they would have spoken to each

7    other more or would have gone to law enforcement earlier.  You

8    heard during the course of this trial that the victims did

9    discuss the defendant's conduct with each other.  They just

10   didn't discuss their testimony with each other.  That's

11   completely appropriate.  Judge Rakoff told you that.

12             The victims were also told to discuss the defendant's

13   conduct with the firm's general counsel.  You heard that they

14   did that.  Ms. Bostick told you the firm helped her get

15   security for her home and helped her to move out of state.

16   That corroborates the steps that she took and that she felt

17   fear from the defendant's conduct.

18             You also heard that Mr. Bicks and Mr. Maletta did

19   speak to the NYPD and that Ms. Bostick's attorney brought the

20   case to the FBI.  I'm not sure why the defendant thinks that's

21   helpful to him.  That's a completely legitimate thing for

22   victims to do.

23             The defendant similarly argued to you that if the

24   victims were really distressed by his messages, they would have

25   responded to him and told him to stop.  You know that's

MahWden4                    Rebuttal - Ms. Simon

1    nonsense.

2           First of all, the defendant was told to stop multiple

3    times.  You saw the emails the firm's general counsel, Jeff

4    Maletta, sent to the defendant in early 2019, telling him to

5    stop emailing firm employees and that firm employees would not

6    respond directly to his messages.  And you saw the cease and

7    desist letter sent by the firm's outside lawyer to the

8    defendant in September 2019, telling him again, in no uncertain

9    terms, that the recipients found these messages harassing and

10   that they needed to stop.

11          When the firm sent these warning emails and the cease

12   and desist letter to the defendant, they told the defendant

13   they were acting on behalf of the victims.  You can see it in

14   the letter itself.  If the defendant somehow didn't know before

15   he received these warnings that his behavior was unacceptable,

16   there is no question that after the firm sent the cease and

17   desist letter the defendant knew that the victims found his

18   messages harassing and wanted them to stop.

19          But as you heard and saw, the defendant didn't stop.

20   He doubled down.  You saw the text messages the defendant sent

21   for months and months after he received the cease and desist

22   letter.  That shows that the defendant's conduct was

23   intentional.

24          Lastly, your common sense tells you that the fact the

25   victims didn't respond directly to the defendant says nothing

about whether they were distressed.  And it certainly wasn't an invitation for the defendant to keep sending them harassing messages.

When the victims didn't respond to his messages for years, it was a clear sign to the defendant that his messages were unwanted.  Again, the thousands of messages the defendant sent without a response only shows that the defendant's own intent was to harass and intimidate his victims.

Now, the defendant has suggested to you that the consequences of his crimes are now your responsibility; that because of your jury service, you are now responsible for the defendant's fate.  That's simply not the case.  The defendant alone is responsible for the consequences of his actions.  He was the one who sent thousands of harassing and threatening messages to his former coworkers.  He was the one who put his victims through hell.  He was the one who refused to stop after being warned multiple times.  No one else is responsible for the defendant's fate but him.

Now, I know that doesn't diminish the difficult task you have here today.  You have a very serious duty, but your job as jurors is simply to examine the evidence dispassionately and apply the law that you're about to hear.  You cannot let whatever sympathy you might have for the defendant interfere with that duty, because at the end of the day, it doesn't matter whether you like the defendant or not.  We're not asking

MahWden4                    Rebuttal - Ms. Simon

1    you to judge whether he's a good person or not.

2              Go back -- excuse me.

3              Now, because of the careful attention you've paid over

4    the last few days, the defendant had a fair trial.  He had his

5    day in court.  Now it's time for you to do your duty.  Go back

6    to that jury room and decide this case based on the principles

7    that Judge Rakoff will explain to you.  Decide this case

8    without fear, without favor, without prejudice, without

9    sympathy.  Decide this case based on all the evidence you've

10   seen and heard.  And if you do all that, and if you use your

11   common sense, there's only one verdict to reach, one verdict

12   that fits the law and the evidence -- that the defendant,

13   Willie Dennis, is guilty as charged.

14             THE COURT:  Thank you very much.

15             MR. DENNIS:  Your Honor, I'd like to --

16             THE COURT:  No.

17             MR. DENNIS:  Your Honor --

18             THE COURT:  No.

19             MR. DENNIS:  Your Honor --

20             THE COURT:  Come to the sidebar, Mr. Dennis, because

21   you have no right to be talking at this point.

22             MR. DENNIS:  Your Honor --

23             THE COURT:  It is absolutely forbidden, but if you

24   want to come to the sidebar, I will hear you at the sidebar.

