UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
UNITED STATES OF AMERICA                              <u>SENTENCING MEMORANDUM</u>

   -against-                                         20-CR-623 (JSR)


WILLIE DENNIS,

               Defendant
---------------------------------------------------X


**SENTENCING MEMORANDUM ON BEHALF OF WILLIE DENNIS**




RESPECTFULLY SUBMITTED,


Cohen Forman Barone, LLP
BY: David J. Cohen
950 Third Avenue, 11th Floor
New York, NY 10022
david@cfblaw.com
212-766-9111

1

## INTRODUCTION

Willie Dennis (hereinafter referred to as: "Mr. Dennis", "Willie", "Willie Dennis" or "Defendant") comes before the Court for his Sentencing Hearing after having been convicted at trial of three (3) counts of cyberstalking under 18 U.S.C. § 2261A(2)(B). After having built and lived an admirable and enviable life, free from any indication of criminality and spent as a successful, practicing attorney and, most recently a long-serving partner at a prominent New York City law firm and a champion of diversity and empowering disadvantaged persons and communities, Mr. Dennis has, in the last five (5) years of his life (from age 55-60), quite literally, lost everything. His career is over, the personal and professional reputation he spent his life creating and cultivating is forever tarnished, his life savings and financial security, all built over the course of decades of hard work and dedication to his profession, his firms, and his clients are gone completely. Mr. Dennis is currently seeing in his own life the manifestation of the old adage that while a reputation takes a lifetime to build, it takes but a moment to destroy. And he recognizes, at long last that his personal devastation and the harm to his victims, was ultimately at his own hands.

Over the last several years leading up to this period of self-inflicted perdition, Mr. Dennis also endured an endless and acrimonious divorce that cost him, not only in terms of serious detriments to his physical and mental well-being, but also his relationship with his two sons and spelled financial ruin even prior to the further financial devastation he suffered as a result of his suspension and termination by his law firm in 2019. During that same period Willie has borne witness to the precipitous decline in the health of his parents while also suffering a cardiac arrest in 2017, and encountering, that same year, the death of his sister from a similar cardiac event. Now, a few short years later, at almost 61 years of age, Willie has been convicted of criminal

conduct for the first and only time in his life and has been deprived of his liberty for the only time in his life. After being remanded to incarceration, his body and health have now completely cratered as well.

Despite having essentially bottomed out during the final stages of last year, having lost nearly everything a man can lose and his health failing, Willie has refused to give in to the temptation to give up and abandon the pursuit of a way back to himself. Willie has instead found the strength of spirit and resolve to take the difficult and painful road of true self-examination and deep reflection upon his actions and how thoroughly wrong he was to do what he did. He has come to an understanding of his actions in a way he simply could not access previously despite the efforts of so many to help him do so. Everyone was able to see it but him. He lost himself because he stopped listening and in his heart of hearts it is Willie's knowledge of that truth that became his anchor in his goal of returning to a healthier Willie.

Willie Dennis is a man who does not belong in prison. On Mr. Dennis' behalf, we respectfully seek this Court's justice and mercy in conducting its analysis of the appropriate sentence to be imposed upon him for his criminal actions and the harm they caused within the context of the full consideration of Mr. Dennis as an individual human being. We respectfully move this Court upon such consideration to sentence Willie Dennis to time-served and supervised release with appropriate conditions to support him in addressing his needs.

## I.      18 U.S.C. §3553(A) FACTORS

*18 U.S.C. § 3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

### History and Characteristics of Willie Dennis

An understanding of who Willie Dennis is and the life he has led, prior to his offending conduct, is an essential element in fully understanding the true nature and circumstances of his

offenses.  It is Mr. Dennis' history that can help shine light on the very pressing question, of why and how he came to commit them.

Willie Dennis is one of three (3) children (his sister passed away recently) born to parents who were blue-collar New York City civil and domestic servants. His parents, father Willie (a career sanitation worker in New York City) and mother Dorise Dennis (Miller), have long since retired and moved to Florida, where they continue to reside in their own home. They are each in their 80's, with increasingly failing physical and mental health. For the eight months preceding his trial, Mr. Dennis resided with his parents serving as their caretaker, taking them to medical appointments, administering their varied medications, taking them shopping and making sure they ate and stayed active. Presently, Dorise is bed-ridden due to the limitations she has from a combination of ailments: lupus, hypertension, arthritis, while also suffering from serious heart problems. Heart problems run in Mr. Dennis' family.  The defendant suffered a cardiac event in 2017 and then serious cardiac complications began late last year resulting in a month-long stay at Bellevue hospital in October/November of 2022. His younger sister, Lisa, also had a very severe heart attack and passed away unexpectedly in 2017.[1]

Willie Dennis, the elder, is 87 years of age and struggling with dementia in addition to a host of physical ailments (including having significant vision problems) that continue to deteriorate with each passing day. See generally, Exh. A, *Statements of Family Members*; see also, *PSR ¶ 86*.  Willie's younger brother, Jeffrey Dennis, is a computer programmer living in Maryland. Jeffrey knows about the defendant's situation and he remains wholly supportive of his brother,

---

[1] Both the defendant and his sister suffered major cardiac events in 2017, months apart.  His sister died and this severely affected her brother, the defendant.

while also acknowledging the wrongdoing and harm Willie caused through his offenses. See, Exh. A, *Statement of Jeffrey Dennis.*

Mr. Dennis is a member of a large extended who maintain strong kinship bonds reinforced by a steady tradition of biannual family reunions in the state of Florida. Within that larger extended family, Willie's mother and her many sisters and their children grew up as first cousins, many of whom have remained close throughout their lives, passing down the particularly strong kinship bonds to the younger generations. See, Exh. A, *Statements of Rev. Dietrich J. Champagnie, Katie D. Walker, Matthew Miller, Brenda Miller Lucas.* Although the family is spread out across the country, they are primarily concentrated in the southeast.  Always one to put family first, Willie was well-known for his generosity in opening his home to cousins, nieces and nephews when they would come up north.  He was equally generous with financial help when they encountered struggles during their lives. According to family, his generosity was in keeping with Willie's overall outlook of being a servant to others, being someone who can use his talents to give to others. See, Exh A, *Statements of Support from Numerous Family Members.*  Willie Dennis has always been about trying to make the world better, more equitable.

