

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 3, 2023

**VIA ECF**

The Honorable Jed S. Rakoff
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

      Re:    *United States v. Willie Dennis*, 20 Cr. 623 (JSR)

Dear Judge Rakoff:

      The Government respectfully submits this letter in advance of sentencing in this matter, currently scheduled for February 10, 2023, at 3:30 p.m., on the defendant's convictions of three counts of cyberstalking following a jury trial. For nearly two years, the defendant, through text messages and other communications, threatened, intimidated, and harassed dozens of his former colleagues, including the three victims in this case. The defendant upended those victims' lives, and has caused them lasting trauma. Despite the overwhelming evidence presented against him at trial, the defendant has shown no remorse for his unlawful conduct. A sentence of four and a half years' imprisonment (which is within the applicable Guidelines range of 46 to 57 months' imprisonment (the "Guidelines Range"), as correctly calculated in the Presentence Investigation Report (the "PSR")), would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**I.    Background**

      **A.  Offense Conduct**

      For decades, the defendant was a high-powered lawyer in New York City, working at major law firms, including at K&L Gates (the "Firm"), where he worked from 2005 until he was terminated in May 2019, based in part on harassing emails he sent to numerous partners at the Firm. Following his termination, the defendant's conduct escalated. He began sending nonstop harassing and threatening messages to his former partners, including to the three victims in this case, Eric Cottle, John Bicks, and Calvina Bostick (the "Victims"). Over the next nearly two years, the defendant's primary focus was to disrupt the lives of his victims. The defendant sent the Victims messages that threatened their professional reputations, their careers, their lives, and their families. The messages were completely one sided and sent at all hours of the day and night, often in rapid succession.

### B. The Charges and Evidence at Trial

On November 19, 2020, a grand jury in this District returned an Indictment charging the defendant with four counts of cyberstalking, in violation of Title 18, United States Code, Section 2261A. On November 19, 2021, the defendant was arrested in the Dominican Republic on the charges in the Indictment. The parties proceeded to trial on three of the four counts in the Indictment.[1] From October 11, 2022, through October 17, 2022, the Court presided over the jury trial; the defendant represented himself at trial *pro se*. At trial, the Government called 10 witnesses, including all three Victims, and introduced dozens of the threatening, harassing messages that the defendant sent the Victims during the relevant time period. The evidence at trial established that over the course of a single night in June 2019, the defendant sent Victim Eric Cottle 23 back-to-back text messages. (GX-518A.) The evidence at trial further established that in 2019 and 2020, the defendant sent the other two Victims, John Bicks and Calvina Bostick, as well as dozens of other partners at the Firm, *thousands* of back-to-back messages. (*See* GX 120-1 through 120-7, 120-9, and 120-10.) On a single day, for example, on September 1, 2020, the defendant sent Ms. Bostick more than 140 text messages and Mr. Bicks nearly 120 text messages. None of the statutory Victims or other victims ever responded to the defendant's messages. That did not stop the defendant.

Specifically, the Government introduced the back-to-back messages the defendant sent Mr. Cottle while they were both physically in the same hotel at a professional conference in June 2019. (GX-518A.) When Mr. Cottle took the stand, he testified that as a result of the defendant's conduct, he not only left the conference early but changed his daily habits, such as how he commuted to work, and how much time he spent outside, because he was fearful of what might happen if the defendant confronted him in person again, as the defendant had done at the conference. (Tr. at 115.)

The Government introduced evidence of the many messages the defendant sent Mr. Bicks, including messages in which the defendant (1) accused Mr. Bicks of being an antisemite—asking him if he had turned on the "ovens" for a Jewish colleague (*e.g.*, GX 105-13, 105-16)—and a racist, asking Mr. Bicks if he and his family were "going out hunting for [n word] this morning" (GX 104-1) or going to a "Klan meeting this weekend" (GX 105-11); (2) told Mr. Bicks over and over again that he was a "bigot" and a "gutter rat piece of shit"; and (3) threatened Mr. Bicks and his family, warning Mr. Bicks, "kids are in." (*See, e.g.*, GX 102-1, 102-2, 102-8, 104-1, 104-2, 105-11, 105-16, 105-65, 104-1, 105-17.) Mr. Bicks testified at trial that as a result of the defendant's messages, Mr. Bicks felt "terrified" for himself and for his family. (Tr. at 429; *see also* Tr. at 509-10.) Mr. Bicks was scared that the defendant was going to go to Mr. Bicks' home and try to interact with members of his family. Mr. Bicks was also deeply disturbed and upset by the fact that the defendant was trying to smear Mr. Bicks's reputation by accusing him of being an antisemite and a racist. (*See* Tr. at 609-10 (Mr. Bicks testifying that he understood the defendant's text messages about Mr. Bicks turning on the ovens and "march[ing] the kids into the ovens," which were sent not only to Mr. Bicks but also to his colleagues, to be a "reference to the ovens that were used as part of the genocide of Jews during the Holocaust as part of World War II"). Mr. Bicks testified about the serious steps he had to

---

[1] The Government, on its own accord, did not proceed on Count Three.

take to protect himself and his family, including upgrading the security system at his home and sleeping with a loaded gun next to his bed. (Tr. at 509-10.)

