23-6194
*United States v. Dennis*

# In the
# United States Court of Appeals
# for the Second Circuit

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __03/21/2025 __

SEPTEMBER TERM 2024

No. 23-6194

UNITED STATES OF AMERICA,
*Appellee,*

v.

WILLIE DENNIS,
*Defendant-Appellant.*[*]

_____

On Appeal from the United States District Court
for the Southern District of New York

_____

ARGUED: SEPTEMBER 26, 2024

DECIDED: MARCH 21, 2025

_____

Before: RAGGI, WESLEY and KAHN, *Circuit Judges.*

_____

_____

[*] The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

CERTIFIED COPY ISSUED ON 03/21/2025

Willie Dennis appeals from an amended judgment entered after a jury trial in the United States District Court for the Southern District of New York (Rakoff, *J.*), convicting him of three counts of cyberstalking in violation of 18 U.S.C. § 2261A(2)(B).  Dennis argues that § 2261A(2)(B) is unconstitutional as applied in his case because the trial evidence was insufficient to prove that his electronic communications constituted "true threats," *i.e.*, threats of physical harm, so as to fall outside the First Amendment's protection of free speech.  In any event, Dennis submits that erroneous jury instructions allowed the jury to find him guilty without proof of true threats, and that he was unduly prejudiced by trial rulings precluding him from eliciting certain evidence and by trial judge statements made in the presence of the jury about his *pro se* status.

The evidence was sufficient to permit a reasonable jury to find true threats as to the electronic communications at issue in Counts One and Four, but insufficient to support such a finding as to the communications at issue in Count Two.  Thus, Dennis's conviction on Count Two must be reversed.  Dennis's failure to raise a true-threat challenge to the jury instructions in the district court limits appellate review to plain error, which is not evident here because, even if there was charging error, it is clear that a properly instructed jury would still have found true threats as to Counts One and Four beyond a reasonable doubt.  Dennis's other arguments are without merit.

AFFIRMED as to Counts One and Four; REVERSED as to Count Two.

————————————

DAVID JASON COHEN, Cohen Forman Barone, LLP, New York, NY, *for Defendant-Appellant*.

STEPHANIE SIMON, Assistant United States Attorney (Sarah L. Kushner and Danielle R. Sassoon, Assistant United States Attorneys, *on the brief*), *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

————————————

REENA RAGGI, *Circuit Judge*:

Defendant Willie Dennis appeals from an amended judgment of conviction entered on March 24, 2023, in the United States District Court for the Southern District of New York (Jed S. Rakoff, *J.)* after a jury trial at which he was found guilty on three counts of cyberstalking committed by sending repeated abusive electronic communications to his former partners at the law firm of K&L Gates LLP ("K&L"). *See* 18 U.S.C. § 2261A(2)(B).[1]  In urging reversal, Dennis—who

---

[1] Section 2261A(2) makes it a crime for any person,

> with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, [to] use[ ] the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—

> (A) places that person in reasonable fear of the death of or serious bodily injury . . .; or

3

appeared *pro se* at trial but who is represented by court-appointed counsel on appeal—argues that § 2261A(2)(B) is unconstitutional as applied to his case because the trial evidence was insufficient to prove that his electronic communications constituted "true threats," *i.e.*, the "serious expression of an intent to commit an act of unlawful violence," *Virginia v. Black*, 538 U.S. 343, 359 (2003), so as to fall outside the sphere of First Amendment protected speech.  In any event, Dennis submits that erroneous jury instructions allowed the jury to find him guilty without proof of true threats.  Further, he argues that he was unduly prejudiced by trial rulings precluding him from eliciting certain evidence and by trial judge statements made in the presence of the jury about Dennis's *pro se* status.

The court concludes that the evidence was sufficient to permit a reasonable jury to find that Dennis conveyed "true threats" in the electronic communications at issue in Counts One and Four (pertaining to John Bicks and Calvina Bostick respectively) but insufficient to support such a finding as to the communications at issue in Count Two (pertaining to Eric Cottle).  Thus, Dennis's conviction on Count Two must be reversed.  Dennis's failure to raise a true-threat challenge to the jury instructions in the district court limits appellate review to plain error, which is not evident here because, even if there was charging error, it is clear that a properly instructed jury would have found true threats as to Counts One and Four beyond a reasonable doubt.  Dennis's other arguments being without merit, we affirm the judgment of conviction on Counts One and Four.[2]

---

> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person . . . .

18 U.S.C. § 2261A(2).

[2] The government moved to dismiss Count Three at trial.  It also resolved ambiguity as to which counts pertained to which victims.  *See* Trial Tr. at 723.

4

# BACKGROUND

## I.    Trial

### A. The Cyberstalking Charges

Each cyberstalking count at issue on this appeal pertains to electronic communications that Dennis sent to a specific K&L partner after Dennis's ouster from the partnership in May 2019.  In these communications, Dennis tells one partner, *inter alia*, that "u r going to get yours," Supp. App'x at 69; that when Dennis was done with him, "you are going to wish you had never met me," *id.* at 11; that Dennis would "chase down" that partner's minor children for the "sins of the father," *id.* at 12; and that "[p]eople will be dying daily for the next year," which the children's school will "watch . . . daily along with me," *id.* at 2.  Dennis told another partner that she was "toast," *id.* at 80; that he was "coming for" her, *id.* at 113; and that she should "[s]leep with one eye open," *id.* at 118.  Rather than detail Dennis's communications further here, we do so later in this opinion when discussing his challenge to the sufficiency of the evidence to prove that what he communicated were, in fact, "true threats" not protected by the First Amendment. *See infra* 17–29.

### B. Precluded Defense Evidence

Dennis did not call any witnesses or testify in his own defense.  Instead, through cross-examination of prosecution witnesses, he attempted to elicit evidence about the unfairness of his ouster from K&L and the circumstances of his prosecution as well as any complaint (or lack of complaint) made by prosecution witnesses to law enforcement authorities about his post-ouster conduct.  Sustaining prosecution objections to Dennis's questions on the first two subjects, the district court instructed the jury that these matters were irrelevant:

The issue in this case, for you, is whether the government has shown beyond a reasonable doubt that the defendant, through emails and text messages, harassed, intimidated, and threatened other persons and caused them substantial emotional distress and that he did that intentionally. Those are the only questions. It doesn't matter whether, for example, the law firm properly terminated or improperly terminated him. It doesn't matter whether there was some . . . police action or not some police action. It is completely irrelevant.

Trial Tr. at 293.

## C. Court Statements About Dennis's *Pro Se* Status

Because Dennis argues that he was prejudiced by certain statements of the trial judge regarding his *pro se* status, we here summarize pertinent background facts. Upon finding Dennis to qualify for court-appointed counsel, the district court assigned an attorney from the Federal Defenders to represent him. Dennis thereafter fired that attorney and moved to represent himself, which the district court allowed after conducting a hearing as required by *Faretta v. California*, 422 U.S. 806, 819 (1975). In doing so, however, the court appointed "shadow counsel" to assist Dennis with his defense. When Dennis later fired that attorney, the court appointed a second shadow counsel. But when Dennis fired that attorney as well, the court declined to appoint a third shadow counsel, and Dennis represented himself at trial without any such assistance.

During an evidentiary dispute, Dennis made statements in front of the jury suggesting that he was compelled to represent himself because he had been assigned ineffective counsel. Specifically, he asserted that he fired assigned counsel because "they were not doing their job," as evidenced by their failure to "submit a single exhibit," "issue[ ] any subpoenas," or make "any requests for discovery." Trial Tr. 437–38. Dennis continued, "[s]o that's why I took over the

6

matter, not that I wanted to, but it wasn't going anywhere.  And I am being faulted . . . So why am I sitting here having to do this myself? . . .  And that's why I'm sitting here at this table right now doing this."  *Id.* at 438.

At that point, the trial judge made the statements here challenged by Dennis:

> Ladies and gentlemen, there's two points.  First of all, what you just heard is inaccurate in the following respect:  Mr. Dennis was given counsel from the Federal Defenders of New York, a very highly regarded group.  He chose to fire them and proceed by himself.  He could have asked for appointment of new counsel, but he said no, I want to represent myself which is his right.

> Then, Judge Schofield, who originally had this case appointed a lawyer, a very highly respected lawyer, to assist him so that even though he was representing himself, he would know the rules of evidence, he would know what things to ask for and so forth.  And he fired that person.