25   Otherwise, I will ask --

MahWden4                    Charge

1          MR. DENNIS:  I apologize.

2          THE COURT:  I will take appropriate action.

3          MR. DENNIS:  I apologize, your Honor.  I just was

4    going to ask a question.

5          THE COURT:  Come to the sidebar if you want to ask a

6    question.

7          MR. DENNIS:  Certainly.

8          (At sidebar)

9          MR. DENNIS:  I was going to ask you if you could

10   explain to the jury why I'm not going to be able to respond so

11   that they understand.  The government just had the last word so

12   the jury would understand --

13         THE COURT:  They have already heard that from me.  The

14   request is denied.

15         MR. DENNIS:  Can the jury --

16         THE COURT:  The request is denied.  They've already

17   heard that from me.  The request is denied.  Now please sit

18   down.

19         (In open court)

20         THE COURT:  All right.  I'll to ask my law clerk to

21   hand out to the members of the jury my instructions of law.

22   We're going to read them together, and then you'll have them in

23   writing to take in to the jury room.

24         All right.  Ladies and gentlemen, if you look at the

25   table of contents, you'll see there are, first, a bunch of

MahWden4                    Charge

1    general instructions which apply not only to this case but

2    really to all criminal cases.  And then in the second section

3    are the elements of the specific three charges that are made in

4    this case, and then there are some concluding instructions

5    about how you fill out your verdict form and things like that.

6    So let's turn to page 3 for the start of the general

7    instructions.

8            We are now approaching the most important part of this

9    case, your deliberations.  You have heard all of the evidence

10   in the case as well as the final arguments of the lawyers for

11   the parties.  Before you retire to deliberate, it is my duty to

12   instruct you as to the law that will govern your deliberations.

13   These are the final and binding instructions which entirely

14   replace the preliminary instruction I gave you earlier.  As I

15   told you at the start of this case, and as you agreed, it is

16   your duty to accept my instructions of law and apply them to

17   the facts as you determine them.

18           Regardless of any opinion that you may have as to what

19   the law may be or ought to be, it is your sworn duty to follow

20   the law as I give it to you.  Also, if any attorney or other

21   person has stated a legal principle different from any that I

22   state to you in my instructions, it is my instructions that you

23   must follow.

24           Because my instructions cover many points, I have

25   provided each of you with a copy of them not only so you can

1    follow them as I read them to you now but also so that you can

2    have them with you for reference throughout your deliberations.

3    In listening to them now and reviewing them later, you should

4    not single out any particular instruction as alone stating the

5    law, but you should instead consider my instructions as a

6    whole.

7         Your duty is to decide the fact issues in the case and

8    arrive, if you can, at a verdict.  You, the members of the

9    jury, are the sole and exclusive judges of the facts.  You pass

10   upon the weight of the evidence; you determine the credibility

11   of the witnesses; you resolve such conflicts as there may be in

12   the testimony; and you draw whatever reasonable inferences you

13   decide to draw from the facts as you determine them.

14        In determining the facts, you must rely upon your own

15   recollection of the evidence.  To aid your recollection, we

16   will send you at the start of your deliberations all the

17   documentary exhibits as well as an index to help you access

18   what you want.  Also, if you need to review particular portions

19   of testimony, we can arrange to provide them to you in

20   transcript or read-back form.

21        Please remember that none of what the lawyers have

22   said in their opening statements, in their closing arguments,

23   in their objections, or in their questions, is evidence.  Nor

24   is anything I may have said evidence.  The evidence before you

25   consists of just two things: the testimony given by witnesses

MahWden4                    Charge

1    that is received in evidence and the exhibits that were

2    received in evidence.

3            Testimony consists of the answers that were given by

4    the witnesses to the questions that were permitted.  Please

5    remember that questions, although they may provide the context

6    for answers, are not themselves evidence; only answers are

7    evidence, and you should therefore disregard any question to

8    which I sustained an objection.  Also, you may not consider any

9    answer that I directed you to disregard or that I directed be

10   stricken from the record.  Likewise, you may not consider

11   anything you heard about the contents of any exhibit that was

12   not received in evidence.

13           Furthermore, you should be careful not to speculate

14   about matters not in evidence.  For example, there is no legal

15   requirement that the government prove its case through a

16   particular witness or by use of a particular law enforcement

17   technique.  Nor should you speculate about why one or another

18   person whose name may have figured in the evidence is not part

19   of this trial or what his or her situation may be.

20           (Continued on next page)

21

22

23

24

25

1          THE COURT:  Your focus should be entirely on assessing

2     the evidence that was presented here for your consideration.

3          It is the duty of the attorney for each side of a case

4     to object when the other side offers testimony or other

5     evidence that the attorney believes is not properly admissible.