Growing up in the 60's and 70's in a working class African-American family transplanted from Florida to Westbury, Long Island, Willie worked exceedingly hard to be successful. Counsel, having grown up in Suffolk County, Long Island around that time, can attest to the fact that it was a racist enclave that eschewed the idea of racial integration.  Through strong marks in elementary school, Mr. Dennis was able to qualify for the A Better Chance program[2] which enabled him to attend the elite Choate Rosemary Hall Boarding School in Connecticut. See, Exh. A, *Statements of Larry Parks and Richard Paul Stone, Esq.*; see also *PSR ¶ 107.* Willie excelled at Choate,

---

[2] https://abetterchance.org/

earning acceptance to Columbia University, before going on to a successful law school career, also at Columbia. From there, as the Court no doubt knows, Willie Denis began his distinguished professional career as a member of the New York Bar and legal community. He has remained heavily involved with Columbia law school as an alumnus and has always used his relationships at Columbia to foster both business and diversity project initiatives. For Willie Dennis helping to bring opportunities to those who traditionally have not had them was a calling.

In his thirties, while he was working hard to make his mark substantively as a successful attorney and in the process earning a strong reputation as a relationship builder and leader in organizing diverse business and policy interests to uplift urban communities[3], Willie met Caryn Bailey. Willie and Caryn went on to wed in 1997 and have two sons, Grant Dennis and Lee Dennis. The Dennis family remained in New York City and Wille purchased the family home in Harlem, where his burgeoning reputation as a leader in the black community continued to grow and expand as did his sterling reputation in the legal and business communities. See generally, Exh. A, *Statements of Willie Suggs & Numerous other Statements Support*. A constant and dedicated champion of diversity policy and initiatives that would economically uplift underserved communities, the defendant committed a great deal of professional and personal time to these organizations and the relationships that made up their bedrock. Willie also utilized his skills in representing some of the largest companies in the world (including Goldman Sachs, Microsoft and American Express[4]) during his years with firms such as Akin Gomp Strauss Hauer & Feld, Mudge Rose Guthrie, and later Thelen Reid & Priest. Willie's creative and relationship building talents

---

[3] Willie is a founding member, since his early years as an attorney, of the Potomac Coalition, a national policy organization focused on methods to develop and use federal policy to enhance wealth creation for urban communities and for racial economic redress. See, Exh. A, *Statements of Larry Parks (current Chair of Potomac Coalition & CEO, Forethought Advisors) & Timothy Simons*
[4] See, Exh. A, *Statement of Tracey Thomas (former in-house counsel with Amex)*.

were always his strongest assets. He amassed an impressive book of business and a well-earned reputation as a champion of diversity and social and economic equality projects.  Amongst the many he influenced and gave his time to, he was also a founder of the Corporate Counsel Women of Color ("CCWC") and the Harlem Economic Empowerment Zone. See, Exh. A, *Statements of Congressmen Glen Ivey, Laurie Robinson Haden, Larry Parks, Richard Stone, et al*. Willie's dedication to empowerment for women, attorneys of color and the larger Harlem community was of paramount importance to him.  Willie believed in the adage that doing was only worthwhile if you helped others to do as well.

Willie developed into a very highly regarded member of the African American legal community both in New York and nationwide. See, Exh. B, *Black Enterprise List of Top Black Lawyers, 2003; Savoy Network Profile, Payton: America's Top Black Lawyers*.  While at Akin Gomp Strauss, at the advice of then partner Vernon Jordan, Willie accepted the request to mentor a young female attorney named Laurie Robinson Haden.  The relationship grew, Ms. Haden calling him her mentor, and the went on to cofound the CCWC where Ms. Robinson Haden remains the organization's CEO.  As Ms. Robinson Haden's letter attests, the Wille Dennis she and so many others came to respect and admire for so many years for all his decades of hard work and community service, simply became unrecognizable to her and to so many of his still strong and steadfast group of supports during the time of his offending. See, Exh. A. Even against the backdrop of his offending, these people have remained in Willie's corner and continue to vouch for his character.  They do this because they know that the Willie who committed these offenses is an aberration to the man they have known for decades.

Mr. Dennis had come to K.L. Gates as a partner with the expressed agreement that he would be adding a diversity practice.  The firm pitched him, somewhat urgently, seeking to redress

the lack of diversity, while also being enticed that he would be bringing with him a strong book of business and corporate clients that would directly benefit the firm's bottom line. It was a "win/win" for the firm and an exciting opportunity for Willie.  He would be able to build something amazing with the support of a prestigious white shoe law firm in New York City. It would be a product of his vision and also a testament to his life's work and passion: using his talents and skills to blend business opportunities with social progress initiatives and policies all while helping this prestigious, century old law firm update and diversify itself. This expectation was part of the discussion and agreement when Mr. Dennis joined KL Gates.  And, it is against this backdrop and understanding that Mr. Dennis' future actions had their beginnings.

The beginning of Willie's fall, after his successful legal career of nearly 30 years, has its genesis in at least some significant part, to the bitter and acrimonious divorce he endured for nearly a decade. Without sidetracking the Court into all the various aspects of those proceedings, suffice it to say they were arduous, taxing, and at times gut-wrenching in a manner only those who have truly endured such matrimonial proceedings, especially with children, may be able to understand. Willie's relationship with his sons, both still boys when the divorce proceedings began, has become a sad casualty of the divorce proceedings and all of its many and often astounding machinations. As the Court is aware, a portion of Willie's litany of complaints against his firm at the time of his suspension and termination included his understanding that his firm had engaged in unauthorized sharing of his personal documents with his wife's attorney. Regardless of the truth of Willie's assertions or the alternative characterization of the situation by Mr. Maletta at trial, the fact that this issue was part of the equation simply illustrates how all-consuming and personal those divorce proceedings had become for Willie, and in a way that clearly infected all the relationships in his life.