The Government also introduced messages the defendant sent Ms. Bostick, including numerous messages in which the defendant (1) told Ms. Bostick that she had to "[s]leep with one eye open" and to leave New York or else the defendant would "follow" her (*see, e.g.*, GX 103-14, 103-34, 107-56); (2) called Ms. Bostick unspeakable, degrading names, such as "cottonhead," "gutter rat," "biscuit head," "murderer," "trash" (*see, e.g.*, GX 107-4, 103-11; Tr. at 610-611); and (3) sexually harassed Ms. Bostick (*see, e.g.*, GX 103-13, 103-39). Despite being visibly terrified of the defendant, Ms. Bostick courageously took the stand. She testified how the defendant's conduct made her "fe[el] threatened, vulnerable," "[f]earful," "in danger," "attacked" (Tr. at 587, 589, 608, 612, 621; *see also* Tr. at 605, 622-23), and how she understood that the names the defendant called her were references to slavery and "racial slurs," in an effort to "really strip [Ms. Bostick] of [her] dignity" and to "demean" her (Tr. at 609-10). Ms. Bostick also testified about the steps she had to take to protect herself, including how the Firm had to hire security to guard her at all times while she was still living in Harlem, which was also the defendant's neighborhood. (Tr. at 605.) Ultimately, Ms. Bostick had to move to a completely different state, until she learned that the defendant had left New York; in moving, she had to leave her beloved apartment in Harlem where she had lived for ten years.

The Government also introduced evidence at trial that the defendant was directed to stop messaging partners at the Firm multiple times in 2019. He was told that his messages were harassing and menacing, but he kept sending them anyway. As early as January 2019, the defendant was repeatedly told to stop "sending emails within the firm containing false allegations against and making demands of other partners." (Tr. at 179-181; GX 502.) He was directed to communicate solely through the Firm's General Counsel. But the defendant refused to abide by those warnings or that directive. The Firm had to ban the defendant from using its email network or coming to its offices. And the Firm was ultimately forced to expel the defendant in May 2019, in significant part because he was harassing his coworkers.

Even being expelled from the Firm, however, did not stop the defendant. As the evidence established, the defendant's harassment of the Victims only intensified from that point forward; he started to inundate his former colleagues with thousands of emails and text messages, and even approached some of those former colleagues in person to harass and intimidate them. Specifically, in the summer of 2019, he accosted Mr. Cottle and badgered him with text messages and emails. That same summer, the defendant started texting Ms. Bostick about a violent movie and sending emails about mass murders and violent biblical passages to Mr. Bicks. (Tr. at 584-586; GX 703.) Because of the defendant's unrelenting conduct, in September 2019, the law firm sent the defendant another cease and desist letter. (*See* GX 231A.) The subject of the letter was "Unlawful Harassment – Final Notice." That spelled out in plain language that the messages the defendant had been sending his victims were harassing. It stated that the defendant's communications to members of the Firm contained "menacing" and "threatening" statements, and were "unwelcome and must stop." (*See* GX 231A.) That letter went on to warn the defendant not to communicate at all with anyone at the Firm. But the defendant did not heed that warning. In fact, his conduct only escalated further. For example, the evidence established that as late as November 25, 2020, the defendant tried to send Mr. Cottle the following

threatening message: "Count your blessings. It ain't over yet but looks like God may end up giving you a pass for your misdeeds. If he so does, I would not spin the wheel again if I were you." (GX 109-1.) The defendant also continued to send both Mr. Bicks and Ms. Bostick hundreds upon hundreds of messages long after the defendant received this cease and desist letter.

Finally, the Government established at trial that the sheer number of messages the defendant sent the Victims in 2019 and 2020 were designed to and did cause substantial emotional distress to them. Below are summary slides the Government used at closing, which summarize underlying exhibits that the Government introduced into evidence showing the number of messages the defendant sent Mr. Bicks and Ms. Bostick in September, October, and November 2020. (GX 120-1 through 120-7, 120-9, and 120-10.) As these slides reflect, there were numerous days on which the defendant sent Mr. Bicks and Ms. Bostick nearly hundreds of text messages a day. On just a single day in October 2020, for example, the defendant sent Ms. Bostick approximately 180 text messages.