> And then when the case was reassigned to me, he asked me to appoint a third person to be standby counsel, and I did.  And I appointed a lawyer who, as I explained at the time, was exceptionally qualified to be of service to Mr. Dennis.  And Mr. Dennis fired him.  Now, he had a right to do that and proceed all by himself, but he can't complain when he was given all those opportunities.

> Furthermore and this is the most important thing—this is all irrelevant.  Here, we have Mr. Dennis playing witness again and making assertions which are, you may well find, less than the whole story.

> MR. DENNIS: I object.

> THE COURT: I know you object.  Duly noted.

7

But the point is, it's irrelevant.  What's relevant for you [*i.e.*, the jury] is whether or not the government has established by proof beyond a reasonable doubt that emails were intentionally sent to harass or threaten one or more other persons and whether it caused those persons substantial emotional distress.  I have told you that several times now, but let me say it once again.  That's the only issue in this case.  It has nothing to do with whether or not he liked his previous lawyers.  It has nothing to do with his claim that his previous lawyers didn't do what he wanted them to do.  It has nothing to do with the fact that he fired not one, but three lawyers.  None of that is relevant.  So please disregard it.

*Id.* at 438–40.[3]

---

[3] When Dennis attempted to respond to what the court had said "about my decisions in terms of counsel," the trial judge excused the jury, and admonished Dennis as follows:

Mr. Dennis, despite my not only directing you but pleading with you to just ask questions and not make statements to the jury, you just insisted right now on making a lengthy statement that was also, in the Court's view, a total distortion.  But whether it was true or false is irrelevant because it was improper for you to do that.  And you left me with no choice, since these were matters within the knowledge of the Court, to have to instruct the jury both as to what the facts were, but more importantly as to the irrelevancy of their consideration.

You insist on trying to inject into this jury trial matters that are completely irrelevant to the jury's role and duty.  And I have warned you.  Again, as you go down this path, you will in the end leave me no choice but to hold you in contempt.  I really don't want to do that.  But the order of this court is that you only ask questions.

If you have some matter that you think needs to be raised that is different from a question, like making a record, you do that at the sidebar.  You know

### D. Jury Charge

Some days before summations, the district court provided the parties with a draft jury charge that proposed to instruct that "[b]efore the defendant can be convicted on any of the three [cyberstalking] charges in this case, the government must prove each of the following three elements [of § 2261A(2)(B)] beyond a reasonable doubt": (1) that Dennis "sent two or more emails and/or text messages to a given intended victim," (2) "that the defendant did so with the intent to harass or intimidate his alleged victim," and (3) "that this course of conduct caused or would be reasonably expected to cause substantial emotional distress to the alleged victim." Trial Tr. at 710–24, 820. As to the second element, the district court proposed to instruct that "harass means to cause worry or distress," and that "intimidate means to threaten with bodily harm either the victim or the victim's family." *Id.* at 714.

At a charge conference on October 17, 2022, Dennis indicated that he was fine with this proposed language and had "[n]o objection." *Id.* at 716; *see id.* at 714.

The prosecution, however, asked the court to modify its instructions in two respects. First, it asked for the third element to read "cause *or attempted to cause*" substantial emotional distress to the alleged victim. *Id.* at 712 (emphasis added). Finding support in the statutory text for the highlighted language, *see supra* n.1,

---

how to do that. But you do not make factual assertions in front of the jury, whether relevant or irrelevant.

In this case, it was blatantly irrelevant. But even if it was relevant, it's still improper. And I don't seem to be able to get you to abide by that fundamental basic rule of law. And I would hate to have to go down the road of holding you in contempt. But if you leave me no choice, I will.

Trial Tr. at 441–42.

the district court granted this request, Trial Tr. at 722.  Second, the prosecution asked for the proposed instruction as to the "*mens rea*" element to excise "bodily harm" from the definition of "intimidate" and to state, instead, that "intimidate means to threaten or frighten the victim or compel him or her to act."  *Id.* at 710–11.  The district court rejected this request, observing that "to simply say to intimidate means to frighten is too unparticularized for a case like this," and that "there arguably could be First Amendment issues if it were so liberal."  *Id.* at 716.  Noting further that the statute identifies "harass" or "intimidate" as "alternative[ ]" intents, the court proposed to modify its instruction on the second element to require proof that Dennis acted "'with the intent *either* to harass or to intimidate his alleged victim,' making clear that the government doesn't have to show both; they can show one or the other."  *Id.* at 717 (emphasis and internal quotation marks added).  Further, the court stated that,

> I would substitute in the next sentence, "to harass means *to frighten or* to cause worry or distress."  And then I would leave the second sentence as I originally had it.  "To intimidate means to threaten with bodily harm either the victim or the victim's family."  I think that fits the particulars of this case and avoids any First Amendment objection.

*Id.* (emphasis and quotation marks added).

Dennis voiced no objection to the district court's proposal to instruct that he could be convicted for acting with an intent either to harass or to intimidate.  Nor did he object to defining "harass" as the district court originally proposed, *i.e.*, "to cause worry or distress."  Rather, Dennis objected to the district court's proposed addition of the word "frighten" to its original definition of "harass," observing that the addition of that word "means that there's one other way that could lead to a conviction," *id.* at 719, and that he had "gone through this whole trial thinking that the standard was that harass meant to cause worry or distress, not frighten,"

10

*id.* at 720.  To assuage Dennis's concern, the district court agreed to use its originally proposed definition of "harass," *i.e.*, "harass means to cause worry or distress," and to instruct that "intimidate means to frighten or to threaten with bodily harm either the victim or the victim's family."  *Id.* at 722.  Dennis voiced no further objection to the resulting charge.

### E. Summations

#### 1. Prosecution Direct Summation

In urging the jury to convict, the prosecution argued that it carried its burden on the first element of a § 2261A(2)(B) crime—*i.e.*, the transmittal of two or more electronic communications—by proving that Dennis had sent Eric Cottle "23 back-to-back text messages in one night"; had sent John Bicks "4,785 text messages . . . from late 2019 to early 2021"; and had sent "Calvina Bostick . . . over 5,000 messages" in that same two-year period.  *Id.* at 744.

As to the second element, the prosecution argued that it proved that Dennis's intent was to "harass and intimidate" his victims in "multiple ways": "from the sheer number of text messages"; from Dennis's persistence in sending messages even though "not one victim responded to a single" communication; and, "of course, [from] the blatantly disturbing content of the messages themselves."  *Id.* at 752–54.  On this last point, the prosecution focused particularly on the content of communications to Bicks and Bostick.  At the same time, however, the prosecution maintained that the jury did "not have to find that the defendant threatened with harm or frightened his victim" to find Dennis guilty of cyberstalking.  *Id.* at 757.  Anticipating the court's instruction with respect to intent to "harass," the prosecution argued that the jury could find Dennis guilty "even if

11

you find [his] intent in sending the number of types of messages that he did was simply to cause worry or distress in each victim.  That is enough."  *Id.*[4]

The prosecution argued that it carried its burden on the third element, *i.e.*, causing a victim substantial emotional distress, based on testimony from Bicks, Cottle, and Bostick that Dennis's communications had left each of them feeling scared or vulnerable, that Bicks had upgraded his home security and started sleeping with a loaded firearm, and that Bostick temporarily moved out of New York in the face of Dennis's communications.

### 2.  Defense Summation

In his summation, Dennis insisted that he "did not commit" the charged crimes.  *Id.* at 767.  He did not deny sending the thousands of electronic communications in evidence.  Instead, he urged the jury to consider his communications in the context of what he had suffered—"attacks on my family, attacks on my career, . . . attacks on my compensation," *id.* at 768—and to recognize that he "was a victim as well," *id.* at 783.

Dennis devoted most of his summation to attacking the credibility of Bicks, Cottle, and Bostick.  *See, e.g.*, *id.* at 770 ("[T]he witnesses who came before you were not truthful."); *id.* at 793 ("The prosecution's witnesses did not tell the truth.  And you saw it on their faces.").  He particularly challenged the prosecution's reliance on these witnesses' testimony to argue that he had caused substantial emotional distress:  "Everyone can say they're scared, but are they credible persons[?]" *Id.* at 774.  Dennis argued that the witnesses' actions—and their inactions—belied such distress.  *See id.* at 777 (pointing to witnesses' denials of speaking to others about communications and arguing if "you have only talked about it three, four, five

---

[4] This is incorrect for the reasons stated *infra* at 17–21, though Dennis did not object at trial.

times, how scared are you really?"); *id.* at 780–89 (arguing that Bicks's and Bostick's limited contact with police belied their professed fear).