6     Counsel also have the right and duty to ask the Court to make

7     rulings of law, to request conferences at the sidebar out of

8     the hearing of the jury.  All such questions of law must be

9     decided by me.  You should not show any prejudice against any

10    attorney or party because the attorney objected to the

11    admissibility of evidence, asked for a conference at the

12    sidebar out of the hearing of the jury or asked me for a ruling

13    on the law.

14         I also ask you to draw no inference from my rulings or

15    from the fact that on occasion I asked questions of certain

16    witnesses.  My rulings were no more than applications of the

17    law and my questions were only intended for clarification or to

18    expedite matters.  You are expressly to understand that I have

19    no opinion as to the verdict you should render in this case.

20         You are to perform your duty of finding the facts

21    without bias or prejudice as to any party.  You are to perform

22    your final duty in an attitude of complete fairness and

23    impartiality.  You are not to be swayed by rhetoric or

24    emotional appeals.

25         The fact that the prosecution is brought in the name

1    of the United States of America entitles the government to no

2    greater consideration than that accorded any other party.  By

3    the same token, it is entitled to no less consideration.  All

4    parties, whether the government or individuals, stand as equals

5    at the bar of justice.

6        Please also be aware that the question of possible

7    punishment is the province of the judge, not the jury, and it

8    should therefore not enter into or influence your deliberations

9    in any way.  Your duty is to weigh the evidence and not be

10   affected by extraneous considerations.

11       It must be clear to you that if you were to let bias

12   or prejudice or sympathy or any other irrelevant consideration

13   interfere with your thinking, there would be a risk that you

14   would not arrive at a true and just verdict.  So do not be

15   guided by anything except clear thinking and calm analysis of

16   the evidence.

17       The defendant here, Willie Dennis, is charged with

18   separate violations or counts of a federal crime called

19   cyberstalking, about which I will instruct you shortly.  Please

20   bear in mind, however, that these three charges or counts are

21   not themselves evidence of anything.

22       The defendant has pleaded not guilty.  To prevail

23   against the defendant on a given charge, the government must

24   prove each essential element of the charge beyond a reasonable

25   doubt.  If the government succeeds in meeting this burden, your

MAHGden5                    Charge

1    verdict should be guilty on that charge; if it fails, your

2    verdict must be not guilty on that charge.  This burden never

3    shifts to the defendant, for the simple reason that the law

4    presumes a defendant to be innocent and never imposes upon a

5    defendant in a criminal case the burden or duty of calling any

6    witness or producing any evidence.

7         In other words, the defendant starts with a clean

8    slate and is presumed innocent until such time, if ever, that

9    you as a jury are satisfied that the government has proven that

10   he is guilty beyond a reasonable doubt.

11        Since to convict the defendant of a given charge the

12   government is required to prove that charge beyond a reasonable

13   doubt, the question then is:  What is a reasonable doubt?  The

14   words almost define themselves.  It is a doubt based upon

15   reason.  It is doubt that a reasonable person has after

16   carefully weighing all of the evidence.  It is a doubt that

17   would cause a reasonable person to hesitate to act in a matter

18   of importance in his or her personal life.  Proof beyond a

19   reasonable doubt must therefore be proof of a convincing

20   character that a reasonable person would not hesitate to rely

21   on in making an important decision.

22        A reasonable doubt is not caprice or whim.  It is not

23   speculation or suspicion.  It is not an excuse to avoid the

24   performance of an unpleasant duty.  The law does not require

25   that the government prove guilt beyond all possible or

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  imaginable doubt; proof beyond a reasonable doubt is sufficient
2  to convict.

3          If, after fair and impartial consideration of the
4  evidence, you have a reasonable doubt as to the defendant's
5  guilt with respect to a particular charge against him, you must
6  find the defendant not guilty of that charge.  On the other
7  hand, if, after fair and impartial consideration of all the
8  evidence, you are satisfied beyond a reasonable doubt of the
9  defendant's guilt with respect to a particular charge against
10 him, you should not hesitate to find the defendant guilty of
11 that charge.

12         In deciding whether the government has met its burden
13 of proof, you may consider both direct evidence and
14 circumstantial evidence.

15         Direct evidence is evidence that proves a fact
16 directly.  For example, where a witness testifies to what he or
17 she saw, heard or observed, that is called direct evidence.