Of course, Willie's divorce was not taking place in a vacuum. He remained an active and busy partner at K.L. Gates where he continued to build firm business and relationships, especially in promoting progressive initiatives designed to benefit people of color and women of color. And, there are instances where K.L. Gates would tout Willie's initializes. See Exh. B, *K.L.Gates 2012 "For the Public Good"*. As the Court knows, the pressure to continue to perform was ever-present. For Willie Dennis, while his personal life was undergoing an earthquake, he had to continue to project an image of success, buoyancy, and energy. When 2017 ushered in further personal exigency, the year he suffered a heart attack and his younger sister died of a heart attack, Willie became more driven than ever to integrate and diversify his firm, as was his mandate.

Willie also could not help but be affected by the cultural and societal changes he saw going on around him. Changes that reverberated through all echelons of even the most prestigious of institutions and businesses including the legal profession and its largest firms. The Black Lives Matter movement continued to gain momentum. And, with the rise of the #metoo movement, Willie, like so many other crusaders and champions of minorities and women, perceived the winds of change to be blowing in a positive direction. Willie began to use his equity partner position and his voice within a prestigious and august firm to more vocally and stridently advocate for change. Doing so required him to call out inappropriate behavior and policies in a more consistent and pressing manner. As one could imagine, this was met with the utmost resistance. It became evident that Willie's mandate when hired was simply empty words. It was Mr. Dennis' experience that the partners at KL Gates were not on board with his goals to diversify the firm.

While Mr. Dennis may have been correctly picking up on cultural and societal shifts on the issues that were of primary concern to him, what he appears to have lost most if not all understanding of as time went on, was how his words and actions within that framework were

being received.  Unlike earlier in his career, his methods and means of achieving his goals were not deftly utilized or artfully calibrated. The firm did not receive his complaints or reports of problems that needed to be addressed in the way he intended for them to. Instead of seeking alternative means of achieving his goals it appears that Willie took these initial dismissals of issues or rejections of his claims[5] as a sign that he needed to push harder, be more forceful and be a louder voice of discontent. Mr. Dennis believed the time had come for him to stop playing politics as he always had and that as a black man with a position of influence it was time to voice his observations and complaints out loud. But, his gambit backfired completely in large part because for the first time in his life, Willie was out of touch when he thought he was in tune. Part of the problem as he recognizes now, was that he was blending various complaints about a lack of diversity, discrimination, and harassment that were in themselves exceedingly serious and threatening to the firm, with complaints about malfeasance, his compensation being less than promised, and having clients he had brought in taken away from him and reassigned to other lawyers. Willie's "kitchen sink" approach was, in retrospect, always doomed. KL Gates, understandably was not impressed.

Mr. Dennis now sees the inartfulness of that approach and instead of reevaluating how he was going about things at that time, he then reacted to the negative reaction he received from K.L. Gates in the worst way possible.  Willie dug in his heels and made the fight personal. Once he assumed this dug in position, Willie's ability to focus, maintain perspective and act rationally was seemingly completely disabled. As he can recount now for counsel, he was so determined, so steadfast and dogged in pursuit of these noble goals that he stopped listening, stopped thinking

---

[5] One portion of his claims that had also developed against K.L. Gates by 2018 was that the firm was not honoring the financial commitments they had made to Willie and were reducing his compensation unfairly while also moving business he brought to the firm away from him.

clearly, and simply set his sights on making sure KL Gates knew they were failing in these very important social contexts and responsibilities.

### The Nature and Circumstances of the Offense

As indicated in the foregoing pages, Willie's course of conduct arose out of a confluence of circumstances of both a professional and personal nature. Of course, this context, or the full, comprehensive reason(s) *why* he embarked down the road into the course of criminal conduct was not directly relevant to the facts to be determined by the jury. However, the defense submits that consideration of that context is critically important in considering the true nature of his offending conduct in the task of fixing a just punishment. The defense would further submit that exploring exactly how and why it is that this distinguished and successful attorney came to obliterate the reputation and life he had built through his conduct of the last five years is also a key component of understanding who Willie Dennis is today. Today, as Mr. Dennis comes before the Court to receive judgment for his crimes he has come full circle to see the wrongfulness of his actions and the harm he has caused.

As described above and as the evidence at trial indicated, by and through 2018, Willie had been articulating specific concerns regarding the actions of various partners as well as patterns and practices he believed to be discrimination and harassment at K.L. Gates. As discussed and detailed, *supra*, Willie had also been going through very difficult years in his personal life. As someone who had always championed for initiatives and organizations that promoted women and minorities throughout his career, Willie saw a culture where sexual harassment was tolerated and where minority attorneys, in particular African-American and female attorneys, experienced discrimination at the highest echelons. Willie felt it was his duty as a black man and partner, to try to affect change at the firm from within. It was in service of those efforts as well as in calling out

malfeasance and the firm's reduction of his compensation, that Willie's communications to other partners initially became disruptive. This led to the meeting with the firm's general counsel that was the subject of the trial testimony and which the Court is eminently aware.

Unsatisfied with his meeting with general counsel, who completely dismissed the representations of unfair treatment and malfeasance within the firm, Willie felt he had to try harder. Willie's "disruptive" emails addressing these topics continued as he dug in further in his position. This culminated in Mr. Dennis being locked out of the office, his email accounts locked and Mr. Dennis being placed on suspension on January 30, 2019. This was, as the Court and government are well aware, a pivotal moment in Willie's life.  He was shocked that the firm had taken such a decisive and crippling action against him. As Mr. Dennis recounts now, at that time he could only see the firm's position as an act of retaliation for his determination to raise these important issues. The very same issues he was hired to promote. It was an existential moment for Willie where he felt the rush of everything he thought he knew and could rely upon having been shattered. He was crushed and lost his ability to think cogently.