The defendant did not call any witnesses at trial and chose not to testify himself. Rather, he improperly tried to present his own version of events to the jury, attempting to cast *himself* as a victim, through his jury addresses and through his questioning of witnesses. (*See, e.g.*, Tr. 783 (Defense Summation) ("I was a victim as well").) The defendant was also disruptive throughout trial and regularly flouted the Court's rules and ignored its basic and clear rulings. (*See, e.g.*, Tr. at 285:23-288:22, 568:6-10, 572:8-21.) The Court warned the defendant multiple times that he

may be held in contempt. (*See, e.g.*, Tr. at 288:20, 441:18-442:4.)

On October 17, 2022, the jury deliberated for only a few hours before returning a guilty verdict on all three counts. The Court remanded the defendant, who has been incarcerated at the MDC since then.

For purposes of sentencing, the Court appointed an attorney to represent the defendant and ordered that an independent psychological evaluation of the defendant be conducted. That evaluation was conducted by Dr. Berrill, who issued his report on January 31, 2023. The report confirms what the Court previously found based on its extensive observations and interactions with the defendant both before and during trial—that the defendant does not suffer from any major psychiatric illness and that he is a high-functioning adult. The report also shows that the defendant, despite all the contrary evidence presented at trial, continues to view himself as a victim and to believe that his conduct in this case was not criminal but that he merely got "carried away."

On January 9, 2023, the U.S. Probation Office ("Probation") completed the PSR, which calculated a Guidelines range of 46 to 57 months' imprisonment. The PSR recommends a Guidelines sentence of 46 months' imprisonment.

Mr. Cottle, Mr. Bicks, and Ms. Bostick have each submitted Victim Impact Statements, copies of which the Government will provide to the Court and to defense counsel in advance of sentencing.

## II. A Substantial Sentence Is Warranted In This Case

### A. Applicable Law

As an initial matter, the Sentencing Guidelines provide guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). The Guidelines serve as the "starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007). After that calculation, however, a court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to provide just punishment, adequately deter criminal conduct, promote respect for the law, and protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a).

### B. Discussion

A substantial term of imprisonment is necessary in this case based on the nature, circumstances, and seriousness of the offense, the defendant's history and characteristics, and the need for the sentence imposed to provide just punishment, to afford adequate deterrence to this defendant and others, and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). All these considerations weigh in favor of a significant sentence.

*First*, a significant sentence is necessary to reflect the nature, circumstances, and

seriousness of the offense, and to provide just punishment. As the evidence at trial showed, for nearly two years the defendant engaged in a cyberstalking campaign against the Victims. He knew the Victims, and so he knew exactly how to attack and threaten what they each cared about most. The defendant scared and humiliated Mr. Cottle at a professional conference among their mutual business contacts. The defendant threatened to go after Mr. Bicks' children and family, to come to his home, and to smear his name. The defendant told Ms. Bostick—a young woman partner who had worked her way through the ranks—to stop practicing in New York and to leave the state or else the defendant would follow her. The defendant warned Ms. Bostick to "sleep with one eye open." And he tried to smear her hard-earned reputation and ruin her career. The Victims did not respond to the defendant's messages, and the defendant was informed on numerous occasions that he needed to stop. But the defendant did not stop harassing and threatening his Victims. Rather, he continued to bombard them with messages again and again, at all hours of the day and night. The sheer volume of messages that the defendant sent the Victims reflected his intent to cause them emotional distress, and the content of the messages was equally disturbing and terrifying. The defendant succeeded in upending his Victims' lives. Because of the defendant's unrelenting conduct, the Victims lived in a constant state of worry, anxiety, and fear. Mr. Cottle changed how he commuted to work, Mr. Bicks enhanced security at his family's home and slept with a firearm near his bed, and Ms. Bostick moved to another state. The drastic measures the Victims took reflect the seriousness of the defendant's offense, and Mr. Bicks's and Ms. Bostick's testimony at trial, as well as all three Victims' impact statements, show that they still live in fear of what the defendant might do to them or to others upon his release. The defendant's conduct has also had a lasting impact on the Victims' ability to trust others. A significant sentence in this case is commensurate with the seriousness of the offense and will provide just punishment.

*Second*, the defendant's history and characteristics, and the need to afford adequate deterrence to the defendant and others warrant a significant sentence. The defendant's own conduct shows that he has no regard for anyone but himself. His campaign of harassment against the Victims in this case was unrelenting and long-lasting. Moreover, the evidence at trial showed that Mr. Cottle, Mr. Bicks, and Ms. Bostick were not the defendant's only victims. The defendant sent thousands of messages to other partners at the Firm—messages that, like the messages to the statutory Victims, were intended to—and did—instill fear and intimidate. The defendant's harassment and abuse were far ranging and impacted many peoples' lives and their families' lives. And despite being warned over and over again that his communications were unwanted, abusive, and harassing, the defendant continued to send nonstop messages to his former partners. The warnings had no deterrent effect. The sentence in this case must be sufficient to deter the defendant from ever engaging in this type of conduct again.