As to the crime's *mens rea* element, Dennis invited the jury to take his measure and, on that basis, to find the prosecution not to have proved that he ever intended to communicate threats of physical harm:

> I ask you to consider the kind of man you see before you. Do you see a man who would ever threaten the physical well-being of or harm anyone in person or by way of text or email? The professional and gentlemanly way I've behaved in my 14-year career at KL Gates, even though I had been [dis]respected, had my clients taken, stolen, my compensation . . . what I did was not a crime. And nothing I did is deserving of prison.

*Id.* at 793.

### 3. Prosecution Rebuttal

In rebuttal, the prosecution urged the jury not to be distracted by Dennis's complaints about his ouster from his law firm, which, in any event, could not excuse the charged cyberstalking crimes. As to those crimes, the prosecution asked the jury to focus on the electronic communications themselves, arguing that "on their face" their content is "intimidating, threatening, and harassing." *Id.* at 798. Moreover, it maintained that "[t]he sheer volume of them is harassing," *id.*, especially when sent "back to back to back," which "would have made anyone fearful," not "know[ing] what the defendant might do," *id.* at 802. The prosecution also reiterated the precautionary steps taken by Bicks, Cottle, and Bostick to assure their own security, arguing that such things are done when people are "scared for their physical safety." *Id.* at 803. Here again, however, the prosecution asserted that proof of such "fear isn't necessary" for conviction, as long as Dennis's actions could be "expected to cause substantial emotional distress." *Id.*

### F.  Judgment

The jury found Dennis guilty on the three counts of cyberstalking pertaining to Bicks, Cottle, and Bostick.  On February 10, 2023, the district court sentenced Dennis to concurrent 24-month terms of imprisonment followed by concurrent three-year terms of supervised release on these three counts, as well as to a total special assessment of $300.[5]  Judgment was entered on February 17, 2023, with a scrivener's error corrected in an amended judgment entered on March 24, 2023. This timely appeal followed.

## DISCUSSION

### I.  As-Applied First Amendment Challenge

### A.  Standard of Review

Acknowledging that § 2261A(2)(B), "by its own terms, regulates conduct, or more precisely, courses of conduct," that do not necessarily implicate speech, Dennis does not contend that, on its face, the statute violates the First Amendment.  Appellant Br. at 8; *see United States v. Yung*, 37 F.4th 70, 81 (3d Cir. 2022) ("join[ing] every other circuit that has evaluated" § 2261A(2)(B) in rejecting facial challenge to law).  Rather, he submits that the statute is unconstitutional as applied in his case because the three counts of conviction charge "courses of conduct defined by the *content*" of his electronic communications.  Appellant Br. at 8 (emphasis in original) (citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (recognizing that "conduct may enjoy First Amendment protection if sufficiently imbued with elements of communication" (internal quotation marks omitted))). Dennis concedes that, even as so applied, the statute raises no constitutional

---

[5] At Dennis's request, the district court had appointed counsel to represent him at sentencing.

14

concern as to "well-defined and narrowly limited classes of speech" falling outside the protections of the First Amendment. *Id.* at 10 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)). Such classes "include, *inter alia*: obscenity, defamation, speech integral to criminal conduct, and . . . true threats." *Id.* (citing *United States v. Alvarez*, 567 U.S. 709, 717 (2012)). Dennis insists that is not his case because the government never contended that his electronic communications were legally obscene, defamatory, or integral to criminal conduct, and the evidence was insufficient as a matter of law to prove a "true threat." *Id.* at 11–12.

In response, the government argues that Dennis failed to raise a First Amendment challenge to his § 2261A(2)(B) prosecution in the district court, which limits this court's review to "plain error." Appellee Br. at 14; *see, e.g., United States v. Feliciano*, 223 F.3d 102, 125 (2d Cir. 2000) (applying plain error review to constitutional challenge first raised on appeal); Fed. R. Crim. P. 52(b). It maintains that Dennis cannot demonstrate plain error here because he can point to "no binding precedent" holding § 2261A(2)(B) unconstitutional as applied to facts akin to those presented in this case. Appellee Br. at 16 (quoting *United States v. Whab*, 255 F.3d 155, 158 (2d Cir. 2004)). Significantly, the government does not contend that § 2261A(2)(B) could constitutionally be applied in Dennis's particular case in the absence of proof of true threats. Rather, it argues that Dennis cannot show First Amendment error—plain or otherwise—because the evidence, in fact, proved that his "course of conduct involved 'true threats.'" *Id.* at 16–18.

The government is correct that Dennis did not explicitly raise any as-applied First Amendment challenge to § 2261A(2)(B) in the district court, much less one premised on the need to prove true threats. Nevertheless, as argued on this appeal by both parties, Dennis's as-applied challenge effectively reduces to a question of evidentiary sufficiency, *i.e.*, was the evidence sufficient to prove "true

threats" falling outside First Amendment protection? *See Counterman v. Colorado*, 600 U.S. 66, 72 (2023) ("True threats of violence, everyone agrees, lie outside the bounds of the First Amendment."); *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021) (holding § 2261A(2)(B) did not violate First Amendment as applied to defendant whose "messages were true threats").  Dennis did raise a general sufficiency challenge in the district court in moving to dismiss the government's case pursuant to Fed. R. Crim. P. 29.  That is enough to warrant *de novo* review of the sufficiency question underlying Dennis's constitutional challenge.  *See United States v. Barrett*, 102 F.4th 60, 71 (2d Cir. 2024) ("[D]efendant need not specify the ground of [a Rule 29] motion in order to preserve a sufficiency claim for appeal." (quoting *United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir. 1983) (second alteration in original))), *cert. granted in part on other grounds*, No. 24-5774, 2025 WL 663692 (U.S. Mar. 3, 2025).

The law governing *de novo* sufficiency review is well established.  A court asks "whether, after viewing the evidence in the light most favorable to the prosecution *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  In answering that question, we consider the evidence in its totality, not in isolation; and we draw all permissible inferences and resolve all issues of credibility in favor of the jury's verdict.  *See United States v. Willis*, 14 F.4th 170, 181 (2d Cir. 2021).  Following those principles here, we conclude that the evidence was sufficient to permit a reasonable jury to find that Dennis communicated, and intended to communicate, true threats to Bicks and Bostick, which caused them severe emotional distress.  At the same time, however, we conclude that the evidence was insufficient to permit a reasonable jury to find that Dennis communicated, and intended to communicate, true threats to Cottle.  We proceed to explain that decision.

### B. Sufficiency of the Evidence To Prove "True Threats"

#### 1. True Threats

We today join several of our sister circuits in recognizing that applying § 2261A(2)(B) to a course of conduct communicating "true threats" avoids any First Amendment concerns that might arise from construing that statute's intent and causation requirements too broadly.  As the Eighth Circuit has observed, if the highlighted words in the statutory phrase "intent to kill, injure, *harass,* or *intimidate," see supra* n.1 (emphasis added), are "construed in their broadest sense," that could "infringe on rights protected by the First Amendment." *United States v. Sryniawski*, 48 F.4th 583, 587 (8th Cir. 2022).  That is because "'harass' can mean simply 'to vex, trouble, or annoy continually or chronically,'" *id.* (quoting *Webster's Third New Int'l Dict. of English Lang. Unab.* 1031 (1993)), while "'[i]ntimidate' can mean 'to make timid or fearful,'" *id.* (quoting *Webster's Third New Int'l Dict. of English Lang. Unab.* 1184 (2002)).  The First Amendment, however, "protects a variety of speech that is intended to trouble or annoy, or to make another timid or fearful."  *Id.* (collecting Supreme Court cases); *see, e.g., Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (holding that First Amendment protects picketers displaying hateful signs at military funeral and observing that "speech cannot be restricted simply because it is upsetting or arouses contempt"); *Hustler Mag. v. Falwell*, 485 U.S. 46, 47–48 (1988) (holding First Amendment protects offensive parody of minister having drunken sex with his mother).  No constitutional concern is present, however, when "the government must identify sufficient evidence for a jury to find that [a defendant] acted with intent to 'harass' or 'intimidate' in a sense that is not protected under the First Amendment," such as by the communication of a "true threat," *United States v. Sryniawski*, 48 F.4th at 587; *see United States v. Yung*, 37 F. 4th at 80 (holding that facial challenge to § 2261A(2)(B) fails when words "harass" and "intimidate" are narrowly construed to mean "true threat or