18         Circumstantial evidence is evidence that tends to
19 prove a fact by proof of other facts.  To give a simple
20 example, suppose that when you came into the courthouse today
21 the sun was shining, it was a nice day, but the courtroom
22 blinds were drawn and you could not look outside.  Later, as
23 you were sitting here, someone walked in with a dripping wet
24 umbrella and, soon after, somebody else walked in with a
25 dripping wet raincoat.  Now, on our assumed facts, you cannot

MAHGden5                    Charge

1    look outside of the courtroom, you cannot see whether it is

2    raining, so you have no direct evidence of that fact.  But on

3    the combination of the facts about the umbrella and the

4    raincoat, it would be reasonable for you to infer that it had

5    begun raining.

6            That is all there is to circumstantial evidence.

7    Using your reason and experience, you infer from established

8    facts the existence or the nonexistence of some other fact.

9    Please note, however, that it is not a matter of speculation or

10   a guess; it is a matter of logical inference.

11           The law makes no distinction between direct and

12   circumstantial evidence.  Circumstantial evidence is of no less

13   value than direct evidence, and you may consider either or

14   both, and may give them such weight as you conclude is

15   warranted.

16           It must be clear to you by now that counsel for the

17   government and counsel for the defendant are asking you to draw

18   very different conclusions about various factual issues in the

19   case.  Deciding these issues will involve making judgments

20   about the testimony of the witnesses you have listened to and

21   observed.  In making these judgments, you should carefully

22   scrutinize all of the testimony of each witness, the

23   circumstances under which each witness testified and any other

24   matter in evidence that may help you to decide the truth and

25   the importance of each witness' testimony.

MAHGden5                    Charge

1          Your decision to believe or to not believe a witness
2    may depend on how that witness impressed you.  How did the
3    witness appear?  Was the witness candid, frank and forthright,
4    or did the witness seem to be evasive or suspect in some way?
5    How did the way the witness testified on direct examination
6    compare with how the witness testified on cross-examination?
7    Was the witness consistent or contradictory?  Did the witness
8    appear to know what he or she was talking about?  Did the
9    witness strike you as someone who was trying to report his or
10   her knowledge accurately?  These are examples of the kinds of
11   common-sense questions you should ask yourselves in deciding
12   whether a witness is or is not truthful.
13          How much you choose to believe a witness may also be
14   influenced by the witness' bias.  Does the witness have a
15   relationship with the government or the defendant that may
16   affect how he or she testified?  Does the witness have some
17   incentive, loyalty or motive that might cause him or her to
18   shade the truth?  Does the witness have some bias, prejudice or
19   hostility that may cause the witness to give you something
20   other than a completely accurate account of the facts he or she
21   testified to?
22          You should also consider whether a witness had an
23   opportunity to observe the facts he or she testified about and
24   whether the witness' recollection of the facts stands up in
25   light of the other evidence in the case.

1          In other words, what you must try to do in deciding

2    credibility is to size up a person, just as you would in any

3    important matter where you are trying to decide if a person is

4    truthful, straightforward and accurate in his or her

5    recollection.

6          The law permits parties to offer opinion evidence from

7    witnesses who were not involved in the underlying events of the

8    case but who, by education or experience, have expertise in a

9    specialized area of knowledge.  In this case, Stephen Flatley

10   was offered as such a witness by the government.  Specialized

11   testimony is presented to you on the theory that someone who is

12   learned in the field may be able to assist you in understanding

13   specialized aspects of the evidence.

14         However, your role in judging credibility and

15   assessing weight applies just as much to this witness as to

16   other witnesses.  When you consider the specialized opinions

17   that were received in evidence in this case, you may give them

18   as much or as little weight as you think they deserve.  For

19   example, a specialized witness necessarily bases his or her

20   opinions, in part or in whole, on what the witness learned from

21   other persons or other materials, and you may conclude that the

22   weight given the witness' opinions may be affected by how

23   accurate or inaccurate the underlying information is.  More

24   generally, if you find that the opinions of a specialized

25   witness were not based on sufficient data, education or

1   experience, or if you should conclude that the trustworthiness

2   or credibility of such a witness is questionable, or if the

3   opinion of the witness is outweighed, in your judgment, by

4   other evidence in the case, then you may, if you wish,

5   disregard the opinions of that witness either entirely or in

6   part.  On the other hand, if you find that a specialized

7   witness is credible and that the witness' opinions are based on

8   sufficient data, education and experience and that the other

9   evidence does not give you reason to doubt the witness'

10   conclusions, you may, if you wish, rely on that witness'

11   opinions and give them whatever weight you deem appropriate.

12          The defendant did not testify in this case.  Under our

13   Constitution, a defendant has no obligation to testify or to

14   present any evidence, because it is the government's burden to

15   prove a defendant guilty beyond a reasonable doubt.  A

16   defendant is never required to prove that he or she is

17   innocent.