Looking back upon his offending conduct now from a cell at MDC Brooklyn, Willie finds himself in a state of disbelief. He now is finally able to recognize where and how he went "off the rails" and that his efforts to communicate with his former colleagues were completely misguided. He understands that his communications to the victims, even in the early stages, before some of them had crescendoed into the most disturbing communications in latter 2020-2021, were never appropriate. Moreover, as these communications escalated and were taken as implying a threat of some kind, they caused real harm. That was never Willie's intention.  These were people he did, and continues to, respect.  His regret is real and palpable. His remorse for scaring people he considered friends will stay with him for all his days on Earth.

As his communications became more and more outlandish, arbitrary, and unrelenting over many weeks and months, even his initial purposes in contacting his victims had become obscured. By that point in his offending, however, Mr. Dennis was operating with blinders on, wrongheadedly believing what he was doing somehow still served the same purposes as his initial attempts to fulfill his mandate to help diversify. As Mr. Dennis recounts now to counsel, he felt so wronged and even tricked, that he stopped listening to those around him.  Even to those he trusted.

It is important to note, there was never a time that Mr. Dennis specifically or expressly considered or intended to cause any actual fear of physical violence. However, he is now able to appreciate that such responses were the only affect that his incessant and at times bizarre, crass, and violence-referencing communications were going to have. But, Willie simply could not see or appreciate this reality at the time.  It was not until recently as he has bottomed out during his incarceration and latest health emergency[6] that he has come to understand the true effects of his actions. Indeed, it is now clear to Mr. Dennis that he caused his former colleagues to fear for their and their loved one's personal well-being.  He understands this to be true even though he never directly or overtly intended to threaten anyone with physical violence. He is humiliated and shattered to know that he caused this kind of harm to his former colleagues. The true Willie Dennis, the Willie Dennis he has been his entire life, and who he has returned to now, is appalled and deeply ashamed at the fear and harm he has caused these former colleagues.


*18 U.S.C. § 3553(a)(2)(A) – the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

---

[6] See, Exh. C.

13

It is critically important that there be no confusion that Willie Dennis comes before this Court fully recognizing the seriousness of the offenses he has committed and the harm he has caused to his victims. A man raised in a family where respect for both the law of man and God were elevated above all else, Willie thoroughly understands the importance of consequences and punishment in the shaping of good habits, correction of improper behavior and in molding and shaping an individual who can exhibit them. In a very real sense, Willie fully appreciates and has come to internalize the understanding that the punishment he suffers now as a result of his ongoing incarceration was brought on by his own actions.

*18 U.S.C. § 3553(a)(2)(B) – The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Activity*

Beyond the need for the imposed sentence to deter Mr. Dennis himself from reoffending[7], a sentence ending his present incarceration, nevertheless reflects the seriousness of the offense and exhibits to the community that engaging in this type of criminal behavior will be punished by serious consequences. Importantly, in fixing a carefully considered and individualized sentence for Mr. Dennis, based upon his unique history and circumstances as well as the full context and nature of the specific offending and the specific harm caused, the Court demonstrates its exclusive ability to fix the correct and just punishment for each individual that comes before it. In a society where the populous sees that justice for each individual defendant is in fact flowing from the Court after a measured consideration of all relevant circumstances, a respect for the law and for law-abiding behavior grows the strongest, the most quickly, and is most enduring.

---

[7] This concept of "specific deterrence" to Mr. Dennis from reoffending is addressed *infra*, in the discussion of 18 U.S.C. § 3553 (a)(2)(C).

14

*18 U.S.C. § 3553(a)(2)(C) – The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant*

Mr. Dennis and his team, including his numerous continuing supporters from a wide variety of corners including family, friends, business associates, protegees, former colleagues and more[8], all recognize this statutory consideration to be amongst the most critical in the Court's determination of the proper sentence. The question is whether, if released, regardless of conditions imposed upon him, will Willie Dennis continue to offend? The Court having heard the evidence at trial and now, having received the support letters for Mr. Dennis, the psychological evaluation[9], a detailed recitation of his personal and professional history contained herein has all the information and supporting evidence it needs to feel fully confident that Willie Dennis lacks the desire, drive, or ability to ever reoffend.

The present case represents 60-year-old Willie Dennis' only contact with the criminal justice system.  No one could argue that for the first 56-57 years of his life, Willie lived not only a law-abiding and upstanding life but also a notable and laudable one as a successful attorney and celebrated champion for causes that advanced societal progress. His criminal conduct in this case was specific and focused.  It was restricted to conduct he engaged in during and regarding his position and ultimate separation from K.L. Gates.  Indeed, the true question is: *would Willie Dennis continue to engage in the same course of conduct in the future?* The answer is a resounding NO.

The reality is that the Willie Dennis of February 2023 is not the Willie Dennis from 2019 through October 2022. Notably, despite his diagnosis of Willie as someone with compulsive personality disorder, Dr. Berrill does not find that there is any evidence Mr. Dennis is mentally ill

---

[8] See, Exh. A.

[9] As the Court chosen psychiatrist's report attests, "In speaking to Mr. Dennis, there is no evidence to suggest that he is presently obsessed with his former colleagues." *Conclusions and Recommendations p. 15.*

nor does he have an obsession with the victims. Dr. Berrill further notes, Mr. Dennis is reflective concerning his "obsessional/compulsive quality" of his that he could have handled his complaints in a more appropriate manner.  The nexus for Mr. Dennis to be involved in anything related to KL Gates ever again has been permanently severed.