Further, the defendant's conduct at trial and since show that he still has no remorse for what he did to the Victims or to anyone else at the Firm. For example, at multiple points in the trial, and again in his post-trial bail motion, the defendant described himself as the victim, when of course the exact opposite is true. The defendant constantly tried to minimize his conduct, arguing that his messages were just part of a garden variety business dispute, and suggested that the Victims did not really suffer emotional distress from his messages, in direct contravention of the Victims' testimony. The defendant's efforts to minimize his conduct continued in his bail application, and in his interview with Dr. Berrill. What is clear is that, to this day, the defendant still does not accept responsibility for his actions or feel remorse for the harm he caused to the

Victims. That lack of remorse, or even recognition that what he did was criminal, underscores the need for specific deterrence. A significant sentence is necessary to deter the defendant from future crimes, and to send a clear message to him and to others that such conduct carries real consequences.

*Third*, for similar reasons, a significant sentence is necessary to protect the public from further crimes by the defendant. Dr. Berrill's finding based on the defendant's own self-serving statements that the defendant does not appear to be "presently obsessed with his former colleagues" should not provide the Court with any comfort. What should inform the Court is the defendant's lack of remorse, which indicates that the defendant has failed to commit to refrain from similar conduct in the future, whether against his prior Victims or new ones. The defendant's conduct at trial is also troubling, and reflects the defendant's disregard for or inability to abide by basic rules. For example, the defendant flouted the Court's rulings on multiple occasions, forcing the Court to threaten him with contempt. As reflected in the victim impact statements, Mr. Bicks, Ms. Bostick, and Mr. Cottle remain fearful of the defendant and his future actions. A significant sentence is necessary to protect them, and the defendant's dozens of other victims, from suffering additional harm at the hands of the defendant. The defendant has shown time and again that, armed with little more than a cellphone, he can inflict intense and lasting damage and trauma and instill fear. The defendant's pattern of conduct shows that he blatantly disregarded multiple warnings in this case and persisted in escalating his harassment and threats against his victims. When his emails were blocked, he simply created and used a different account from which to harass his victims, and his conduct persisted even when he was living overseas. Incapacitation is the surest means to provide protection for the defendant's victims under these circumstances.

***

There are no mitigating factors that outweigh the need for a significant sentence. The defendant did not have a troubled childhood or come from a challenging background. Quite the opposite. As reflected in the PSR, he was raised by two caring parents in a nice "church-going community" in Westbury, New York. (PSR ¶ 88.) He attended some of the top schools in the country, graduating from Choate, Columbia College, and Columbia Law School, and had a successful career as a high-powered lawyer at major law firms in New York. He also has two sons for whom he is supposed to serve as a role model. The defendant had many positive things going for him in his life and yet he decided to risk losing it all by choosing to engage in a compulsive, criminal streak of cyberstalking his former colleagues. Again, the defendant's behavior shows that he has no desire to control his behavior and that he is not motivated to live a law-abiding life based on external, positive elements in his life.

Nor was the defendant's conduct the product of mental illness. In preparation for sentencing, the Court ordered a psychological evaluation of the defendant, which concluded that "Mr. Dennis does not impress as suffering from a major psychiatric illness" and found that the defendant was not characterized as "mentally ill." To the contrary, the evidence and the psychological evaluation show that the defendant acted intentionally and deliberately to perpetrate his extensive campaign of vitriolic harassment against his former colleagues.

While the defendant appears to have various health conditions, his medical records show

that he is receiving appropriate treatment and medication at the MDC. In any event, the defendant's current health does not outweigh all the 3553(a) factors discussed above, which warrant a significant term of imprisonment and supervised release.

### III. Conclusion

For the reasons set forth above, the Government respectfully submits that a sentence of four and a half years' imprisonment, followed by five years' supervised release (based on having terms run consecutively on each count), would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing. In addition, the Government respectfully submits that the defendant should be ordered to comply with the special conditions set forth in the PSR (PSR at 31-32) while on supervised release, including not speaking—whether directly or indirectly—to, or otherwise interacting with, any of the Victims or any current or former employees of the Firm. In addition, the Government submits that it would be appropriate to impose as an additional condition of supervised release that the defendant provide the U.S. Probation Office with his phone number and email address and not be allowed to create or open any new email or phone accounts without first getting the permission of his probation officer.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney
for the Southern District of New York

By: _____
Sarah L. Kushner
Stephanie Simon
Kimberly Ravener
Assistant United State Attorneys
(212) 637-2676/(914) 993-1920/(212) 637-2358

cc: David Cohen, Esq. (by ECF)