17

speech integral to a crime"); *United States v. Fleury*, 20 F.4th at 1365 (holding "§ 2261A(2)(B)—as applied to [defendant]—did not violate the First Amendment because his messages were true threats").[6]

Similarly, as to § 2261A(2)(B)'s causation requirement—*i.e.*, that a defendant "engage in a course of conduct that . . . causes, attempts to cause, or would be reasonably expected *to cause substantial emotional distress . . .*," *supra* n.1 (emphasis added)—a broad reading of the highlighted text could run afoul of "a bedrock principle underlying the First Amendment," *i.e.*, that government may not prohibit speech because some persons find its content "offensive or disagreeable." *Virginia v. Black*, 538 U.S. at 358 (citation omitted). This concern is also avoided when the government is required to prove that the course of conduct causing substantial emotional distress implicated speech not protected by the First Amendment, such as true threats. *See United States v. Fleury*, 20 F.4th at 1372 (upholding § 2261A(2)(B) conviction where charge required jury to find "true threat," defined to mean threat "made under circumstances that would place a reasonable person in fear of being kidnapped, killed, or physically injured"); *see generally United States v. Wills*, 346 F.3d 476, 494 (4th Cir. 2003) (identifying no charging error in § 2261A case where jury told government had to prove defendant

---

[6] Because the parties here focus on the government's proof of "true threats," we need not decide in what circumstances other classes of speech falling outside First Amendment protection can support a cyberstalking conviction under § 2261A(2)(B). *See generally United States v. Sryniawski*, 48 F.4th at 588–89 (considering viability of § 2261A(2)(B) case based on theories of defamation, obscenity, and speech integral to criminal conduct); *United States v. Fleury*, 20 F.4th at 1365 (noting, in context of § 2261A(2)(B) case, that content-based restrictions are permitted for speech involving "incitement, obscenity, defamation, speech integral to criminal conduct, fighting words, child pornography, fraud, speech presenting a grave and imminent threat, and true threats").

"committed an act of placing [victim] in reasonable fear of death or serious bodily injury").

For these reasons, then, we conclude that Dennis's as-applied First Amendment challenge to § 2261A(2)(B) necessarily fails if the evidence was sufficient to permit a reasonable jury to find that he communicated, and intended to communicate, "true threats" to each of his three cyberstalking victims.

In considering that question, we start with *Counterman v. Colorado*, wherein the Supreme Court recently reiterated that "[t]rue threats" falling outside the First Amendment's protection of speech "are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" 600 U.S. at 74 (quoting *Virginia v. Black*, 538 U.S. at 359) (alteration in original). Generally, the "existence" of a true threat does not depend on the mental state of a declarant, "but on 'what the statement conveys' to the person on the other end." *Id.* at 74 (quoting *Elonis v. United States*, 575 U.S. 723, 733 (2015)); *see United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (holding true threats may be prohibited "even where the speaker has no intention of carrying them out"). That determination is made objectively, by asking whether an "ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *United States v. Turner*, 720 F.3d at 420 (internal quotation marks omitted, alteration in original). Nevertheless, the "First Amendment still requires proof that the defendant had some subjective understanding of the threatening nature of his statements." *Counterman v. Colorado*, 600 U.S. at 79 (holding that to convict defendant of true threat consistent with First Amendment, government must prove that he acted with at least "reckless" state of mind, *i.e.*, awareness "that others could regard his statements as threatening violence and delivers them anyway") (internal quotation marks omitted). A specific statutory intent requirement can impose a still higher *mens rea* burden. *See id.* at 75 n.3 (holding

that reckless communication of true threat satisfies First Amendment and observing that references to higher *mens rea* requirement in concurring opinion "merely reflect[s] that the [state] statute involved in [*Virginia v. Black*] required a showing of [specific] intent [to intimidate]") (citing *Virginia v. Black*, 538 U.S. 343)). Section 2261A(2)(B) includes a specific intent requirement that, as applied in this case and consistent with the First Amendment, required the government to prove that Dennis sent the electronic communications at issue with the intent to "harass," or "intimidate" his victims by communicating true threats. *See supra* n.1.

A defendant need not precisely or explicitly reference physical harm to communicate a true threat. Our precedent recognizes that a defendant can instill, and intend to instill, in his victim's mind "as clear an apprehension of impending injury by an implied menace as by a literal threat." *United States v. Malik*, 16 F.3d 45, 50 (2d Cir. 1994); *accord United States v. Turner*, 720 F.3d at 425. Thus, a seemingly ambiguous communication is properly considered in context to determine whether it implicitly conveyed a true threat. For example, in *United States v. Malik*, this court ruled that a defendant's proposal to "play" with his victims, when considered with attending scriptural references to physical retribution, could be found to communicate a true threat. 16 F.3d at 50 (quoting letter proposing to "play . . . with you judges from a Koranic and [Torah] perspective that['s] an eye for an eye and life for a life"). Similarly, in *United States v. Turner*, although the defendant never said that *he* would kill particular judges, but only that they "deserve to be killed," we were satisfied that a reasonable jury could find a true threat in light of defendant's online posting of the judges' photographs and addresses and a link drawn between his posted statement that another judge was "worthy of death" and the subsequent murder (by others) of that judge's family members. 720 F.3d at 422. "[P]roof of the effect of the alleged

20

threat upon the addressee is highly relevant" in determining if a communication objectively constitutes a true threat. *United States v. Malik*, 16 F.3d at 49.

### 2. Count One: Bicks

Applying these principles here, we conclude that the evidence was sufficient for a reasonable jury to find that Dennis communicated, and intended to communicate, true threats to Bicks. In the two years after Dennis's ouster from K&L, Dennis sent Bicks thousands of electronic communications. These messages, sometimes numbering as many as a hundred on a single day and often sent late at night, persisted even after attorneys for K&L, in September 2019, sent Dennis a formal cease-and-desist letter characterizing his communications as "menacing" and "threatening." Supp. App'x at 126.[7]

Bicks testified to receiving certain communications from Dennis that explicitly threatened him with harm. For example, in one communication, Dennis told Bicks that "u r going to get yours." *Id.* at 69 (May 30, 2020). In another, Dennis told Bicks "[u] need to pay the most." *Id.* at 99 (Sept. 8, 2020). In yet another, Dennis stated, "[w]hen we are done, you are going to wish you had never met me." *Id.* at 11 (Oct. 26, 2020).

That the harm being threatened was physical was made plain by a communication drawing an analogy to deadly scriptural retribution, *i.e.*, predicting "evildoers" (presumably, such as Bicks) "soon be[ing] cut down like the green herb" (*i.e.*, killed). *Id.* at 145; *see United States v. Malik*, 16 F.3d at 50 (holding Biblical reference to "eye for an eye" indicated that defendant's proposal to "play" with targets was true threat). That conclusion finds further support in Dennis's accompanying references to mass shootings in Ohio and Texas, and a

---

[7] Bicks testified that he could have blocked Dennis's communications, but did not do so, thinking it better to know when and what harm Dennis was contemplating.

communication two days later about a mass stabbing in California, with Dennis emphasizing that this story was not "fake news" and that the victims really "did die," strongly insinuating that Bicks would too.  Supp. App'x at 145, 148; *see United States v. Turner*, 720 F.3d at 422 (holding references to murders committed by others, when viewed in context, supported finding of true threat by defendant).

In now urging otherwise, Dennis submits that his references to mass violence could be understood to urge only that Bicks "take heed" of such events and do what he could to "stop them rather than remain part of a system that gave rise to them."  Appellant Br. at 17.  As for references to Biblical retribution, Dennis argues that he never indicated that he would "inflict any type of physical harm as the agent of the almighty," nor did he ever state what "specific harm" would result in Bicks's "being 'cut down like the green herb.'"  *Id.*  Dennis was, of course, free to make these arguments to the jury—though he did not do so.  But, they are hardly so persuasive as to have required jury acceptance, much less to have precluded a finding of true threat to Bicks.  *See United States v. Turner*, 720 F.3d at 423 (holding that true threat need not explicitly reference physical harm or defendant's intent to inflict such harm himself); *United States v. Malik*, 16 F.3d at 50 (holding that true threat can be implicit as well as literal).  On sufficiency review, we consider only whether the evidence, viewed most favorably to the government and in its totality, was sufficient to allow any reasonable jury to find that what Dennis communicated, and intended to communicate, to Bicks were true threats.  We conclude that it was.