18          Accordingly, you must not attach any significance to

19   the fact that the defendant did not testify.  No adverse

20   inference against the defendant may be drawn by you because he

21   did not take the witness stand, and you may not consider it

22   against the defendant in any way in your deliberations in the

23   jury room.

24          With these preliminary instructions in mind, let us

25   turn to the specific charges against the defendant, Willie

MAHGden5                    Charge

1    Dennis.

2              Federal law makes it a crime to intentionally use

3    emails, text messages or other such facilities of interstate

4    and foreign commerce to harass or intimidate another person in

5    such manner as to cause that person substantial emotional

6    distress.  This is called the crime of cyberstalking.  Before

7    the defendant can be convicted on any of the three charges in

8    this case, the government must prove each of the following

9    three elements of the given charges you are considering beyond

10   a reasonable doubt:

11             The first element is that the defendant sent two or

12   more emails and/or text messages to a given intended victim;

13             The second element is that the defendant did so with

14   the intent either to harass or to intimidate his alleged

15   victim.  To harass means to cause worry or distress.  To

16   intimidate means to frighten or to threaten with bodily harm

17   either the victim or the victim's family.  To intend to do so

18   means to act deliberately and with a wrongful purpose, rather

19   than by accident or mistake.

20             The third element is that this course of conduct

21   caused, attempted to cause or would be reasonably expected to

22   cause substantial emotional distress to the alleged victim.

23             Mr. Dennis has been charged with three counts of

24   cyberstalking.  In the first charge, he is charged with

25   cyberstalking John Bicks.  In the second charge, he is charged

1    with cyberstalking Eric Cottle.  In the third charge, he is

2    charged with cyberstalking Calvina Bostick.  In your

3    deliberations and in reaching your verdict, you must consider

4    each count separately and determine whether the government has

5    carried its burden of proof with respect to each element of the

6    charge you are considering.

7            One last requirement.  Before a defendant can be

8    convicted of any given charge, the government must also

9    establish what is called venue, that is, that some act in

10   furtherance of that charge occurred in the Southern District of

11   New York.  As already noted, the Southern District of New York

12   is the judicial district that includes Manhattan, the Bronx,

13   Westchester and several other counties previously mentioned.

14   Venue is proven if any act in furtherance of the crime you are

15   considering occurred in the Southern District of New York,

16   regardless of whether it was an act of the charged defendant or

17   anyone else.

18           Furthermore, on the issue of venue -- and on this

19   issue alone -- the government can meet its burden by a

20   preponderance of the evidence, that is, by showing that it was

21   more likely than not that an act in furtherance of a given

22   charge occurred in the Southern District of New York.

23           You will shortly retire to the jury room to begin your

24   deliberations.  As soon as you get to the jury room, please

25   select one of your number as the foreperson, to preside over

 1    your deliberations and to serve as your spokesperson if you

 2    need to communicate with the Court.

 3            You will be bringing with you into the jury room a

 4    copy of my instructions of law and a verdict form on which to

 5    record your verdict.

 6            And let me just pause there and show you the verdict

 7    form.  It is a very simply one page document.  And on each

 8    charge it asks you to check the box of guilty or not guilty, by

 9    the way, there's no magic to the order of these charges, that's

10    just the way they were in the original indictment.

11            After you have reached your verdict, your foreperson

12    will sign the verdict form, date it and seal it in this

13    envelope very cleverly marked jury verdict.  And I will not

14    open that envelope until you are all back here in the

15    courtroom.  And then we will open it, we'll read out your

16    verdict, and I will ask each of you individually is that your

17    verdict.  And the reason we go through all that is to be

18    absolutely sure that we have your verdict as you signed it.

19            So let's go back to the instructions.

20            In addition, we will send into the jury room all the

21    exhibits that were admitted into evidence, except for the

22    telephones, which you may request if you would like.  You will

23    also receive an index to help you access specific exhibits.  If

24    you want any of the testimony provided, that can also be done,

25    in either transcript or read-back form.  But please remember

1    that it is not always easy to locate what you might want, so be

2    as specific as you possibly can be in requesting portions of

3    the testimony.

4         Any of your requests, in fact any communication with

5    the Court, should be made to me in writing, signed by your

6    foreperson, and given to the marshal, who will be available

7    outside the jury room throughout your deliberations.  After

8    consulting with counsel, I will respond to any question or

9    request you have as promptly as possible, either in writing or

10   by having you return to the courtroom so that I can speak with

11   you in person.

12        You should not, however, tell me or anyone else how

13   the jury stands on any issue until you have reached your

14   verdict and recorded it on your verdict form.  As I have

15   already explained, the government, to prevail on a particular

16   charge against the defendant, must prove each essential element

17   of that charge beyond a reasonable doubt.  If the government

18   carries this burden, you should find the defendant guilty of

19   that charge.  Otherwise, you must find the defendant not guilty

20   of that charge.