The Willie Dennis of today is a circumspect and remorseful man who has returned to listening to the better angels of his nature and the actual voices of support and love that are all around and eagerly awaiting Willie's safe return.  Willie Dennis has, through his trial, his conviction, his incarceration and unrelenting medical emergencies that now define his daily life, come full circle. He now sees what he has done, the harm he has truly caused to Eric, John and Calvina, and, to himself and aging parents, perhaps most of all. It is galling to Willie to know that all the assistance and support he offered and actually provided these colleagues is forever obscured by the course of harassment he subjected them to. Willie has come to a place of reckoning with himself, ultimately coming to truly appreciate that he did cause real harm to people who did not deserve it and that he brought about his own personal devastation. He has accepted responsibility for all of that harm and is prepared to move forward. He has had to reconcile his life, this aberrant course of behavior he engaged in toward those former colleagues, and decided (with the Court's mercy) how he intends to live in the years he has left free.  He candidly states to counsel, "it is no longer about my goals.  It is only my health and my parent's health that matter anymore." He wants now to be simply service to his loved ones.

Emerging from all of this, is the truth that Willie simply poses zero threat of reoffending. These last four months have brought this man to the bowels of despair and on the brink of death. In his mind in his locked jail cell, he has returned to the person he was and had always been before his own personal breakdown led him astray. Moreover, he will never again reject help or stop

listening and will not allow himself to become isolated and estranged from those who are there for him. Willie recognizes he needs help and support.  He stands ready to accept such support clinically, personally and professionally.  Mr. Dennis has been humbled by all that has taken place over the last several years.   professional and personal.

Beyond Willie's complete evolution and his perspective on his transgressions, which have extinguished any motivation to ever reoffend, all of the external factors also clearly support that same conclusion. There is, rather self-evidently, Willie's increasingly dire medical situation to consider, discussed *infra*. He currently needs, essentially, four (4) surgical procedures as soon as possible, two of which are heart valve procedures (the other two are for much more painful and uncomfortable hernias which force him to walk with a cane and use a supportive device to manage daily life). See generally, Exh. C.  Addressing the heart and hernia procedures and then recovery is of exclusive and paramount importance to Willie. His physical anguish is compounded exponentially when he thinks of the deteriorating condition of his parents and the patchwork of relatives and home aides attempting to provide them the care they need.   This adds to his mental anguish.  It truly pulls on his soul.

Whether it is the all-consuming personal and familial health concerns or undergoing them while being incarcerated in a violent and frightening environment for the first time at 60 years of age, these realities simply leave no space for Willie to reoffend.  He understands in a way he simply could not previously, that his actions brought about the complete devastation and downfall of this once proud African American partner at a prestigious law firm.   Gone is the anger, the striving, the desire to make changes.  Replacing them is a humbled and humiliated human being who wants nothing more than to not die in prison.

There will also, of course, be a host of monitoring conditions that would be in place and of which Mr. Dennis will be specifically aware of and specifically subject to that would immediately identify any impermissible behavior. The conditions[10] the Court may elect to impose along with a sentence of time-served and supervised release would effectively eliminate in even the most remote threat that he would contact anyone from K.L. Gates. Counseling, which the defense would agree should be mandated, will be an essential condition that will permit Mr. Dennis to address any frustrations or problems he encounters and afford him a better opportunity to understand and be educated by the sins of his past. Willie wants counseling, he has sought it out[11] and benefitted from his initial session with a counselor at MDC[12] just as he did from his counseling during pre-trial supervision[13].

*18 U.S.C. § 3553(a)(2)(D) – the need for the sentence imposed to provide the defendant with needed educational of vocational training, medical care, or other correctional treatment in the most effective manner*

If there were any tangible factor that cries out the loudest for Willie Dennis to be released from his current incarceration and sentenced to time-served, it may be his own dire medical conditions. Willie's vulnerability is exacerbated by the inadequacy of his present institution (or any correctional institution of which counsel is aware) to be able to provide the specific type of treatment and care that is actually necessary for someone suffering from the various ailments that Mr. Dennis is presently. As stated above, Mr. Dennis needs four (4) surgical procedures. Two surgeries are necessary to address his blocked arteries and place stents in his heart and his right femoral artery.  Another two surgeries are necessary to alleviate the daily pain, vulnerability and

---

[10] See, *PSR Addendum, Conditions of Release (Mandatory & Specific)*.
[11] See, <u>Exh. D</u>, *Defendant's Request for Meeting with Psychiatrist on January 11, 2023*.
[12] See, <u>Exh. E</u>, *Clinical Encounter, January 27, 2023, Dr. Byrskin*.
[13] See, <u>Exh. E</u>, *Discharge Summary, Dr. Schefstad*.

immobility associated with his inguinal and umbilical hernias. See, Exh. C. His present conditions of confinement and the anxiety that is interwoven in his days is compounded in knowing how highly at risk he is for a cardiac episode. This awareness of how vulnerable he is, and all the factors in his present environment that can hasten or trigger a likely life-threatening episode is, in itself, an additional form of prison beyond his literal one. It is understandably difficult to remove from Willie's consciousness the knowledge that his family has a history of cardiac episodes, or, that his younger sister (much younger than Willie is today) died of precisely such an event just 5 years ago. The fear of dying in prison, wholly and utterly alone and having failed his parents is a surrealistic nightmare that Willie endures now as a real possibility.[14] Willie Dennis cannot get the medical help he needs in prison.  Willie Dennis needs to receive proper medical care, proper recovery time and proper follow up visits that do not depend on the mood of a particular prison official.  He deserves at least that.