That conclusion is even more apparent when one considers evidence that Dennis directed true threats not only against Bicks's person but also against his minor children.  In one undated communication, Dennis stated that he planned to travel to Bicks's New Jersey home to "water the plants," promising to "find a time when you are not there" and that "your sons can help me."  Supp. App'x at

153–54.  The proposal is so bizarre that, when considered in the context of Dennis's insistence that Bicks needed to pay "the most" for injuring Dennis professionally, *id.* at 99, it could well be understood by a reasonable jury to communicate, and intend to communicate, a physical threat to the children. Indeed, any doubt in that regard was removed by a more chilling communication in September 2020 identifying Bicks's children's school by name and stating that "[d]uring this biblical moment, God is going to test [school name] like it has never been tested before" because "[p]eople will be dying daily for the next year and the [school name] is going to watch it daily along with me."  *Id.* at 2.  That same month, Dennis also copied Bicks on an email threatening to kill another K&L partner or his children.  *Id.* at 88 ("Rob, kill u and or your kids" (Sept. 1, 2020)). Further, moments after sending the above-cited October 26, 2020 communication telling Bicks that he would wish that he "had never met me," Dennis sent another message, stating that he was going to "chase . . . down" Bicks's children for the "sins of the father," emphasizing that "this is real."  *Id.* at 11–12.  Dennis then named two of Bicks's law partners and their children, telling Bicks that he should speak to them or have his children speak to them.  *Id.* at 12.  These communications can only be understood as threatening and intending to threaten physical harm to Bicks's children, regardless of whether Dennis actually intended to carry out that threat.  *See United States v. Turner*, 720 F.3d at 420.

Not surprisingly, Bicks testified that he was "terrified" by Dennis's communications and took several precautionary protective actions.  Trial Tr. at 484.  Specifically, he showed his children Dennis's picture and instructed them to call the police if they ever saw him.  He similarly alerted his parents, who worked at the children's school.  Bicks also upgraded his home security system and kept a loaded firearm by his bed.

Viewing this evidence in its totality we conclude that it was more than sufficient to permit a reasonable jury to find that Dennis engaged in a course of conduct in which he electronically communicated, and intended to communicate, true threats to Bicks, and that these threats caused severe emotional distress.[8]

### 3. Count Four: Bostick

We reach the same conclusion with respect to the thousands of communications that Dennis sent to Bostick, which also sometimes numbered more than a hundred in a single day. Trial Tr. at 636. Many were overtly threatening. *See, e.g.*, Supp. App'x at 118 ("Cally Sleep with one eye open" (Jan. 13, 2020)); *id.* at 40 ("They like to make examples. I am going to make one of u u u" (Aug. 31, 2020)); *id.* at 80 ("Cally U r toast" (Sept. 1, 2020)); *id.* at 113 ("Cally, [w]e are coming for you" (Nov. 25, 2020)). While none of these threats explicitly reference physical harm, they certainly imply it. Telling someone to "[s]leep with one eye open" is the sort of vigilance most necessary when there is a risk of physical harm, and "toast" colloquially suggests that one is doomed. *See United States v. Turner*, 720 F.3d at 422 (explaining that true threat need not be explicit, but can be discerned from context); *see also United States v. Malik*, 16 F.3d at 50 (rejecting "rigid adherence to the literal meanings of a communication without regard to its reasonable connotations derived from its ambience").

That true-threat conclusion is further supported by communications referencing Biblical retribution, *e.g.*, promising to make Bostick a "biblical example" or "biblical symbol," warning that a "storm" was "descending on" her, and stating that "God" had "commanded" Dennis "to call out" Bostick for "actions which are so offensive in his eyes." Supp. App'x at 26 (Aug. 31, 2020);

---

[8] *See infra* 35 (concluding that, for purposes of plain error review of charging error, evidence compelled finding of true threat).

*id.* at 44 (Sept. 1, 2020); *id.* at 49 (Sept. 6, 2020); *id.* at 50 (Oct. 5, 2020).  *See United States v. Malik*, 16 F.3d at 50 (holding that references to Biblical retribution indicated intent to communicate true threat).  That such retribution included violence was implied by other communications repeatedly referencing "death" and "skull."  Trial Tr. at 604.  *See also United States v. Turner*, 720 F.3d at 422 (recognizing that references to death, viewed in context, conveyed true threat).

In still other communications, Dennis racially disparaged Bostick and ordered her to leave New York.  *See, e.g.*, Supp. App'x at 38 ("You need to practice outside of New York.  Because if you stay in New York, I am going to follow u till u answer my questions cotton head.  Easier I think for you to practice elsewhere . . . but your call . . . cotton head . . . ." (Aug. 31, 2020))[9]; *id.* at 40 ("[U] packing yet?" (Aug. 31, 2020)); *id.* at 41 ("U really need to leave the New York office soon . . . like in a week or so or you will become part of the public conversation" (Sept. 1, 2020)).  On September 1, 2020, Dennis also told Bostick he could "hardly wait to get to you."  *Id.* at 81.  The command to leave New York is so extreme that, when considered in light of the totality of the evidence, a reasonable jury could easily have understood it to convey, and intend to convey, a true threat.  Certainly, Bostick so understood Dennis's communications, because they so frightened her that, even though K&L was then providing her with round-the-clock private security at her home, she did move out of state.

Accordingly, we conclude that the totality of the evidence was sufficient for a reasonable jury to find that Dennis engaged in a course of conduct in which he

---

[9] Bostick, who like Dennis, is African American, testified that she understood "cotton head" to be a derogatory racial slur.  Dennis also called Bostick a "biscuit head," "murderer," and "gutter rat," insults that, in context, could reinforce an inference that Dennis was threatening Bostick with physical, and not simply professional, harm.  Supp. App'x at 24, 34, 48; *see United States v. Malik*, 16 F.3d at 50.

electronically communicated, and intended to communicate, true threats to Bostick, causing her severe emotional distress.[10]

### 4. Count Two: Cottle

We cannot reach the same sufficiency conclusion as to Count Two. On that count, the evidence showed that on June 6, 2019, approximately one month after Dennis's ouster from K&L, Cottle coincidentally met Dennis at a professional conference for Black attorneys in New York City. Cottle testified that Dennis was then "pretty angry" about his recent ouster, prompting Cottle to leave the venue and return to his hotel room. Trial Tr. at 91–92.

Between 9:06 p.m. that night and 7:05 a.m. the next morning, Dennis sent Cottle 23 electronic communications. Some were seemly innocuous. *See, e.g.,* Supp. App'x at 140 (proposing "meet[ing] for breakfast" next morning because two men had "[s]o much to catch up on . . . brother," and referencing common acquaintance and another professional organization).[11] Others complained about Dennis's ouster from K&L and accused Cottle of insensitivity to Dennis's situation. *Id.* ("My kids . . . so what . . . right."); *id.* ("Gonna try to pick my pocket and tell me 'I am concerned about u'"); *id. at* 142 ("I cannot wait until the next time i hear you talking about brotherhood with someone."). He also accused Cottle of ingratitude for Dennis's past professional support. *Id.* at 141 ("[I] always knew…hoped some goodwill and introductions would help. Take take take."). Dennis suggested that Cottle viewed his ouster as "[a]ll a big game, right?" and challenged, "OK. Let's play," *id.* at 143, specifically proposing that "[t]oday" the two men "run our views

---

[10] *See infra* 35 (concluding that, for purposes of plain error review of charge, evidence compelled finding of true threat).

[11] Cottle testified that he understood "brother" as a "term of endearment" that "sometimes black men call each other." Trial Tr. at 97.

by independent people at the conference to see if they can identify a path forward." *Id.* at 144. In his final communication, Dennis advised that he was "[h]eading to breakfast shortly," and asked Cottle, "[p]ls save me a seat. I will find you." *Id.* Cottle testified that he found these communications "concern[ing]," and feared that Dennis was threatening to "expose[ ]" him "for something." Trial Tr. at 105.

While these communications may have been distressing, they are not sufficient to show a true threat. Insofar as Dennis proposed to "play" with Cottle, his communication is not akin to that in *United States v. Malik. See* 16 F.3d at 50 (following "play" proposal with explicit reference to physical harm, *i.e.*, "that['s] an eye for an eye and life for a life"). By contrast, Dennis's "play" proposal is followed by a suggestion that "[t]oday" he and Cottle "run our views by independent people at the conference to see if they can identify a path forward." Supp. App'x at 144. This might well have been professionally embarrassing to Cottle and K&L, but a reasonable jury could not have found it physically threatening. Indeed, in contrast to the communications Dennis sent to Bicks and Bostick, none of his communications with Cottle told him that he needed to pay for his part in Dennis's ouster, much less referenced death, skulls, acts of violence or Biblical retribution.