21        Each of you must decide the case for yourself, after

22   consideration, with your fellow jurors, of the evidence in the

23   case, and your verdict must be unanimous.  In deliberating,

24   bear in mind that while each juror is entitled to his or her

25   opinion, you should exchange views with your fellow jurors.

1    That is the very purpose of jury deliberation, to discuss and

2    consider the evidence, to listen to the arguments of fellow

3    jurors, to present your individual views, to consult with one

4    another, and to reach a verdict based solely and wholly on the

5    evidence.  If, after carefully considering all the evidence and

6    the arguments of your fellow jurors, you entertain a

7    conscientious view that differs from the others, you are not to

8    yield your view simply because you are outnumbered.  On the

9    other hand, you should not hesitate to change an opinion that,

10    after discussion with your fellow jurors, now appears to you

11    erroneous..

12            In short, your verdict must reflect your individual

13    views and must also be unanimous.

14            This completes my instructions of law.

15            Now, ladies and gentlemen, in a minute or two, we will

16    swear in the marshal who will be guarding you throughout your

17    deliberations.  You can take as little or as long as you need

18    for your deliberations.  I have had juries that have reached a

19    verdict in five minutes.  I have had juries that have reached a

20    verdict in ten days.  It's totally up to you.

21            However, if you haven't reached a verdict by

22    4:00 o'clock today, then you have to leave and come back

23    tomorrow, because I have another matter at 4:00 o'clock that I

24    have to take up today.  So if you haven't reached a verdict by

25    4:00 o'clock, just leave, come back tomorrow at 9:30, of

MAHGden5                          Charge

1    course.  And your foreperson will be in charge of making sure

2    that you are all there before you begin your deliberations

3    again.

4             Now, we come now to the one part of this process that

5    I really don't like, and that is excusing our alternate jurors.

6    You still cannot discuss the case with anyone because if, god

7    forbid, some juror gets sick or something, we would have to

8    call one or more of you back and start deliberations all over

9    again.  But we will let you know when the jury has reached a

10   verdict.  After that, you are free to discuss it.  Until then,

11   if you would go into the jury room, get your belongings and

12   then just leave the courthouse, that would be appreciated.  And

13   you have the very great thanks of the Court for your excellent

14   service.  And you may leave at this time.

15            And now we will swear in the marshal.

16            (Marshal sworn)

17            THE DEPUTY CLERK:  Jurors, please follow the marshal.

18            (At 2:40 p.m., the jury retired to deliberate)

19            (Continued on next page)

20

21

22

23

24

25

MAHGden5

```
1              (Jury not present)
2              THE COURT:  I will mark a copy of my instructions as
3      Court Exhibit 1, and they will be docketed.
4              Now, while the jury is deliberating, I need to have
5      Mr. Dennis and at least one government counsel present here in
6      the courtroom so we can respond promptly to any questions the
7      jury may have.  If there is no questions or no verdict by
8      4:00 o'clock, then you can just leave.  Return here at 9:30
9      tomorrow.  And I'll let you know then what the schedule is for
10     lunch, in case it appears that we're going to go through lunch.
11             Any questions that anyone has?
12             MR. DENNIS:  Can I take a bathroom break, your Honor.
13             THE COURT:  Well, I think we are ready to excuse you
14     for the day.  Go to the bathroom, and then come back in the
15     room in case the jury has any questions.
16             Very good.  We'll see you tomorrow or we will see you
17     later today if the jury has anything.
18             (Recess pending verdict)
19             THE COURT:  So we have received a note from the jury.
20     It reads, quote, "Re: venue.  Is the venue based on the
21     physical location of the text/email received or something else,
22     e.g. location at an email's headquarters versus home receipt?"
23             So what's the government's view on this?
24             MS. KUSHNER:  Your Honor, is the venue based on
25     physical location of the text or email received, we would say,
```

MAHGden5

1    yes, it's based on physical location of where the text or email

2    is received or shown to a victim, and it also of course would

3    be based on the defendant's own physical location at the time.

4         THE COURT:  So does defendant agree with that?

5         MR. DENNIS:  Could you repeat that, please.

6         THE COURT:  I'm sorry.

7         MR. DENNIS:  Could I ask that to be repeated, please.

8         THE COURT:  Yes.  So as I understand the government's

9    position, they would respond by saying that the venue can be

10   based on the physical location of the text/email received or on

11   the physical location of the text/email sent or any action

12   taken by the defendant or any victim in the Southern District

13   of New York relating to the sending or receipt of the emails.