In the correctional setting, Mr. Dennis is often unable to have his requests/needs for medical treatment, monitoring or examination satisfied.  Appointments are missed, medications not given, and the need for nearly daily observation impossible.  Indeed, despite his unmistakably obvious heart and hernia conditions, Willie has nevertheless been unable to have his blood pressure checked with any appropriate regularity.[15] For example, his blood pressure was not checked a single time between January 5th and January 24, 2023, when it should be checked at least once per day for someone with Willie's conditions.[16] His nearly fully blocked coronary arteries and his fully

---

[14] At the exact moment counsel is writing this, MDC called and it was reported that Mr. Dennis' blood pressure had dropped to 86 over 66.  He was seen by a doctor at MDC who reported this is very concerning and could lead to a cardiac episode.  There is no one managing Mr. Dennis' various medications nor adjusting the dosages nor types of medication Mr. Dennis is taking so as to avoid an improper mix that could literally kill him.

[15] See, Exh. C, *Medical Records.*

[16] Even more shockingly, the medical staff did not even measure or record Willie's pulse for well over a month (December 19, 2022 – January 24, 2023).  See, Exh. C. This is shocking and astounding for someone with Willie's heart conditions; personal and family history of cardiac illness; his advanced age;  and, with the recent medical emergency that had him Bellevue for nearly one month.

blocked femoral artery in his right leg require blood pressure monitoring. He is, still without the necessary hernia truss that is needed to help make his discomfort somewhat less painful and more manageable while he continues to wait for surgical procedures. See, Exh. C, *Letter of Bellevue Attending Physician of November 18, 2022 (bearing indication of MDC Clinical Director review on 11/22/22) and relate, selected BOP Medical Records.*

For a small (5'6" and 155 pounds) and essentially defenseless man living in a chaotic and turbulent environment, where episodes of violence, violent institutional responses, arbitrary group punishments, lockdowns, tear gas or cold blasting air filtering into his cell amidst all sorts of other spontaneous and alarming events taking place on a frequent basis, each day is its own challenge. In the last month, Mr. Dennis' hernia conditions have worsened measurably. See, Exhs. C & D. He is in substantial pain daily; and is now seeking to move forward with the surgical options that were presented (but discouraged) to him when he was at Bellevue. Discouraged because his heart trouble may prove fatal if there are any issues on the operating table during such procedure(s). However, in somewhat typical institutional fashion, not only are his efforts to communicate with his doctor at MDC fraught by communication delays, snafus, and week-long lockdowns, but even the surgeries that Willie was prepared for but elected to hold off from temporarily in November, are unavailable to him now. The institutional claim is, due to a lack of necessary language in the paperwork from his doctors as Bellevue, indicating to the satisfaction of the MDC clinical staff, that Willie has been "cleared" for the hernia surgeries. As a result, Mr. Dennis must "start over" and be scheduled with the cardiologist again in order to be cleared for the hernia procedures. See, Exh. D, *Email Correspondence between Defendant and MDC Clinical Director.* Given the stark contrast between the realities of trying to manage his conditions in this institutional environment versus being under the care of a cardiac specialist outside of a penal setting, it simply cannot be

overstated how strongly this increasingly urgent factor militates in favor of this Court imposing a noncustodial sentence on Willie Dennis.

From a mental health perspective, Mr. Dennis' needs would be more adequately addressed outside of a correctional facility.  If he were at liberty, able to live at home with his parents and provide them care, attend properly to all of his own medical needs, he could concomitantly attend mental health therapy. Of course, the stressors of not being there for his aging and infirm parents would be removed.  This would alleviate Mr. Dennis' anxiety and guilt of leaving his parents at such a vulnerable time.

Inside the prison, a fear of dying brings an incredible sense of dread at how this once proud member of the legal community may meet his demise.  This dread, the physical pain of his hernias, the anguish and humiliation at his own actions, his inability to be present for his parents and, the harm he has caused to his former colleagues define his mental state while incarcerated. Notably, Willie has responded positively to both of his most recent counsel/therapy experiences. The first, during his pre-trial service monitoring from February to September of 2022 and now, once again, after finally being provided access to a therapist to talk with at MDC Brooklyn. See, Exh. E, *Discharge Summary and Initial Assessment of Dr. Anthony Schefstad*; see also, *BOP Medical Note of Janaury 27, 2023, meeting with Dr. Byrskin.*

Given the findings of Dr. N.G. Berrill in his recent psychological evaluation of Willie, and his finding that Willie suffers from no cognitive deficiencies or disabilities, it would appear that Willie's understanding of his own needs in this area are now finally aligned with the recommendation of professionals.  He does have certain personality disorders that he must remain attentive to and for which he recognizes the benefits of treatment. Clearly, the best formula for Willie to address his needs from a mental health perspective would involve both his release from

21

the suffocating anxiety of his present institutional environment coupled with required continuing mental health treatment.

To briefly address the issue of alcohol and substance abuse, the defense must state that there does not appear to be any basis whatsoever for Willie to be mandated, as a special condition of any supervised release, to a substance abuse program. See *PSR, Addendum, Special Conditions (3rd Paragraph)*. There is simply no indication of any linkage whatsoever between the extremely benign and limited recreational use of marijuana and the occasional glass of wine he candidly reported when interviewed by pre-trial services and probation and the offending conduct in this case. There is no such linkage in reality and given that, the defense would suggest that the determination of the necessity of Willie being required, while on supervised release, to attend any manner of substance abuse treatment program should be left to his actual supervising officer with the input of his mandated mental health treatment provider.

*18 U.S.C. § 3553(a)(3) – The Kinds of Sentences Available*

The Court has before it a substantial range of sentencing options. The Guidelines range as found by the probation department (46-57 months), with recommendation for a custodial sentence at the bottom of that range[17], goes vastly beyond what is sufficient and necessary in this case. The Court has the discretion and authority to sentence Mr. Dennis to a time-served with or without supervised release with conditions or probationary sentence, as appropriate.

*18 U.S.C. § 3553(a)(4) – The Guidelines and Guideline Range*

The offenses of which Mr. Dennis now stands for sentencing have no mandatory minimum incarceratory requirements.  And, by statute and the maximum term of incarceration is 5 years.