The government argues that a jury could have found that Dennis implicitly threatened Cottle with violence when, in his last communication, Dennis stated, "I will find you." *Id.* We are not persuaded because the communication, read in its entirety, simply proposes meeting for breakfast: "Heading to breakfast shortly. Pls save me a seat. I will find you." *Id.* Insofar as Cottle testified that he thought this might be a threat, he testified that what he understood Dennis to be threatening was professional embarrassment, not physical injury. *See* Trial Tr. at 105 ("I was starting to think now as a threat almost; I'm going to be *exposed for*

*something*") (emphasis added).  This comports with Dennis's communication proposing that the two men "run our views by independent people at the conference to see if they can identify a path forward."  Supp. App'x at 144.  Thus, a reasonable jury might well conclude that Dennis was threatening to embarrass Cottle and K&L professionally at the conference.  But more than a threat of embarrassment is necessary to admit a finding that the communications conveyed, and were intended to convey, the sort of physical harm required for a true threat.  *See Snyder v. Phelps*, 562 U.S. at 458; *Hustler Mag. v. Falwell*, 485 U.S. at 47–48.

To be sure, after these electronic communications, Dennis's conduct escalated.  After finding Cottle at the conference breakfast and taking an empty seat at his table, Dennis proceeded to go into what Cottle described as a "soft rant" about the lack of "due process" attending Dennis's ouster and his loss of health benefits.  Trial Tr. at 107.  Feeling embarrassed and uncomfortable, Cottle left the table, soon after which he saw Dennis photographing him speaking with another conference attendee, which made Cottle feel "threatened."  *Id.* at 109.  When Cottle started to leave the room, Dennis followed him, getting physically "close" and "not backing away" as he angrily complained further about his ouster.  *Id.*  At that point, Cottle testified he grew "concerned" for his safety and checked Dennis's hands to be sure he was not armed with a weapon.  He was not.  *Id.* at 109–10.

The question for the jury, however, was not whether it was objectively reasonable for Cottle, at that moment, to feel physically threatened by Dennis's in-person actions, or whether Dennis intended by those actions then to communicate a true threat to Cottle.  Rather, the sole question for the jury was whether Dennis conveyed, and intended to convey, true threats in the course of his earlier electronic communications to Cottle.  We do not foreclose the possibility that a defendant's subsequent conduct—particularly violent conduct—might shed light on whether he intended an earlier course of communications to convey true

threats.  But Dennis never engaged in any violence toward Cottle at the breakfast.
Nor did he there signal that he had intended his earlier communications to convey
threats of physical harm.[12]

In sum, as to Count Two, the totality of the evidence might have permitted
a reasonable jury to find that, on the night of January 6, 2019, and into the morning
of January 7, Dennis subjected Cottle to a course of unwanted, annoying, and even
distressing electronic communications.  But, even when viewed in the light most
favorable to the prosecution, the evidence was insufficient to permit a reasonable
jury to find that the communications themselves conveyed, and were intended to
convey, true threats to Cottle, so as to fall outside the protection of the First
Amendment.  *See United States v. Sryniawski*, 48 F.4th at 587 (recognizing, in
reversing § 2261A(2)(B) conviction, that First Amendment "Free Speech Clause
protects a variety of speech . . . intended to trouble or annoy, or to make another
timid or fearful").  Accordingly, we reverse Dennis's cyberstalking conviction on
Count Two, and we proceed to consider Dennis's other challenges only as they
pertain to Counts One and Four.

## II.    Jury Instructions

Dennis argues that, even if the evidence was legally sufficient to prove true
threats, various trial errors require vacatur of his conviction.  The first urged error
pertains to jury instructions.

---

[12] After the June 7, 2019 breakfast, Dennis attempted—unsuccessfully—to reach Cottle
through K&L email accounts, Cottle having blocked Dennis from his cell phone.  Cottle
testified that Dennis's actions prompted him to make certain changes in his life: *e.g.*,
avoiding professional events where he might encounter Dennis or attending such events
only when K&L arranged for security, not wearing headphones on his way to work so as
to be more alert to his surroundings, and wearing rubber-soled shoes better to be able to
run from any encounter with Dennis.

Dennis submits that the trial court erred in failing to instruct the jury that it could find him guilty of cyberstalking only if the government proved beyond a reasonable doubt that he electronically communicated true threats. He argues that the trial court specifically erred in defining the words "harass" and "intimidate" as used in § 2261A(2)(B) so expansively as to allow the jury to find him guilty without proof of true threats.

Dennis concedes that he "did not articulate [t]his precise challenge" in the district court. Appellant Br. at 3. Because such a failure "deprives the district court of the opportunity to correct its putative error," we deem the argument forfeited and review only for plain error. *United States v. Weintraub*, 273 F.3d 139, 145–46 (2d Cir. 2001).[13] To demonstrate plain error, Dennis must show (1) error, (2) that was clear and obvious under existing law, *i.e.*, law established at the time of this appeal, (3) that affected his substantial rights, and (4) that cast doubt on the fairness, integrity, or public reputation of judicial proceedings. *See, e.g., United*

---

[13] Here we have no doubt that the district court would have given serious consideration to any request by Dennis for a true-threat charge. The court expressly noted the need to construe § 2261A(2)(B) consistent with the First Amendment in denying the prosecution's motion to delete "physical harm" from its definition of "intimidate." *Supra* 10 (stating that "there arguably could be First Amendment issues" with such a deletion). Far from asking the district court also to include "physical harm" in its definition of "harass," however, Dennis specifically opposed any departure from the court's original proposed instruction, which defined that word to mean simply "to cause worry or distress." *Supra* 10 (opposing addition of phrase "or frighten" to definition because Dennis had "gone through this whole trial thinking that the standard was that harass meant to cause worry or distress"). The government does not argue, and we do not here consider, whether this might constitute a true waiver of the true-threat challenge that Dennis now raises to the charge's definition of harass. *See United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009) (holding "defendant who has invited a challenged charge has waived any right to appellate review" (internal quotation marks omitted)). Rather, we treat the argument as forfeited and proceed to explain why Dennis fails to demonstrate plain error.

*States v. Martinez*, 991 F.3d 347, 351 (2d Cir. 2021); *United States v. Le*, 902 F.3d 104, 109 (2d Cir. 2018).  He cannot carry this burden, particularly at the third step.

For reasons already explained, we conclude that for § 2261A(2)(B) to be constitutionally applied to Dennis's case, the government had to prove that he communicated, and intended to communicate, "true threats."  *See supra* 17–21.  The district court did not clearly instruct the jury to that effect.  In charging as to intent, it instructed that the government had to prove that Dennis transmitted the electronic communications at issue "with the intent either to harass or to intimidate his alleged victim," defining "harass" to mean "to cause worry or distress," and "intimidate" to mean "to frighten or to threaten with bodily harm either the victim or the victim's family."  Trial Tr. at 820.  While the phrase "with bodily harm" in this definition of "intimidate" conveyed the violence inherent in a true threat, to the extent the court used alternative infinitives to define "intimidate," it did not make clear that "with bodily harm" qualified each, *i.e.*, "to frighten . . . with bodily  harm" and "to threaten with bodily harm."[14]  We do not pursue the point because even assuming that the jury would have understood each meaning of "intimidate" to require a true threat of "bodily harm," the same cannot be said for the definition of "harass." Nowhere did the charge instruct the jury that the "worry" or "distress" caused by harassment must pertain to bodily harm.

---

[14] The district court may have so intended because in denying the government's request to delete any reference to "bodily harm" from its definition of "intimidate," the court observed that "to simply say to intimidate means to frighten is too unparticularized for a case like this," and that "there arguably would be First Amendment issues if it were so liberal."  Trial Tr. at 716.  If the court had expressly qualified "frighten" as well as "threaten" with the phrase "with bodily harm" or if it had defined "intimidate" to mean "to frighten by threatening with bodily harm," that would have avoided First Amendment concern.