14        Do I have that right?

15        MS. KUSHNER:  Yes, your Honor.

16        MR. DENNIS:  That's fine, your Honor.  Yes.

17        THE COURT:  Very good.  Let me write that out.

18        (Pause)

19        THE COURT:  "To the jury, thank you for your note.

20   Venue can be based on:  One, the physical location of the

21   text/email place of receipt; two, the physical location from

22   which the text/email is sent; or three, any other action taken

23   in the Southern District of New York in furtherance of the

24   alleged cyberstalking."  Signed, Judge Rakoff.

25        So I will give that to my courtroom deputy to bring to

MAHGden5

1    the jury.  And we will see what happens next.

2              (Recess pending verdict)

3              (Continued on next page)

MAHGden5

1          (Jury present)

2          THE DEPUTY CLERK:  Will the foreperson please rise.

3          You say you have reached a verdict.

4          JUROR:  We have, your Honor.

5          THE COURT:  When I open the verdict and we read it

6     out, I will make no comment, because the determination of the

7     verdict is your job, not mine.  But I do want to take a moment

8     to compliment you.  This was a really excellent jury.  I was

9     watching you out of the corner of my eye and you paid such

10    strict attention to all the evidence, you were taking careful

11    notes, it was really a very impressive job.  And you will be

12    glad to know that, as a result of your excellent service, you

13    are free from being called for federal jury service for another

14    four years, which I know will be disappointing to you, but get

15    over it.

16          So let me open the envelope.

17          So the verdict appears in proper form.  I will give it

18    to my courtroom deputy to take the reading of the verdict.

19          THE DEPUTY CLERK:  Foreperson, please rise.

20          On United States v. Willie Dennis, Docket No. 20 Cr.

21    623, on the first charge, charge of cyberstalking John Bicks,

22    you, the jury, find Willie Dennis guilty or not guilty, you

23    say?

24          JUROR:  Guilty.

25          THE DEPUTY CLERK:  On the second charge, the charge of

MAHGden5

1    cyberstalking Eric Cottle, you, the jury, find Willie Dennis

2    guilty or not guilty, you say?

3              JUROR:  Guilty.

4              THE DEPUTY CLERK:  On the third charge, the charge of

5    cyberstalking Calvina Bostick, you, the jury, find Willie

6    Dennis guilty or not guilty, you say?

7              JUROR:  Guilty.

8              THE DEPUTY CLERK:  Shall I poll the jury.

9              THE COURT:  Yes.

10             THE DEPUTY CLERK:  Juror No. 1, is that your verdict?

11             JUROR NO. 1:  Yes.

12             THE DEPUTY CLERK:  Juror No. 2, is that your verdict?

13             JUROR NO. 2:  Yes.

14             THE DEPUTY CLERK:  Juror No. 3, is that your verdict?

15             JUROR NO. 3:  Yes.

16             THE DEPUTY CLERK:  Juror No. 4, is that your verdict?

17             JUROR NO. 4:  Yes.

18             THE DEPUTY CLERK:  Juror No. 5, is that your verdict?

19             JUROR NO. 5:  Yes.

20             THE DEPUTY CLERK:  Juror No. 6, is that your verdict?

21             JUROR NO. 6:  Yes.

22             THE DEPUTY CLERK:  Juror No. 7, is that your verdict?

23             JUROR NO. 7:  Yes.

24             THE DEPUTY CLERK:  Juror No. 8, is that your verdict?

25             JUROR NO. 8:  Yes.

MAHGden5

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  Juror No. 9, is that your verdict? |
| 2 | JUROR NO. 9:  Yes. |
| 3 | THE DEPUTY CLERK:  Juror No. 10, is that your verdict? |
| 4 | JUROR NO. 10:  Yes. |
| 5 | THE DEPUTY CLERK:  Juror No. 11, is that your verdict? |
| 6 | JUROR NO. 11:  Yes. |
| 7 | THE DEPUTY CLERK:  Juror No. 12, is that your verdict? |
| 8 | JUROR NO. 12:  Yes. |
| 9 | THE DEPUTY CLERK:  Jury polled, your Honor.  Verdict |
| 10 | unanimous. |
| 11 | THE COURT:  All right.  Thank you, again, for your |
| 12 | excellent jury service, and you are now free to go.  Thank you, |
| 13 | again. |
| 14 | (Jury excused) |
| 15 | THE COURT:  Please be seated.  We will set this down |
| 16 | for a sentencing date of January 18th, 2023 at 4:00 p.m. |
| 17 | Mr. Dennis, if you are still representing yourself, |
| 18 | anything you want me to take a look at in connection with |
| 19 | sentencing needs to be provided to me at least one week before |
| 20 | sentence in writing. |
| 21 | Where do we stand on bail? |
| 22 | MS. KUSHNER:  Your Honor, the government at this time |
| 23 | would move to have the defendant remanded under 18 USC 3143. |
| 24 | The defendant now has the burden of proving by clear and |
| 25 | convincing evidence that he is not likely to flee and doesn't |