---

[17] See, *PSR Addendum, Sentencing Recommendation*.

See, 18 U.S.C. § 2261(b)(5). While the Guidelines remain wholly advisory (and arbitrary) the defense is obliged to point out to the Court, for purposes of sentencing, our disputes with the Guidelines calculation of the probation department in certain respects. The defense concurs that the base level offense for each conviction is 18[18] and that given the three (3) counts, the combined offenses level computes to 21 by the operation of U.S.S.G. § 3D1.4. See, *PSR ¶ 73*. However, it is at that point in the probation department's calculations and those of the defense diverge.

The probation department has determined that Willie should not to be credited with an adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1 based on its stated view that by going to trial and in his statements at his presentencing interview, he does not now qualify for the two-point adjustment. See, *PSR ¶¶ 73, 48-50*.   While the commentary application notes indicate this adjustment is generally not intended to apply to defendants go to trial, such defendants are not automatically barred from receiving this adjustment. U.S.S.G. § 3E.1.1, Note 2. The defense submits that Willie Dennis' case does represent that rare case where despite having gone to trial, Willie has been shaken loose of the compulsive blinders he previously had on concerning the prosecution and indeed the entire situation with K.L. Gates. Moreover, Willie's genuine acceptance of responsibility and manifestation of what is truly profound remorse for his actions is indeed reflected in his statement about his offenses in the presentencing interview with the probation department. As quoted and characterized by his interviewer, Willie a) admitted to having sent threatening and harassing emails to the victims after being told by general counsel to stop doing so;  b) acknowledges that despite not having the specific intent to cause the extent or the type of harm he did to his victims he was obviously wrong about that;  c) understands that the amount and the nature of his communications caused his victims to feel intimidated; and, d) agrees

---

[18] *PSR ¶¶ 53, 59, 65.*

that he did not keep the dialogue on track and he should have done things differently. *PSR ¶¶ 48-49*.

Mr. Dennis' presentencing interview took place a short time after a month long stay at Bellevue hospital.  It was just not long after the jury's verdict and before he had become fully engaged with present counsel. This was a somewhat early point in the evolution of Willie's newfound understanding of his behavior and the harm it caused.  Nevertheless, his statements to the probation department as recounted above represent a sea change in Willie's outlook that had already taken hold within him before sitting with counsel or probation. Willie will be addressing the Court at his sentencing hearing and will be placing this issue directly before the Court.

Additionally, the defense takes issue with the probation department's assessment of a two-level increase in the offense level for each count pursuant to U.S.S.G. § 2A6.2(b)(1).  Notably, this specific offense characteristic applies when it is found at sentencing that a convicted defendant under 18 U.S.C. § 2261A engaged in "*a pattern of activity* involving the stalking, threatening, harassing, or assaulting the same victim." See, U.S.S.G. § 2A6.2(b)(1)(E) (emphasis added). While this increase makes sense for those convicted under 18 U.S.C. § 2261A (1) for specific individual acts, for those defendants like Willie Dennis, convicted under the second statutory subsection for having engaged in a "course of conduct" there would appear to be no discernable difference or additional aspect between the conduct making out the elements of the offense itself and the conduct that satisfies the additional specific offense characteristic.

Were the two-level enhancement to apply here to Mr. Dennis, it would be impossible to conceive of any instance or fact pattern where someone convicted under 18 U.S.C. § 2261A (2) for a "course of conduct" in harassing a victim would not also be subject to this two-level enhancement for a "pattern of activity." Despite the rather straightforward nature of this

observation, there appears to be little, if any, published authority addressing this issue. As a result, the defense will rely upon the Court's careful consideration and determination of this issue. Notably, the government had calculated Willie's sentencing exposure in its "Pimentel Letter" and had not included this two-level enhancement in its calculations. See, Exh. F, *Pimentel Letter*.

Based upon the foregoing discussion concerning Willie's acceptance of responsibility and the defense's belief in the inapplicability of the two-level enhancement, the defense would respectfully submit that the adjusted offense level under the Guidelines should in fact be calculated at 19 with a corresponding sentencing range of 30-37 months' imprisonment.

*18 U.S.C. § 3553(a)(5) – Any Pertinent Policy Statement issued by the Sentencing Commission*

There does not appear to be any applicable policy statement of the Sentencing Commission that is applicable to Mr. Dennis' conviction or case.

*18 U.S.C. § 3553(a)(6) - The Need to Avoid Unwarranted Disparities in Sentencing of Similarly Situated Defendants Convicted of Similar Conduct*

Counsel makes the following observations after reading through the trial transcripts.  The defense submits that the considerations relating 18 U.S.C. § 3353(a)(5) are, amongst several other statutory factors discussed *supra*, particularly important in Willie Dennis' case. Upon initial observation, this offense is not one of the more common offenses prosecuted in federal courts, much less in the Southern District of New York. This fact somewhat limits the ability to talk about how the offense is punished "generally" from a district, circuit or even nation-wide level. Indeed, in 2021 (the last year for which data is currently available) there were 221 stalking/harassment prosecutions in U.S. District Courts nationwide, 22 within the Second Circuit and five (5) in the SDNY. See, Exh. G. *Sentencing Statistics (U.S.S.C.).*  Accordingly, the defense opines that it

makes each case a bit unique and requires a closer look at the actual conduct and harm other individual cyberstalking cases entail, and then comparing them to Willie Dennis' actual conduct and harm caused.

As noted by the probation department in its amended report, Mr. Dennis' conduct constituted the sending a voluminous amount of email and text messages over a sustained period with respect to at least two of the three victims. The most troubling of his messages included asking victims about or referencing their wives and children; calling the victims derogatory and vulgar names; insinuating victims' involvement in infidelity, racist conduct and organizations; quoting biblical passages referring to righteous vengeance and punishment of the wicked; linking articles on mass shooting and police-involved killings of African Americans in messages suggesting the victims' culpability for such events; making general references to damaging the career or reputation of a victim should they remain in the New York area.