That was error because, as we earlier noted, the First Amendment protects much speech causing, and intending to cause, worry or distress, even substantial emotional distress. *See supra* 17. Thus, the absence of any true-threat instruction to limit either the word "harass" in § 2261A(2)(B)'s intent element, or the phrase "cause substantial emotional distress" in the statute's causation element, was error. *Cf. United States v. Yung*, 37 F.4th at 80 (rejecting First Amendment challenge to § 2261A(2)(B) conviction where "harass" and "intimidate" were narrowly construed to mean "form of true threats or speech integral to a crime"); *United States v. Fleury*, 20 F.4th at 1372–73 (upholding § 2261A(2)(B) conviction where jury charge required proof of "true threat"); *United States v. Wills*, 346 F.3d at 494 (upholding § 2261A conviction where jury charged that government had to prove defendant placed victim "in reasonable fear of death or serious bodily injury").

But was the error plain? "For an error in a jury instruction to be plain, it must, at a minimum, be clear under current law." *United States v. Hunt*, 82 F.4th 129, 139 (2d Cir. 2023) (internal quotation marks omitted). We typically will not find an error plain under current law where the operative legal question is unsettled by binding precedent from the Supreme Court or this court. *See United States v. Orelien*, 119 F.4th 217, 223 (2d Cir. 2024). As pertinent here, the Supreme Court has clearly ruled that the First Amendment does not permit the government to prohibit or punish speech simply because its content is "offensive or disagreeable." *Virginia v. Black*, 538 U.S. at 358. Our court has similarly ruled. *See, e.g., United States v. Turner*, 720 F.3d at 420 ("We have no doubt that Turner was constitutionally entitled to condemn and disparage the Seventh Circuit."). The Supreme Court and this court have also clearly ruled that "in true-threats cases," the First Amendment requires the government to prove, at a minimum, "that the defendant had some understanding of his statements' threatening character, meaning an understanding that" what he is conveying is that he "means to commit

32

an act of unlawful violence." *Counterman v. Colorado,* 600 U.S. at 73–74; *see United States v. Hunt*, 82 F.4th at 138 (stating that true threat is one defendant made at least recklessly by consciously disregarding risk that communication would be viewed as threatening violence).

But does that precedent clearly establish that when, as in Dennis's case, a course of electronic communications implicating speech is the subject of a § 2261A(2)(B) prosecution, the jury must be instructed that the requisite intent to "harass" or "intimidate" requires proof that the defendant intended to harass or intimidate by conveying "true threats" (or some other class of speech not protected by the First Amendment)?  Does precedent further clearly establish that the jury must be instructed that true threats (or some other class of unprotected speech) must be the cause of any resulting "substantial emotional distress"?  We today adopt the reasoning of our sister circuits in concluding that, as applied in Dennis's case, § 2261A(2)(B) requires proof of a true threat as to both intent and causation for the communication to fall outside First Amendment protections.  *See supra* 17–21.  But neither the Supreme Court nor this court had previously so held in a precedential decision.[15]

_____

[15] The model jury instructions most frequently used in this circuit also had not made this clear, providing no definition for "harass" or "intent" as used in § 2261A(2)'s intent element or for "substantial emotional distress" as used in the statute's causation element. *See* Leonard B. Sand, *et al.*, 3 *Modern Federal Jury Instructions: Criminal*, Instruction 63-24 (2024).  After stating, as to causation, that "the government must prove beyond a reasonable doubt that as a result of [defendant's] course of conduct [a victim] was placed in reasonable fear of . . . death or serious injury or . . . experienced substantial emotional distress," the model charge states that "[t]o establish this element, the government must prove that as a result of the defendant's conduct, an ordinary and reasonable person in

We need not further pursue this second point of plain error review, however, because, even if we were to resolve it in Dennis's favor, that would not secure him relief from judgment. That is because he cannot satisfy the third prong of plain error, which demands that the asserted error have affected substantial rights. To carry that burden, a defendant must show "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer v. United States*, 593 U.S. 503, 507–08 (2021) (internal quotation marks omitted); *see United States v. Dominguez Benitez*, 542 U.S. 74, 83 (2004) (stating that "reasonable probability" is one "sufficient to undermine confidence in the outcome of the proceeding" (internal quotation marks omitted)). A "reasonable probability" requires a showing of more than "any possibility, no matter how unlikely," *United States v. Marcus*, 560 U.S. 258, 263 (2010) (internal quotation marks omitted), but it can be satisfied by less than a preponderance, *see Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (explaining that "reasonable probability" requires lesser showing than "preponderance of evidence").

When applying these principles to a charging error, a court asks if the defendant has shown a reasonable probability that the jury would not have returned the same verdict if it had been correctly instructed. Or, put another way, are we satisfied that a correctly charged jury would "have returned the same verdict beyond a reasonable doubt"? *United States v. Martoma*, 894 F.3d 64, 72 (2d

---

[the victim's] position would have been in fear of death or serious bodily injury . . . ." *Id.* at 63-25. This appears to explain only § 2261A(2)(A)'s requirement for the causation of fear of "death or serious bodily injury" without clearly stating that it applies also to § 2261A(2)(B)'s alternative requirement for the causation of "substantial emotional distress." *Supra* n.1 (quoting subsection in full). But even assuming the model instruction is meant to reach both these statutory sections, the cited supporting authority is not controlling precedent from the Supreme Court or this court, but is from out of circuit. *See* Sand, *supra* 63-25 (citing *United States v. Wills*, 346 F.3d 476 [4th Cir.]).

34

Cir. 2017) (holding that "[e]ven with respect to an instructional error that incorrectly omitted an element of the offense, we will not overturn a conviction if we find that the jury would have returned the same verdict beyond a reasonable doubt" (internal quotation marks omitted)); *Greer v. United States*, 593 U.S. at 517 (Sotomayor, *J., concurring*) (stating that error "did not affect [defendant's] substantial rights" where he "has not shown a reasonable probability that the jury in an error-free trial would reasonably doubt an element erroneously omitted from jury instructions"). We are so satisfied in this case.[16]

We need not here repeat the evidence detailed *supra* in Discussion § I.B.2–3. Upon review of that evidence, however, we conclude not only that it is sufficient to admit a finding that Dennis threatened and intended to threaten Bicks and Bostick with physical harm, but also that it compels such a finding.

Accordingly, we identify no reasonable probability that if the jury had been charged that it needed to find that Dennis communicated, and intended to

---

[16] As we have previously observed, "[o]ur Circuit has used different verbal formulations to describe the standard for evaluating whether a defendant's substantial rights have been affected by an erroneous jury instruction under plain-error review." *United States v. Eldridge*, 2 F.4th 27, 39 n.16 (2d Cir. 2021), *cert. granted, judgment vacated on other grounds*, 142 S. Ct. 2863 (2022). "[W]e have applied [a] reasonable probability phrasing on several occasions when evaluating instructional errors." *Id.* "But we have also evaluated such [ ] errors under the third prong of plain-error review by asking whether the jury would have returned the same verdict beyond a reasonable doubt," and whether "the erroneous jury instruction was harmless beyond a reasonable doubt." *Id.* (internal quotation marks omitted). As we noted in *United States v. Eldridge*, there is no "appreciable difference" between these formulations. *Id.* Nevertheless, because plain error and harmless error are distinct doctrines, *see Greer v. United States*, 593 U.S. at 517 (Sotomayor, *J., concurring*), in here considering whether the identified charging error affected Dennis's substantial rights, we ask whether there is a reasonable probability that a correctly charged jury would not have returned the same guilty verdict under the proper standard, *i.e.*, proof beyond a reasonable doubt.

communicate, "true threats" to Bicks and Bostick, it would not have so found. In sum, we conclude that a properly charged jury would have returned verdicts of guilty on Counts One and Four beyond a reasonable doubt. Dennis's jury instruction challenge therefore fails at the third step of plain error review. [17]

## III.   Evidentiary Challenges

Dennis submits that he was denied both a fair trial and his right to confront witnesses by district court rulings precluding as irrelevant inquiry into (1) state prosecutors' decision not to charge him with any New York crime relating to his actions toward Bicks and Bostick, and (2) visits to his home by New York police officers investigating such actions. We are not persuaded.