MAHGden5

pose a danger to anyone or to the community.  We don't think he

can satisfy either of those standards.  And in fact, he has

every incentive to flee now, given the guilty verdict.  And of

course, we know that he poses a danger at least to the victims

in this case.  Mr. Bicks himself testified how scared he was

what the defendant might do after hearing Mr. Bicks testify

against him.  And the defendant was also particularly

interested throughout the trial in who first reported this case

to the FBI; he now has that information.  So we believe that

for those reasons there's no condition or combination of

conditions that can assure his appearance at sentencing and

that can protect the people in this trial and the community.

THE COURT:  Let me hear from Mr. Dennis.

MR. DENNIS:  Your Honor, as the government is aware, I

have not worked for the last three years, and so I have no

savings that remains in my account.  As the government is

aware, I have been taking care of -- the primary caretaker for

my parents, who participated on this call, so I have been

living with them, attending to their healthcare needs, doctor's

appointments and the like and have been doing that for

approximately a year under the supervision of pretrial.  So to

remand -- so my every intent was to continue to do what I have

been doing for them until sentencing, which is to maintain

their health to the best extent I can and also to put in place

a replacement for me once sentencing should occur.  So at this

MAHGden5

1    point, they're on their own.

2           And pretrial will show, during my entire time, which

3    has been a year, I have been completely compliant with all my

4    obligations under my bail and have not violated anything, any

5    sort of rule, so my intent would be to return to Sanford,

6    Florida to continue my care of them.

7           THE COURT:  So I think this is quite a difficult

8    decision because -- Mr. Dennis may or may not credit this -- I

9    have a great deal of sympathy for Mr. Dennis.  Here is someone

10   who, through hard work, made a successful career with a major

11   law firm.  And while I have no disagreement whatsoever with the

12   jury's verdict, it is in the broader context of a great shame

13   that it's all come to this.  Furthermore, as I have expressed

14   repeatedly, I have nothing but sympathy for Mr. Dennis' aging

15   parents, who are elderly and apparently not in great health and

16   who have been looking to Mr. Dennis for support.

17          But having said that, on the other hand, Mr. Dennis is

18   a substantial flight risk.  We know how he previously went to

19   the Dominican Republic and had to be captured there, and that

20   was before he had been convicted.  Now, of course, he faces

21   potentially substantial time.  Secondly, I think he is a danger

22   to the community.  And I say that recognizing that he has a

23   complicated psychology and, at times, he is the model of

24   professionalism, but at other times, he seemingly loses total

25   control, as the evidence in this case so clearly showed.  And

MAHGden5

1    I'm particularly struck by the fact that, as she testified,

2    Ms. Bostick remains in fear of what may happen if he is at

3    large.

4              So I think, in the end, the balance is decided by the

5    burden of proof.  Under the law, the burden of proof shifts to

6    the defendant at this stage, and I don't believe he has

7    satisfied the burden of proof.  So he will be remanded, and the

8    marshals can step forward and take care of that.

9              That concludes this proceeding.

10             MR. DENNIS:  Your Honor, I'd like to make a request

11   for extension to apply for any appeals.

12             THE COURT:  Yes.  Mr. Dennis -- excuse me, please be

13   seated again -- first of all, since you are pro se, if you

14   wish, we will file a notice of appeal on your behalf.

15             MR. DENNIS:  Yes.

16             THE COURT:  I urge you to think once again about

17   whether you really want to go pro se.  I would at least -- I'm

18   not making any promises -- but I would at least consider

19   appointing free counsel to represent you on appeal.

20             Now, I don't want to go through again this whole

21   business where you just fire one guy and then fire the next guy

22   and so forth.  But I will allow you for this limited purpose to

23   send me an email sometime in the next week saying whether or

24   not you want me to appoint someone to represent you on appeal.

25   In the meantime, though, we will go ahead and file a notice of

MAHGden5

1    appeal on your behalf.

2              Very good.  Thanks a lot.

3              (Adjourned)

1                          INDEX OF EXAMINATION

2   Examination  of:                                    Page

3   GARY COBB

4   Direct By Ms. Simon  . . . . . . . . . . . . 726

5   Cross By Mr. Dennis  . . . . . . . . . . . . 730

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25