Mr. Dennis also engaged in conversations with one of his victims at a professional conference that made his victim uncomfortable and then saw him later in the year at another conference and looked at him in a manner that made the same victim uneasy. The victims described the effect of Willie's conduct upon them as primarily causing emotional distress and anxiety while also, at times, concerns about the potential that their physical well-being were threatened. Tangibly, the effects were manifested by heightened security measures taken by some of the victims . They became more aware of their surroundings  over concerns that they could encounter Mr. Dennis. One of the victims testified as to having left the New York area, at least for a time, and at least in part due to concern over the possibility of Mr. Dennis showing up and harassing her in-person. These emotional harms that translated to actual measures taken in response are real and

significant and neither Willie, nor his defense team, will question the veracity nor the legitimacy of how the victims felt.

The foregoing being said, however, it remains critical in the spirit of proportionality and consistency, to compare the conduct of Willie Dennis, as distressing and alarming as it was, to the actual conduct of others convicted federally of cyberstalking. In a more prototypical example of a cyberstalking prosecution, the Second Circuit Court of Appeals in 2018 upheld the imposition of 37-month sentence for a defendant who had sent over 10,000 emails to a former paramour over a seven-year period.   Such communications included countless specific and detailed threats of violence and death that the defendant was going to inflict upon the victim when he would encounter her. See, *U.S. v. Yilmaz*, 910 F.3d 686 (2018). The Court of Appeals noted the extreme violence that Yilmaz repeatedly and directly threatened his victim with in finding the sentence reasonable and in the finding of the district court that the defendant had stolen "seven years of peace of mind from his victim." *Id* at 689. In an earlier case, indeed cited by the Court in Yilmaz, an 18-month sentence was found reasonable for a defendant who directly engaged in the *course of conduct for some 24 years,* sending thousands of messages, *many of which included overt threats that were delivered to the victim's home by the defendant*. See, *U.S. v. Ull*, 370 F. App'x 225, 225-27 (2d Cir. 2010) (emphasis added).

The overt threats of a defendant such as in *Yilmaz* or even in *Ull* are simply of a different character than even the worst and most vile of what Willie Dennis sent to any of his victims. To the extent that the victims felt threatened by Mr. Dennis' conduct, the only true threats were implied threats that he would a) damage the victim's career or reputation in some manner or b) embarrass the victim by taking some action that would involve some type of contact (violence was never expressly stated or implied in this regard) with the victim's loved ones or would reflect

27

negatively upon the victim in the eyes of colleagues. To the extent that he sent links to new articles about mass shootings to his victims, he never sent messages that constituted him saying "this is what I am going to do to you" but rather, somehow, in his mind, "you are in a way responsible for this and could have done something to prevent it." While receiving an incessant amount of such messages is no doubt annoying and anxiety-inducing, those emotions are nevertheless a far cry from actual well-founded fear for personal safety based on expressly terrorizing threats, that some victims of cyberstalking, like those in *Yilmaz* or *Ull*, endure each day from their perpetrators. It simply would not be accurate to say that Willie Dennis threatened any of his victims with direct physical violence at all, much less extreme violence and death. His harassment, while at times incessant, and clearly distress-inducing and intimidating, simply did not take on the truly sinister character of direct threats of physical violence and the extent of the harm he caused must be evaluated proportionately through this lens.

*18 U.S.C. § 3553(a)(7) – The Need to Provide Restitution to Victims*

According to the probation department, restitution is not applicable to this offense pursuant to 18 U.S.C. § 3663 or under the Guidelines. *PSR ¶ 130-131.* The defense is presently unaware of the government's position on this issue[19] and accordingly is unable to make any further pertinent statements to the Court in this regard.

*Conclusion - Sentencing Recommendation*

> *"I look at myself now, walking with a cane, pain all over my body and a true fear that I will die in prison.  I am a broken old man."*  Willie Dennis.

Willie Dennis will never again put fear into the minds of another human being. Willie Dennis will never practice law again.  Willie Dennis will never again sit in a partner's meeting,

---

[19] The government's October 6, 2022 "Pimentel Letter" to Mr. Dennis did not address the issue of any restitution to the victims. See, <u>Exh. F.</u>

recruit young African American lawyers or live another day without being reminded of how he "damaged (my) father's name and scared my friends and colleagues." Willie Dennis will be lucky to have any days without pain coursing through his body or walking without a cane.

The fall from grace is epic and complete.  Enough humiliation and remorse to last several lifetimes.  A once proud member of the bar, a champion of progressive initiatives, and a brother in arms to female and minority lawyers is no more.  The only fight Willie Dennis has left in him now, is to just be healthy and stay alive.  And, this is a real challenge in his present circumstances.

Was it all worth it?  Of course not. Would Mr. Dennis choose a different path given the chance of turning back time?  Without a doubt.  Each of us is better than the worst of what we have done.  Thirty years of leadership, community involvement, and loving the life of being an attorney are all gone.  The rise and fall of Willie Dennis is as sad as it was abrupt.  No one need fear Willie Dennis ever again.

It is against this backdrop that his time in prison has been sufficient.  The consequences noted above are all part of the punishment for Willie Dennis.   His aging parents, his dire medical circumstances, the loss of his law license and the time already spent in that third world animal cage of a prison at MDC, is enough to persuade this esteemed Court that releasing Willie on federal supervised release is a sufficient sentence.

We pray for this Court's mercy and just punishment in asking for a sentence of ninety days incarceration, essentially a time served plea.

Sincerely yours,

//s//David Jason Cohen//s//
David Jason Cohen
Cohen Forman Barone, LLP.
950 Third Avenue, 11th Floor
New York, NY 10022
david@cfblaw.com