"We review evidentiary rulings by the district court under a deferential abuse of discretion standard, reversing only those determinations that are manifestly erroneous." *United States v. Torres*, 124 F.4th 84, 99 (2d Cir. 2024). When evidentiary rulings implicate the right of confrontation, *see* U.S. Const. amend. VI, we are mindful that a criminal defendant must "be afforded a meaningful opportunity to cross-examine witnesses against him." *Alvarez v. Ercole*, 763 F.3d 223, 230 (2d Cir. 2014). Nevertheless, a trial court retains "broad discretion . . . to impose reasonable limits" on cross examination as, for example, when such examination is "only marginally relevant," *id.* (internal quotation marks omitted), and, certainly, when it is completely irrelevant, *see* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

The district court here acted well within its discretion in excluding evidence as to any decision by prosecutors not to file charges against Dennis for the conduct

---

[17] Because we resolve the claim on the third prong, we need not address the fourth prong of plain error review.

at issue in this federal case.  Preliminarily, we note that neither in the district court
nor in this court has Dennis identified what admissible evidence he might have
adduced to show such a decision.  Even had he done so, a decision by local
authorities not to file charges under state law is irrelevant to the singular question
of whether federal prosecutors offered sufficient evidence at trial to prove Dennis
guilty on charged violations of United States law.  *Cf. United States v. Sewell*, 252
F.3d 647, 651 (2d Cir. 2001) (rejecting double jeopardy challenges where federal
prosecution followed state acquittal for same events because sovereigns distinct).
Even when a single sovereign is involved, a "prior judgment of acquittal" on
related charges is "not usually admissible to rebut inferences that may be drawn
from the evidence admitted" in a subsequent prosecution.  *United States v. Viserto*,
596 F.2d 531, 537 (2d Cir. 1978).  The conclusion applies with even more force here,
where there is no prior acquittal but, at best, only a failure to prosecute by local
authorities followed by a federal conviction.  *See generally United States v. Fell*, 571
F.3d 264, 281–82 (2d Cir. 2009) (Raggi, *J.,* with Jacobs, *C.J.,* Cabranes, Parker,
Wesley, and Livingston, *JJ.) (*concurring in denial of rehearing *en banc*) (observing
that "[c]ountless" reasons can inform decision not to prosecute, some of which do
not mitigate defendant's guilt, such that inquiries into such decision are
"invariably more prejudicial and confusing than probative" and, thus, properly
excluded at subsequent trial).

        As for evidence that New York police officers visited his home, Dennis
argues that he should have been allowed to question Bicks and Bostick about their
"awareness" of such visits to contextualize his electronic communications and,
thereby, to show that, in the communications at issue, he was simply blaming
these victims for mistreatment he had experienced, not threatening them with
physical harm.  Appellant Br. at 27.  The argument fails to persuade.

The district court permitted Dennis to question Bicks and Bostick about their own contact with police authorities and their knowledge of such contact by other K&L employees. The court recognized such inquiry as relevant to Dennis's argument that Bicks, Bostick, and K&L "weren't really so upset" by his communications and "the jury should not take literally how scared they were purportedly." Trial Tr. at 564–65. But the district court did not allow examination on what police authorities did *after* such contact, explaining that was "irrelevant to whether or not [Dennis] intentionally sent harassing messages" to Bicks and Bostick. Trial Tr. at 564. This ruling was well within the district court's discretion. *See United States v. Monsalvatge*, 850 F.3d 483, 493 (2d Cir. 2017) (recognizing "district court's superior position to assess relevancy"); *cf. United States v. Gole*, 158 F.3d 166, 168 (2d Cir. 1998) (noting that "common sense commands us to reject . . . defense" that entitlement to assets obtained by fraud was defense to fraud charge).

Because none of the district court's evidentiary rulings exceeded its discretion or deprived Dennis of his right to elicit admissible evidence on cross-examination, we reject them as without merit.

## IV. District Court Comments

Dennis submits that he was denied a fair trial by court statements telling the jury how Dennis came to appear *pro se* and effectively accusing him of misrepresenting facts pertinent thereto. *See supra* 7–8 (reproducing challenged statements). In evaluating that claim, we do not ask whether the district judge might better have phrased his remarks or have left some unsaid. *See United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985). A defendant is entitled to a fair trial, not necessarily a perfect one. *See United States v. Amiel*, 95 F.3d 135, 146 (2d Cir. 1996). Thus, the focus of our inquiry is on whether the challenged remarks "so impressed" the jury "with the judge's partiality to the prosecution that it became

38

a factor in determining the defendant's guilt, or whether it appear[ed] clear to the
jury that the court believe[d] the accused is guilty." *Id.* (alterations in original).
That is not this case.

First, Dennis provoked the statements he now challenges. Before trial, the
district judge explicitly told him that he would not be permitted to raise the matter
of his *pro se* status before the jury and that, if he tried to do so, the court would
itself explain the relevant circumstances. Dennis not only raised the point, but also
suggested to the jury—without taking the stand or subjecting himself to cross-
examination—that his court-appointed attorneys had been deficient, had failed to
do "their job," and had given him no choice but to fire them and "do this myself."
Trial Tr. at 438 (quoted in full *supra* 6–7). By thus disobeying the court's pre-trial
directive and appealing for jury sympathy by incorrectly insinuating that the court
had failed in its duty to provide him with competent counsel, Dennis provoked
the court's response, a fact that may be considered in assessing prejudice. *See
United States v. Pisani*, 773 F.2d at 404 (stating that counsel's persistence in doing
things court told him to avoid was factor "that properly may be taken into account
to determine whether defendant was prejudiced" by court's statements); *United
States v. Robinson*, 635 F.2d 981, 985 (2d Cir. 1980) (upholding conviction where
district court's challenged statements before jury had been provoked by defense
counsel's improper remarks, obviously objectionable questions, and disobedience
of court rulings).[18]

Of course, provocation does not necessarily excuse all comments, however
prejudicial. That brings us to a second point: the district judge's challenged

---

[18] The trial record shows that Dennis repeatedly failed to comply with any number of
court rulings and directives in the course of his trial. The district court showed great
patience and frequently took time to explain the bases for its rulings.

comments were relatively brief, which reduced the likelihood of prejudice. *See United States v. Pisani*, 773 F.2d at 404 (rejecting prejudice claims because, *inter alia*, "as serious as some of the [judge's comments] are, they occupy but a very small part of this extensive trial record"); *United States v. Robinson*, 635 F.2d at 984 (same).

Third, and most importantly, the district judge effectively cured any possible prejudice by telling the jury that the circumstances of Dennis's *pro se* status were irrelevant to their deliberations, which should focus only on whether the government carried its burden to prove that Dennis had intentionally harassed or threatened his victims, thereby causing them substantial emotional distress:

> But the point is, [how Dennis comes to be representing himself *pro se* is] irrelevant. What's relevant for you is whether or not the government has established by proof beyond a reasonable doubt that emails were intentionally sent to harass or threaten one or more other persons and whether it caused those persons substantial emotional distress. I have told you that several times now, but let me say it once again. That's the only issue in this case. It has nothing to do with whether or not [Dennis] liked his previous lawyers. It has nothing to do with his claim that his previous lawyers didn't do what he wanted them to do. It has nothing to do with the fact that he fired not one, but three lawyers. None of that is relevant. So please disregard it.

Trial Tr. at 439–40. Even if the district judge might better have avoided emphasizing that Dennis "fired not one, but three lawyers," we identify no prejudice because the court immediately followed that statement with one repeating that "[n]one of that is relevant" and instructing the jury to "disregard it." *Id.* at 440.

That conclusion is further reinforced by the district judge's later instruction that the jury was "to reach a verdict based solely and wholly on the evidence," that nothing the judge had said was "evidence," and that the jury should "expressly

. . . understand that I have no opinion as to the verdict you should render in this case." *Id.* at 810, 812, 824.

On this record, we conclude that the district judge's challenged remarks did not prejudice Dennis or otherwise deny him a fair trial.

## CONCLUSION

To summarize, we conclude as follows:

1. Title 18 U.S.C. § 2261A(2)(B) was not unconstitutionally applied in this case to convict Dennis on Counts One and Four because the evidence as to those counts was sufficient to prove that Dennis conveyed, and intended to convey, "true threats" to his victims, which fall outside the protection of the First Amendment. Insofar as the evidence was not sufficient to prove "true threats" as to Count Two, Dennis's conviction on that count must be reversed.

2. While the district court's charge to the jury did not clearly instruct as to the need to find "true threats," Dennis cannot show plain error because the evidence of "true threats" on Counts One and Four was so compelling that there is no reasonable probability that a properly charged jury would not have returned the same verdict of guilty beyond a reasonable doubt on those counts.

3. There is no merit to Dennis's arguments that evidentiary rulings by the district court denied him a fair trial or the right to confront witnesses against him.

4. There is no merit to Dennis's argument that certain statements by the district court to the jury about his *pro se* status denied him a fair trial.

41

Accordingly, we **AFFIRM** the March 24, 2023 amended judgment of conviction as to Counts One and Four, and we **REVERSE** as to Count Two.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

42